UNITED STATES
COURT OF FEDERAL CLAIMS

---

```
CENCAST SERVICES L.P.,      )
                            )
          Plaintiff,        )
                            )
v.                          )  Docket No. 02-1916C
                            )
UNITED STATES,              )
                            )
          Defendant.        )
```

<u>Live Tape</u>

(The following transcript was transcribed from a digital recording provided by the United States Court of Federal Claims to Heritage Reporting Corporation on April 20, 2009.)

Pages:    1 through 35

Place:    Washington, D.C.

Date:     April 17, 2009

---

**HERITAGE REPORTING CORPORATION**
*Official Reporters*
1220 L Street, N.W., Suite 600
Washington, D.C.  20005-4018
(202) 628-4888
contracts@hrccourtreporters.com

1

IN   THE   UNITED   STATES   COURT   OF   FEDERAL   CLAIMS

CENCAST SERVICES L.P.,        )
                             )
          Plaintiff,          )
                             )
v.                            )  Docket No. 02-1916C
                             )
UNITED STATES,                )
                             )
          Defendant.          )

                              Friday,
                              April 17, 2009

                         Live Tape

          (The following transcript was transcribed from a

digital recording provided by the United States Court of

Federal Claims to Heritage Reporting Corporation on

April 20, 2009.)

          BEFORE:   HONORABLE GEORGE W. MILLER
                    Judge

          APPEARANCES:

          For the Plaintiff:

          KENT A. YALOWITZ, Esquire
          AMALIA JORNS, Esquire
          Arnold & Porter, LLP
          399 Park Avenue
          New York, New York   10022
          (212) 715-1113

          For the Defendant:

          FREDERICK CROMBIE, Esquire
          U.S. Department of Justice
          Tax Division
          P.O. Box 26
          Washington, D.C.   20044
          (202) 616-3366

1                   P R O C E E D I N G S

2                                           (9:56 a.m.)

3          THE COURT:  We are here for a status conference in

4    the case of Cencast Services et al., Plaintiffs, v. The

5    United States, Docket No. 02-1916T and consolidated cases.

6    The Court would request that counsel identify themselves for

7    the record, please.

8          MR. YALOWITZ:  Good morning, Your Honor.  I'm Kent

9    Yalowitz from Arnold & Porter.  I represent Plaintiffs.

10   With me is my colleague, Amalia Jorns.  And also present in

11   the courtroom is Mr. Kerry Elliot.  Mr. Elliot is the

12   statistician working this who's been giving us some guidance

13   on sampling questions and things like that.

14         THE COURT:  Great.  Welcome all.

15         MR. CROMBIE:  Frederick Crombie for the Defendant.

16   I just recently filed a notice of appearance.

17         THE COURT:  Yes, Mr. Crombie.  Thank you.  It's a

18   pleasure to have you.

19         The Court has reviewed the quite thorough status

20   report that the parties have filed and I think it might be

21   useful at the outset for the parties to let the Court know

22   whether there is any updating information since the status

23   report was filed on March 23rd that the Court should be

24   aware of.  Mr. Yalowitz?

25         MR. YALOWITZ:  So, since the 23rd of March, Your

1  Honor -- we have microphones in the courtroom?

2          THE COURT:  We do.  They're very small, but

3  they're powerful.  And if one rattles his papers near the

4  microphone, it can obscure what someone might be trying to

5  say, so we'll try to avoid that.

6          MR. YALOWITZ:  My paper was --

7          THE COURT:  It should be no problem.

8          MR. YALOWITZ:  There have been two minor

9  developments that I suppose should be noted.  The first is

10 we received the Defendant's response to the request for an

11 admission on the per diem and box rental question and they

12 denied the request.  And so it appears that that remains a

13 live issue, although I'm not 100 percent sure.  I'll let Mr.

14 Crombie speak to that issue.

15          And in addition, we spoke with Mr. Crombie about

16 the SUI credit issues, State Unemployment Insurance credit

17 issues, and the Department of Justice has a position in

18 review.  And so he expects to be able to get with us in the

19 near future, and again I'll let him speak to the particulars

20 of it.  We don't have a position, but we expect one soon.

21 And if the position is not to agree with us, if we can't

22 reach agreement, we're prepared very shortly thereafter to

23 file our summary judgment on that issue.

24          THE COURT:  But as far as the Plaintiff knows, the

25 Defendant has everything that he needs or that it needs in

4

1   order to respond on the SUI credit point?

2            MR. YALOWITZ:  They have not asked us for anything

3   further, and if they do, of course, we would talk about it

4   with them and consider any reasonable request.

5            THE COURT:  You also mentioned the response to the

6   request for admission.  Refresh my recollection as to what

7   issue the request for admission was directed.

8            MR. YALOWITZ:  The per diem and box rental issue.

9   I had hoped that in part because of the small dollar amount

10  and too in part because of the inconsistency with later

11  years that issue could be dropped out of the case.  But it

12  doesn't seem to have been quite yet.

13           THE COURT:  Did you say box rental?

14           MR. YALOWITZ:  Right.

15           THE COURT:  As in cardboard box?

16           MR. YALOWITZ:  Right.  I think toolbox.

17           THE COURT:  Toolbox.

18           MR. YALOWITZ:  In the years at issue, the IRS

19  ultimately changed the rules starting in 2002.  But in the

20  years at issue in this case, an employee or a worker could

21  receive wages and then side-by-side with the wages the

22  person might have a contract for rental of tools.  They call

23  them box rentals.  They might be carpentry tools or makeup

24  kits or something that they would carry to the jobsite and

25  they would be issued a Form 1099 along side their W-2.

5

1      And so, in the audit in the 1991 and '92 years,

2  the Service reclassified those payments under Forms 1099,

3  reclassified them as taxes and wages.  The Service did not

4  do the same reclassification for the years 1993 through

5  1996.  And so we've always assumed that it was based on a

6  misunderstanding of the data layout and computer systems,

7  which changed as of 1993.  But the Service and the United

8  States haven't agreed with us as of yet on that, so we seem

9  to still have a live issue on that, although in comparison

10  to the rest of the case, the dollars on this issue are not

11  very significant.

12      THE COURT:  Before we go into the contents of the

13  status report itself, if, Mr. Yalowitz, your updating

14  presentation has concluded --

15      MR. YALOWITZ:  Yes, sir.

16      THE COURT:  -- why don't we hear from Mr. Crombie.

17      MR. YALOWITZ:  Very good.  Thank you, Your Honor.

18      MR. CROMBIE:  Your Honor, it's a pretty good

19  summary by Mr. Yalowitz.  Those really are the two

20  developments.  We did provide them with our response to the

21  request for admission.  We also did have a conference call

22  where they sort of walked us through in greater detail than

23  they did during the last status conference their theory on

24  the SUI credits.  As he said, that position is under review

25  and I expect to be able to get them a letter by Wednesday.

1           THE COURT:  By Wednesday of next week?

2           MR. CROMBIE:  By Wednesday, yes.  That's certainly

3     my hope, that states out our legal position on that issue.

4     My hope is to also provide an update on our position as far

5     as the accountable plan issue on Wednesday as well.  It

6     might be in a separate letter just for the sake of clarity.

7     That's really as far as I have in an update.

8           THE COURT:  Okay.  Let me ask you to stay where

9     you are.  Going now to the joint status report, let's maybe

10    jump to the end and talk about the protective order for just

11    a minute.  I notice that, Mr. Crombie, you asserted that the

12    entry of that protective order would create logistical

13    problems, including the necessity to reorganize files.  That

14    naturally piqued my curiosity and I was curious to know how

15    that came about.

16          MR. CROMBIE:  One of the provisions in the

17    protective order is that any information that's been deemed

18    confidential by the producing party would have to be kept in

19    separate files under lock and key, and to the extent that

20    it's electronic information, it would have to be encrypted

21    with a password.  And if the password is printed out, the

22    password has to be kept in a separate file under lock and

23    key.

24          As I'm sure Your Honor is well aware, the building

25    in which our section operates is under 24-hour surveillance

7

1    by U.S. Marshals.  It's certainly a 100 percent ID check

2    coming in and out, after hours.  Even section attorneys have

3    to sign their name to get in and out of the building.  The

4    information that's the subject of the protective order is

5    already protected by 26 U.S.C. § 6103.

6              THE COURT:  That's true for some of the

7    information, isn't it?

8              MR. CROMBIE:  Right.

9              THE COURT:  I mean, the protective order in scope

10   it seems to me is a little bit broader than the Privacy Act

11   type information and the return type information.

12             MR. CROMBIE:  Certainly, it's the taxpayer

13   information that's protected by 6103.  To the extent they

14   would deem any nontaxpayer information confidential, that

15   wouldn't be protected by 6103.

16             THE COURT:  Is there any reason why counsel

17   couldn't by further discussion perhaps ameliorate the

18   concern about putting things in locked files and such?  And

19   if that were able to be done, would that lead us to perhaps

20   an agreed order here?

21             MR. CROMBIE:  I don't know that it would.  We've

22   had actually several discussions on this protective order,

23   but it's a subject that we can't seem to come to agreement

24   on.  I will say that it's simply the practice of at least

25   our section within the Tax Division that we do not enter

1    into protective orders because the information the parties

2    want to protect is already protected by statute and backed

3    by criminal and civil penalties.

4         THE COURT:  That's the information that you are

5    required by statute to protect?

6         MR. CROMBIE:  That's the taxpayer information.

7    That's right.

8         THE COURT:  As I understand what Plaintiffs are

9    saying is there perhaps is other information outside of

10   those categories in the presence, for example, of third

11   parties who would find it easier perhaps to produce that

12   material in discovery if they knew that it was going to be

13   subject to the really quite traditional sort of protective

14   order, which the Court, although it may not regularly enter

15   such orders in tax cases, obviously in bid protests and such

16   routinely enters such orders -- indeed, one of our forms is

17   a form of protective order -- and query whether that

18   couldn't be adapted to this situation.

19        MR. CROMBIE:  Right.  My response to that would

20   just simply be that that's not a problem that our section

21   has ever seen.  At least to my knowledge, I've certainly

22   never seen a circumstance where an attorney in our section

23   has had problems obtaining third party discovery because

24   there isn't a protective order entered in the case.

25        To the extent that arose as a problem in this

1   case, it's something that I think could be addressed on a

2   case-by-case basis.  And that's something that we've

3   indicated to Plaintiffs, that while we're not prepared to

4   enter into a protective order, we are prepared to work with

5   them, protecting a wider swath of information on a case-by-

6   case basis.

7         I know one of the issues that came up was

8   associating names with salaries and addresses and filing

9   that all publicly with the Court, and that was again

10   something that while protection requested by the Plaintiffs

11   might be outside of § 6103, it is certainly something that

12   we indicated we would be willing to work with them on but on

13   a case-by-case basis.

14         THE COURT:  I guess my suggestion to the parties

15   would be that they continue to discuss the question, but at

16   some point, if agreement is not reached, I would anticipate

17   that the Plaintiffs would file a motion for a protective

18   order and then the Court would have to decide what to do

19   about that.

20         Mr. Yalowitz, do you have anything to add on the

21   protective order issue?

22         MR. YALOWITZ:  No.  I think Your Honor summed it

23   up well.  We have practical concerns.  There are large

24   business entities who are likely to be subject to discovery

25   in this case I hope on a very limited basis, but nonetheless

1    discovery and having a very traditional protective order to

2    protect whatever information they provide so that it's not

3    the subject of review by competitors or anything like that,

4    would be extremely helpful and having it in advance would be

5    extremely helpful so I don't have to go around negotiating

6    with six or eight or 10 different people.  We'd say, look,

7    this is the Court's order and it should protect you.

8           And the second thing, one that really concerns me

9    is we have a very large database of individuals' names,

10   addresses, social security numbers, financial information.

11   It's not a return.  It's not return information.  It's the

12   Plaintiff's information.  We're ready, willing and able to

13   share that database with the Defendant.

14          But, you know, even employed by the United States

15   Government, there are from time to time people who fall to

16   temptation.  This is information, some of it very sensitive,

17   about people who are in the public eye, celebrities.

18   There's a market for this kind of material.  There have been

19   problems, as I'm sure Your Honor remembers, with celebrities

20   who are subject to stalking and things like this.  And as a

21   protective measure, to make sure that that data is encrypted

22   and protected in a database that has an extra measure of

23   security is very important to us.

24          THE COURT:  How onerous a process is the

25   encrypting process?

1          MR. YALOWITZ:  Well, for me, it would be quite

2     onerous because I don't know how to do it.  But the people

3     who provided it to me sent it on disks with passwords that

4     when we got it to the Bates Whites firm, they have had no

5     trouble maintaining it in an encrypted form and maintaining

6     the passwords in confidence.  So I think for people who are

7     familiar with computers and with managing large databases,

8     it's not an onerous process.

9          THE COURT:  Let me then -- yes, go ahead, Mr.

10    Crombie.

11         MR. CROMBIE:  Thank you, Your Honor.  From a

12    process standpoint, you know, I'm actually somewhat familiar

13    with the way Arnold & Porter's processes work because I used

14    to work there.  I'm also familiar with Department of

15    Justice's.  It's a different system for storing information

16    in the sense that when we take a piece of data at Department

17    of Justice and put it on our computer system, it goes into a

18    file that already has restricted access.

19         So it goes into the case file for this particular

20    case and the only people that have access to that file are

21    the people that work on the case.  So I would have access to

22    it for instance.  Mr. Higgins had access to it and our legal

23    assistants would have access to it.  And to the extent that

24    there were other attorneys assigned to the case, they would

25    have access to that database as well.

12

1          But an attorney that has not been specifically

2    assigned to the case, not only would they not have access to

3    it, it wouldn't even show up on their screen to access the

4    file.  And as far as the thought that someone from our

5    section might leak information on celebrities, so far the

6    case hasn't generated a lot of press.  There's not a lot of

7    people snooping around looking for information as far as I

8    know.

9          THE COURT:  You missed the press conference out

10   front this morning?

11          (Laughter.)

12          THE COURT:  Unless you gentleman can come into

13   agreement, I think we are going to need a motion on this

14   subject.  The Court will deal with it as the Court can when

15   the papers are filed.

16          MR. YALOWITZ:  Very well.

17          THE COURT:  Let's if we can talk about some of the

18   matters discussed in the protective order.  Let's see.

19          Okay.  With regard to the aggregation issue so-

20   called, the parties are working on developing a statistical

21   sampling plan as I understand it, is that correct,

22   gentlemen?

23          MR. YALOWITZ:  I'm not sure that's correct, Your

24   Honor.

25          THE COURT:  Okay.

1      MR. YALOWITZ:  Maybe I might give the Court an

2 overview of what I would like to accomplish in the coming

3 months and how I think we might go about it.

4      THE COURT:  Terrific.  That's fine.

5      MR. YALOWITZ:  I think it's useful to bear in mind

6 that leaving aside interest, which, of course, interest runs

7 and interest from 1991 to 1996 is a material number, I

8 understand that.  But leaving aside the interest and leaving

9 aside penalties, which have been conceded that penalties are

10 not appropriate in this case, that's been stipulated by the

11 Defendant, we're talking about a base assessment of

12 approximately $60 million.

13      So the Plaintiffs paid $475 million in FICA and

14 FUTA taxes and the Defendant has claimed approximately $60

15 million in additional FICA and FUTA taxes.  So, on the $60

16 million, there are -- and let's leave aside the box rental

17 issue, which is in its order of magnitude less than

18 $500,000, the aggregation issue and the state unemployment

19 issue are both material issues.  They're more than $10

20 million issues, but they're not $60 million issues.

21      The independent contractor issue as I understand

22 the numbers could be a $100 million issue or a $200 million

23 issue, as to which the Plaintiffs don't have a refund claim

24 based on independent contractor payments.  The Plaintiffs

25 have a modest refund claim because it is a divisible tax.

1    Plaintiffs have a modest refund claim, which commenced the

2    case.  But essentially the independent contractor dollars at

3    stake are capped at the $60 million assessment.

4         And yet, for every penny that the taxpayers paid

5    in FICA or FUTA tax, with respect to an independent

6    contractor is $1 that comes off dollar for dollar from that

7    $60 million.

8         THE COURT:  So I take it you're getting to the

9    point that the independent contractor issue and the SUI

10   credit issue taken together could be determinative?

11        MR. YALOWITZ:  I think very likely will be

12   determinative.

13        THE COURT:  Okay.  So I would assume therefore,

14   and I think you've indicated this, that you want to focus on

15   those two issues first?

16        MR. YALOWITZ:  Yes, sir.

17        THE COURT:  Right.

18        MR. YALOWITZ:  Because I don't want to make a

19   lifelong career of the case.  I want to get the case

20   finished efficiently and quickly.  It's hard to say from a

21   case that was filed in 2002.

22        THE COURT:  Right.

23        MR. YALOWITZ:  But the way I would like to

24   approach the independent contractor and aggregation issues

25   right now is as follows.

1          THE COURT:  Do you equate aggregation issue with

2     SUI credit?

3          MR. YALOWITZ:  No, sir.

4          THE COURT:  Okay.

5          MR. YALOWITZ:  So the shorthand that I'm using,

6     the independent contractor is people who were actually not

7     employed by anybody.

8          THE COURT:  Not employees, right.  Right.

9          MR. YALOWITZ:  Aggregation is a shorthand we've

10    used for essentially aggregating productions to the level of

11    a common law employer.  So, if Twentieth Century Fox

12    produced eight or 10 movies in 1996, the Service in their

13    assessment treated each of those movies as an independent

14    employment event.  But the Court's ruling of course is that

15    the statute references common law employer, and in that

16    case, that's an easy case because Twentieth Century Fox has

17    a lot of infrastructure and they just make picture after

18    picture.  So that doesn't require a lot of discovery to know

19    that their eight or 10 pictures all roll up to Twentieth

20    Century Fox.

21          There are some productions where there are

22    intermediary companies.  Twentieth Century Fox might have a

23    special purpose entity for the purpose of making a single

24    movie or NBC might have created a limited liability

25    partnership for the purpose of keeping track of the money

1    with respect to the Seinfeld show season two and then a

2    different LLP with respect to Seinfeld season three.

3           And so then the question is, well, is that LLP,

4    number one, is that a common law employer and, number two,

5    is it the only common law employer, or is it legitimate to

6    say, well, NBC is a common law employer too, and therefore,

7    the statute permitted the taxpayers on a reasonable basis to

8    aggregate at the common law employer level of NBC.

9           So how can we be practical in addressing these

10   things?  Well, the first thing to do is to know is the SUI

11   credit going to be applied.

12          THE COURT:  And that, you're waiting for a

13   statement of the government's position?

14          MR. YALOWITZ:  Correct.

15          THE COURT:  Right.

16          MR. YALOWITZ:  And that is a legal question.  It

17   requires application of the statute as written and the

18   regulations as adopted.  It's not a complicated statutory

19   question.  I think it will be a simple one.  And we won't

20   know exactly how many dollars that will lower the

21   assessment, but we'll have an order of magnitude.

22          And then the second thing is we need to find some

23   way to get our arms around the hundreds of thousands of

24   employment events that took place from 1991 to 1996.  The

25   order of magnitude is 700,000 employment events.

1        So here's my thought on how we do that.  The first

2   thing we're going to do is we're going to provide the

3   Defendant with two expert reports.  Expert Report No. 1 is

4   from a gentleman who has worked for his whole career in the

5   production of filmed entertainment and who is I think

6   qualifiable as an expert, a very knowledgeable man who will

7   say I'm going to categorize employees into groups of 1, 2

8   and 3.  Group 3 are people who I think pretty much are going

9   to be employees of someone.  We don't need to evaluate them

10  for purposes of whether they're an independent contractor.

11  Group 2 are going to be people who depending on the facts

12  and circumstances and the particular employment event may

13  have had independent contractor -- employment event is the

14  wrong word.  We slip into the --

15              THE COURT:  Status brief.

16              MR. YALOWITZ:  Yes.  But they had a work

17  experience on a production.  That may have been an

18  experience as an employee.  It may have been an experience

19  as an independent contractor depending on --

20              THE COURT:  The facts.

21              MR. YALOWITZ:  -- the facts as they existed at

22  that time back in 1991 to 1996.  Group 1 are a very select

23  group of people who in his judgment and experience have a

24  very high likelihood of meeting the common law requirements

25  of independent contractor a significant amount of the time.

1    And so then that's going to be his opinions.

2         And then the next question is what conclusions

3    might one draw from the numbers based on his opinions.  And

4    we're going to give that report to the Defendant as well

5    from our statistical experts.

6         And so I'm going to give the Court -- and now I

7    will use some paper -- I'm going to give the just some

8    orders of magnitude, again just so that we have -- these are

9    not exact, but just so that we kind of have our heads around

10   what we might need to accomplish here.  We think, I mean,

11   you know, the work is still in progress.  These are not the

12   final numbers by any stretch of the imagination.  But we

13   think something on the order of magnitude of $75 million of

14   the $475 million will turn out to be associated with Group 1

15   employees.  So that means that if we have something on the

16   order of magnitude of half or two-thirds of those people

17   being independent contractors, the case is over.

18        We think that something on the order of magnitude

19   of $200 million of the $475 will be associated with Group 2

20   employees.  And so order of magnitude, if there is another

21   five or 10 percent of those, that would just add an extra

22   layer of assurance for the Court that with a reasonable

23   degree of certainty the $60 million has been wiped out.

24        THE COURT:  But even if you took the most

25   conservative approach, looking only at Category 1 folks, the

1    Plaintiffs' assertion is that the dollar magnitude that's

2    involved would exceed the $60 million figure, which you have

3    referred to.

4              MR. YALOWITZ:  That's my working hypothesis.

5              THE COURT:  Okay.

6              MR. YALOWITZ:  And so what I'd like to do is

7    finalize the work that I've just described and provide it to

8    the Defendant and let the Defendant then evaluate, you know,

9    in fairness to the Defendant, because they haven't seen our

10   assertions.  They've heard it from me.

11             THE COURT: Right.

12             MR. YALOWITZ:  But, you know, they're from

13   Missouri, they want to see it.  So let them evaluate it and

14   let them come to me and to you if we can't agree and say

15   here's the discovery we would like to take in response.

16   They may want to depose the experts.  That would certainly

17   be reasonable.  They may want to sponsor their own expert

18   reports.  That would certainly be reasonable.  And in my

19   judgment, they may want to engage in some sort of a sampling

20   program.  We're not going to have 700,000 minitrials.

21   That's humanly impossible.  I know the Court wouldn't

22   tolerate that.

23             But with the guidance of our statistical experts,

24   I believe we can select a limited number of productions,

25   stratified, so that we may have one very large or a couple

1    of very large productions, some midsized productions, some

2    very small productions.  But we have to be guided by our

3    mutual experts on statistical selection.

4         But given the cushions that we seem to have, I

5    don't think we're going to need to look at hundreds of

6    productions.  I think we can look at a relatively small

7    number of productions that can be randomly selected on a

8    stratified basis and look at the Group 1 and 2 employees

9    within those productions and look at the control issues of

10   the nonindependent employees in those productions.

11        And so assuming that the Defendant wants to do

12   this and assuming that I don't feel we have enough to just

13   go on summary judgment with the experts, which we may or may

14   not, I'd like to see what the Defendant's reaction is to the

15   expert's opinions and see where the numbers break.  It may

16   be that it's enough and we can just do it on summary

17   judgment.  It may need to be that they want to take this

18   discovery and that we can work together to do some sampling

19   where we're talking about looking at -- you know, I mean, we

20   have to be guided by the experts.  But my personal hope

21   would be that we're looking at an order of magnitude of a

22   dozen productions and 100 or 200 employees within those

23   productions or something like that, and as to those, there

24   may be disputes and there may not be disputes.

25             THE COURT:  This sampling process, though, that

1   you're describing is different from the sampling process

2   designed to illuminate the common law employer issue?

3           MR. YALOWITZ:  My understanding is that 10

4   productions or a dozen productions or something like that

5   would not be enough to draw statistically reliable

6   conclusions across the entire population of productions, but

7   it would give us enough insight.  First of all, it would

8   teach us material information about the common law employer

9   issue that then might cause that issue to be resolved.  And

10  even if it doesn't, it would be a start on dealing with that

11  issue, and it would give us enough information about the

12  Group 1 and 2 employees or we would design it to give us

13  enough information about the Group 1 and 2 employees that we

14  could draw statistically reliable conclusions about the

15  independent contractor issue.

16          THE COURT:  But it's not a consensual process of

17  coming into agreement on a sampling methodology?

18          MR. YALOWITZ:  Well, we have to see.

19          THE COURT:  Okay.  But we're not working on that

20  right now?

21          MR. YALOWITZ:  Well, I don't have a response from

22  the Defendant that, yes, this is how we want to do it.

23          THE COURT:  So it's still possible that it would

24  be a consensual agreement?

25          MR. YALOWITZ:  I would hope that -- I mean, the

1    Defendant is going to look at my -- I'm laying all my cards

2    out for the Defendant, and they're going to look at them and

3    they're going to have to say how they want to defend the

4    case.  And if they say we don't want to conduct this

5    sampling, then I'll say, okay, that's fine, you're done with

6    your discovery, I'll move for summary judgment and we'll see

7    what they say.  They have to have some evidential basis to

8    respond to our contentions.

9              THE COURT:  Yes.  And as I read the status report,

10   the government also anticipates arguing that the Plaintiffs

11   are estopped now from asserting independent contractor

12   status having previously treated them as employees.

13             MR. YALOWITZ:  Sure.  They should make whatever

14   legal arguments they think are appropriate.

15             THE COURT:  Right.  But that would come up I take

16   it in the context of the summary judgment motion that you're

17   referring to.

18             MR. YALOWITZ:  I think so.  And, you know, when

19   one pressure tests a contention of law in a briefing, one

20   always learns new things.  But my impression of the

21   estoppel, my first impression of the estoppel argument is

22   that it doesn't persuade me that this is not an exercise

23   worth doing.  I mean, after all, where we are in the case is

24   the theory of the returns has been rejected by the Court.

25   The theory of the assessments has been rejected by the

1   Court.  And we now are in the process of saying, okay, what

2   is the truth.

3            THE COURT:  Yes, what's the right way to do it,

4   right.

5            MR. YALOWITZ:  And so if we had gotten some

6   financial advantage by -- if we had persuaded the Court of

7   something and gotten some advantage, then I can see, okay,

8   well, now you have to be held to that.

9            THE COURT:  Yes.

10           MR. YALOWITZ:  But that's not where we are in the

11  case.  Where we are is both sides, the Court has concluded

12  that both sides, this Court has concluded both sides have

13  overplayed their hand if you will and we now have to come to

14  the ripeness.  But again, you know, they should make

15  whatever legal arguments they think are appropriate.  I

16  don't want to be disrespectful.

17           THE COURT:  Yes.  I didn't mean to get into a

18  discussion necessarily of the merits of that position but

19  just try to understand where that's going to come up, and I

20  gather part of the response to the motion for summary

21  judgment would be a legal argument.  There may well be other

22  aspects which are essentially saying that there are issues

23  of fact that can't be resolved on summary judgment.

24           MR. YALOWITZ:  They might say that, although I

25  would expect that once they see my expert reports and

1   they've certainly heard very clearly what kind of a process

2   we're prepared to engage in if they think it will be

3   helpful, I would expect it would be required of the

4   Defendant to come to the Court and say I've seen the expert

5   reports, here's the discovery plan I would like to engage in

6   so that I have sufficient evidential basis to oppose the

7   anticipated motion for summary judgment and that we have a

8   plan and a time limit so that we can move this issue --

9            THE COURT:  To a conclusion, right.

10           MR. YALOWITZ:  -- to a conclusion.

11           And simply saying not proven, you know, after all,

12   essentially this is the Defendant's counterclaim, and so,

13   you know, it's my offset.  I mean, I don't want to stand on

14   the ceremony of who bears the burden --

15           THE COURT:  Burden of proof, right.

16           MR. YALOWITZ:  -- of proof, but it's very, very

17   important that we move this case to conclusion.

18           THE COURT:  I totally agree with that attitude.

19   Let me just suggest then I think I understand where the

20   Plaintiffs would like to go on the independent contractor

21   issue.

22           MR. YALOWITZ:  And it would also get us,

23   potentially get us started on resolving the other major

24   issue, which is the common law, the aggregation issue.

25           THE COURT:  Right.  Let's let Mr. Crombie respond

1    to the presentation that we've just heard about how to

2    proceed on the independent contractor issue.

3             MR. YALOWITZ:  Thank you, Your Honor.

4             MR. CROMBIE:  Your Honor, let me start off by

5    saying I think we're sort of, coming down to a foot level,

6    we're both approaching the case in the same way in the sense

7    that we're just trying to organize the various pieces in the

8    most efficient way to resolve the case.  We just have a

9    different interpretation of what the most efficient way

10   forward is at this point.

11            On the independent contractor theory, we had our

12   sitdown meeting a little bit more than a month ago I think

13   it was, and at that point, after our discussion, it looked

14   to Defendant there were 18,000 rows of employees I think,

15   and I may have the numbers not exactly right, but they're in

16   the ballpark, 18,000 employees across all of these

17   productions, various employees falling into 2,000 and some

18   categories that then may be aggregated up, according to

19   Plaintiff's theory into 50 or 60 categories of employees,

20   and when you sit down and you look at that from the

21   Defendant's perspective, if we're going to do the sampling

22   process, you have to sample on each category of employee to

23   determine which category is an independent contractor and

24   then to have a statistically reliable sampling set, you're

25   already talking about several hundreds of depositions.

1          And so our perspective at this point is that

2     that's attainable, but it's probably best reserved to last.

3     It would be a truly cumbersome discovery process and

4     probably the most expensive part of the case to resolve.

5          I think at this point, we both agree that the SUI

6     credit and the accountable plan issues are obviously the

7     cheapest ones to resolve up front.  They rely mostly on

8     legal positions and we're moving forward on those.

9          From the Defendant's perspective, when you look at

10    what the Plaintiffs refer to as the aggregation issue, you

11    know, you're not faced with 18,000 rows of employees.

12    You're faced with a smaller number of rows of productions

13    and production companies and studios.  And if you attack the

14    aggregation issue first, well, first of all, it makes sense

15    from the perspective of, well, okay, you're establishing a

16    basis for the IRS assessment.  If you're going to move

17    things from left to right, it sort of makes sense to tackle

18    aggregation first and independent contractor last.

19         But the aggregation issue from the Defendant's

20    perspective also has the advantage of being a less

21    cumbersome discovery process.  We're talking most likely the

22    equivalent of 30(b)(6) depositions of studios and production

23    companies.  Productions, obviously not every one of those,

24    but a sampling set.

25         It also provides the advantage at the same time of

1    getting a good look at the independent contractor theory,

2    because if we're taking the equivalent of 30(b)(6)

3    depositions, there's no reason we can't ask them how various

4    categories of employees were treated and whether the level

5    of control in the 20-factor test of who is an independent

6    contractor, there's no reason we can't get them to look at

7    that through the aggregation issue.

8          Now, moving forward from today, I think what makes

9    sense is for Plaintiffs to produce their expert reports, and

10    we're obviously going to take a close look at them and

11    evaluate the Plaintiffs' legal theory.  It may be that up

12    front the Defendants believe it has legal defenses, some of

13    which we put in our joint status report.  Obviously I think

14    it would make sense to resolve those legal defenses before

15    jumping headlong into discovery and sampling on the

16    independent contractor theory.

17          And if Plaintiffs are going to move for summary

18    judgment, well, then it probably makes sense to hold off on

19    all sampling if they're going to file a dispositive motion

20    that deals in the amount of dollars that would take care of

21    the rest of the assessment.  And in that case, the Defendant

22    can conduct the targeted discovery that it feels it needs to

23    respond to that motion, which would not rise to the level of

24    sampling on the independent contractor theory.

25          So, like I said, moving forward from today, I

1    think we can quickly resolve the SUI credit and the

2    accountable plan issues.  You know, Plaintiffs can produce

3    their expert reports and we'll take a look at those and

4    we'll see if there is any targeted discovery that the

5    Defendant believes is necessary, but it may be that the

6    parties file cross-motions at that point.  But I think in

7    our joint status report we laid out our case for why we

8    believe the independent contractor sampling to the extent it

9    becomes necessary should be handled last.

10           THE COURT:  Okay.

11           MR. CROMBIE:  There is one other thing I did want

12   to address.

13           THE COURT:  Yes.

14           MR. CROMBIE:  It came up briefly in Mr. Yalowitz's

15   presentation.  He stated that the Court has at this point

16   rejected both the return theory and the assessment theory,

17   and I don't know if that's necessarily correct, Your Honor,

18   and you can correct me if you think that I'm wrong.

19           The way I view the Court's opinion on the previous

20   motion for summary judgment was that it did reject the

21   return theory in the sense that it said the common law

22   employer controls and the Plaintiffs were not the common law

23   employers.  I didn't read anything in that opinion that

24   rejected the IRS assessment.  The IRS believes its

25   assessment is based on the common law employers.  It

1    believes that the productions are the common law employers,

2    and that's been our position from the start of this case and

3    I don't know that anything that's happened to date has

4    outright rejected the IRS position that productions were

5    common law employers.

6              THE COURT:  And how would that issue be litigated,

7    assuming as you're suggesting that it's still open?   In

8    other words, how would the parties propose to resolve that

9    issue, assuming that your characterization is accurate?

10             MR. CROMBIE:  Well, I don't know that it

11   necessarily changes the process that we've discussed today.

12   We'd probably still need to take a look at the aggregation

13   issue.  Plaintiffs contend that some of the studios or some

14   of the production companies are the common law employers,

15   and that's something we'll have to take a look at.

16             THE COURT:  And if I understand the government's

17   position, it is that it would prefer to proceed first with

18   the SUI credit and the -- is it the aggregation issue or

19   the --

20             MR. CROMBIE:  The accountable plan issue.

21             THE COURT:  The accountable plan, okay.

22             MR. CROMBIE:  And like I said, I expect that we'll

23   be able to get letters out to the Plaintiffs on both of

24   those issues on Wednesday of next week, at which point I

25   think our respective positions will be clear in the case.

1          THE COURT:  Yes.  I was wondering whether it would

2   make sense both to await the outcome of those communications

3   and, assuming Plaintiffs are in a position to do so, the

4   filing of their expert reports.  And in that context, we

5   might be a little better informed about particularly the

6   government's inclination as to what discovery it feels it

7   needs and it feels is appropriate, because it seems to me

8   until we sort of see it in the flesh, it's quite an abstract

9   concept that we're talking about.

10          And it may be the case that the government would

11   have a fairly expansive view of the discovery that was

12   necessary.  It's conceivable the Court might have a somewhat

13   different view.  But the Court doesn't really have any view

14   at this stage until it sees the materials that the

15   Plaintiffs are preparing in connection with the independent

16   contractor issue.

17          So I think without prejudice to sort of who is

18   going to go first or which issues are going to go first,

19   maybe let's take a little bit smaller bite and analyze the

20   Plaintiffs' submissions, the government's stated positions,

21   and then get back together and talk about where we should go

22   from there.  Would that seem to make sense to you, Mr.

23   Crombie?

24          MR. CROMBIE:  Absolutely.  I agree with that.  I

25   think once Plaintiffs provide Defendant with the expert

1   report, that would probably help crystalize everyone's

2   views.

3           THE COURT:  Mr. Yalowitz, what do you think about

4   that?

5           MR. YALOWITZ:  I think that's a great idea, Your

6   Honor.  We have been targeting April 30th.  I hope and

7   expect that we will provide those reports on April 30th.  I

8   have a trial that starts the following week before Judge

9   Smith, and so I would really like personally to get those

10  done before I begin trial.

11          THE COURT:  Which week is your trial with Judge

12  Smith did you say?

13          MR. YALOWITZ:  We begin trial May 7th.

14          THE COURT:  Okay.  And you want to get this

15  wrapped up before that?

16          MR. YALOWITZ:  I sure hope to, yes.

17          THE COURT:  Obviously.  Right.  Okay.

18          MR. YALOWITZ:  You know, I don't think there's an

19  order of April 30th and if we wind up needing the weekend or

20  needing a couple of extra days --

21          THE COURT:  It wouldn't be the end of the world.

22          MR. YALOWITZ:  -- I would appreciate the

23  indulgence, but really my strong hope is to get it done

24  before we begin that trial.

25          THE COURT:  Let's just look for a second.  May 7

1   is a Thursday, is that your recollection?  You're starting

2   on a Thursday with Judge Smith?

3               MR. YALOWITZ:  Yes.  It slipped to Thursday.

4               THE COURT:  Okay.

5               MR. YALOWITZ:  It was supposed to be Monday, but

6   we're now Thursday.  Our pretrial conference is the 1st and

7   then Thursday, the 7th, is the next trial date.  So, if we

8   had our expert reports due the 8th of May, that would be

9   fine, and it would give us the cushion if we need it, but my

10  personal goal is to have them done on the 30th.

11              THE COURT:  Mr. Crombie, what do you think about

12  May -- is it May 8th we're talking about?

13              MR. YALOWITZ:  Yes, sir.

14              MR. CROMBIE:  So you would produce the expert

15  reports on May 8th?

16              MR. YALOWITZ:  Correct, if not before.

17              MR. CROMBIE:  Okay.  Yes.  That works.

18              THE COURT:  Good.  Okay.  Well, we'll embody that

19  in an order after we finish here this morning.

20              Let's give thought to getting together at some

21  mutually convenient time after May 8th and after Mr.

22  Yalowitz's trial and after the government has had an

23  opportunity to digest the materials that will be provided on

24  May 8th.  If we gave ourselves two weeks, that would take us

25  to May 22nd, a Friday, for a status conference.  How would

1    that be?

2              MR. YALOWITZ:  We are scheduled to go through

3    Memorial Day in the <u>American Savings</u> trial.

4              THE COURT:  Okay.  So we're into --

5              MR. YALOWITZ:  But I don't know that Judge Smith

6    is going to sit every single day.

7              THE COURT:  Yes.  You want to defer on that and

8    maybe you gentlemen can talk among yourselves and pick a

9    date which suits your convenience and let Chambers know?

10             MR. YALOWITZ:  I think we can do that and we can

11   check with Your Honor's chambers.

12             THE COURT:  Sure.

13             MR. YALOWITZ:  If Mr. Crombie has some flexibility

14   and Judge Smith gives us a day off, we can come and visit

15   with Your Honor if Your Honor has flexibility.

16             THE COURT:  Can we leave it that way, Mr. Crombie?

17   Is that satisfactory?

18             MR. CROMBIE:  Certainly.  I think there is one

19   Friday in June that I'm off, but otherwise, my schedule is

20   very flexible.

21             MR. YALOWITZ:  All right.

22             THE COURT:  Good, okay.

23             MR. YALOWITZ:  That's great.  And, Your Honor,

24   typically we don't file expert reports and I don't know that

25   there's a need to here.  But we would be happy to provide a

1    courtesy copy to Chambers.

2              THE COURT:  I would like to have a courtesy copy

3    of the expert report.

4              MR. YALOWITZ:  We'll do that.

5              THE COURT:  Anything that we need to talk about

6    further, gentlemen?

7              MR. YALOWITZ:  Not from the Plaintiffs, Your

8    Honor.

9              MR. CROMBIE:  Nothing from Defendant.

10             THE COURT:  Okay.  Then we'll adjourn.  We'll put

11   out a brief order and we'll wait to hear from you gentlemen

12   with respect to the status conference that we're going to

13   try to work around Mr. Yalowitz's trial before Judge Smith.

14             MR. YALOWITZ:  Thank you, Your Honor.

15             THE COURT:  Thank you very much, gentlemen and

16   lady.

17             (Whereupon, at 10:49 a.m., the hearing in the

18   above-entitled matter was concluded.)

19   //

20   //

21   //

22   //

23   //

24   //

25   //

35

CERTIFICATE

DOCKET NO.:  02-1916C

CASE TITLE:  Cencast Services L.P. v. U.S.

HEARING DATE:  April 17, 2009


       I certify that the foregoing is a true and correct transcript made to the best of our ability from a copy of the official electronic digital recording provided by the United States Court of Federal Claims in the above-entitled matter.


Date:  April 20, 2009


 Theresa Rowell

Heritage Reporting Corporation
Suite 600
1220 L Street, N.W.
Washington, D.C.  20005-4018