# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

|  |  |
|---|---|
| Cencast Services, L.P., et al., ) | |
| ) | Nos. 02-1916 T, 02-1917 T, |
| Plaintiffs, ) | 02-1918 T, 02-1919 T, |
| ) | 02-1920 T, 02-1921 T, |
| v. ) | 02-1922 T, 02-1923 T, |
| ) | 02-1924 T, 02-1925 T |
| United States, ) | |
| ) | Judge George W. Miller |
| Defendant. ) | |

### PLAINTIFFS' MOTION TO COMPEL DEFENDANT TO ANSWER INTERROGATORIES AND PRODUCE DOCUMENTS AND REQUEST FOR EXPEDITED BRIEFING SCHEDULE

Pursuant to RCFC 37(a), plaintiffs respectfully request an order compelling defendant to answer interrogatories and produce documents. Plaintiffs have conferred with counsel for the defendant in good faith but have been unable to resolve the impasse.

Plaintiffs also respectfully request that the briefing schedule on this motion be expedited in light of the October 15, 2009 cutoff for fact discovery on defendant's estoppel and doctrine of variance theories.

**I.    BACKGROUND**

Pursuant to RCFC 33 and 34, plaintiffs served document requests and interrogatories on July 9, 2009 relating to two specific IRS publications addressing the existence and treatment of independent contractors in the entertainment industry. On August 18, 2009, defendant served responses and objections, refusing categorically to answer certain of the interrogatories (Nos. 1-8, 16, 17) or to produce documents responsive to certain of these requests (Nos. 1, 2, 6) on the

grounds that they are "not relevant to plaintiffs' refund claim or any matter currently before the Court."[1]

### A. The Two Publications

The first of the two publications is the IRS's Market Segment Specialization Program ("MSSP") Guidelines entitled *Entertainment—Important 1040 Issues* (the "MSSP Entertainment").[2] The IRS published the MSSP Entertainment in April 1995, during the tax periods at issue and before completion of the IRS examination of plaintiffs' returns for those periods. The publication states, "This MSSP Guide is designed to provide assistance in auditing individuals in various aspects of the entertainment industry," and it lists the following specific purposes:

1. To provide an overview of the activities encountered in audits of individuals in the entertainment industry.

2. To familiarize auditors with issues and terminology pertinent to individuals in the entertainment industry.

3. To assist auditors with their examinations by providing audit techniques.

Ex. E at 6. Under the heading, "EMPLOYEE VERSUS INDEPENDENT CONTRACTOR," the publication states that workers in the entertainment industry must be classified as employees or independent contractors based on the "extent of control a studio or production company has" and refers to the "20 common law factors." *Id.* at 10. It indicates that the IRS "is issuing a Market Segment Understanding to establish the relative importance of each of the 20 common law factors in regard to many of the jobs in the movie industry." *Id.* at 11. And it provides a list of specific steps that auditors should take to determine whether individuals in the industry should be

---

[1] Plaintiffs' Third Set of Interrogatories and Plaintiffs' Second Request for Production of Documents are Exhibits A and B, respectively. Defendant's responses and objections are Exhibits C and D, respectively.
[2] A copy is attached as Exhibit E.

classified as common law employees or independent contractors. *Id.* According to the Internal Revenue Manual, audit technique guides like the MSSP Entertainment are developed as follows:

> Analysis is conducted of a particular segment using historical voluntary compliance levels, closed case data, filing populations, current compliance initiatives and any other available information. Based on this analysis, Headquarters may ask for field assistance for [Audit Technique Guidelines] development. In other instances, an Area will provide suggested segments for ATG development after an analysis at the Area level. This could include input from the local Area Research office staff.

*Internal Revenue Manual* § 4.28.1.2.3; *see also id.* § 4.28.1-1 (describing current objectives and allocation of duties in researching, developing, and writing such guides).

The second publication is a "Market Segment Understanding" published by the IRS—apparently the one referred to in the MSSP Entertainment.[3] It offers guidelines for field examiners to classify workers in a portion of the entertainment industry as employees or independent contractors. "The purpose of these guidelines is to enable examiners to make accurate and consistent determinations of employee/independent contractor status in the Television Commercial Production and Professional Video Communication Industries (collectively the 'Industry')." Ex. F, at 1.[4] The Guidelines "are intended to identify those [common law] factors that [the IRS believes] are clearly more significant than others in determining control" in that industry "and to establish wherever possible, objective standards for determining whether these factors are met." *Id.* at 2, 3. The Guidelines discuss each of the various common law factors, categorizing them as "Critical", "Significant" or "Not Generally Applicable." *Id.* at 10-22. The Guidelines also divide jobs in the industry into three categories

---

[3] A copy is attached as Exhibit F.

[4] The Market Segment Understanding states that "issues [of distinguishing employees and independent contractors] raised in connection with the [Commercial and Video] Industry may be similar to issues raised with regard to other types of entertainment companies (such as companies that produce feature films . . .)." Ex. F, at 29.

and explain how IRS agents should apply the factors to workers within each of these three categories. *Id.* at 23-28. In short, the Guidelines provide the IRS's detailed and considered analysis of how field examiners should apply the common law employee test in a portion of the industry at issue in this case.

The examination of plaintiffs' returns in this case included a request for and issuance of a Technical Advice Memorandum (the "TAM"). Plaintiffs cited and relied on the Market Segment Understanding in their communications to the IRS in connection with the issuance of the TAM.[5] *See* Ex. G at 10-11; Ex. H at 8-12. Thus, though the Market Segment Understanding is undated, it was publicly available during the audit of plaintiffs' returns, and the IRS had an opportunity to consider it in connection with that audit.

### B. The Discovery Requests

Plaintiffs propounded interrogatories and document requests with respect to both publications. Specifically, plaintiffs requested that defendant identify the people who contributed to drafting of each publication (Interrogatories 1 and 5), the people who reviewed or approved drafts of each publication (Interrogatories 2 and 6), and the people who read, used or relied on each publication (Interrogatories 3 and 7). Plaintiffs also requested that defendant identify and produce documents considered or created in connection with the creation, drafting, approval or publication of each publication (Interrogatories 4 and 8, Document Requests 1 and 2). In addition, plaintiffs requested that defendant identify and produce documents relating to any IRS analysis of the existence, identity or prevalence of independent contractors in the entertainment industry or any policy concerning such independent contractors (Interrogatory 16, Document Request 6). Plaintiffs requested that defendant also identify persons who on behalf of

---

[5] Plaintiffs' October 24, 1997 and April 14, 1998 submissions to the IRS in connection with the TAM are attached as Exhibits G and H, respectively.

the United States or the IRS supervised or participated in such an analysis (Interrogatory 17). Defendant has categorically refused to respond to these interrogatories and requests on the ground that they are not relevant.

On July 24, 2009, defendant served its own interrogatories and requests for production. Defendant's objections to plaintiffs' requests notwithstanding, defendant has asked plaintiffs to produce all documents relating to the MSSP Entertainment and the Market Segment Understanding and to provide a list of each communication with the IRS in which plaintiffs referred to these publications.[6]

## II.   ARGUMENT

This Court has adopted a regime of broad discovery:

> When determining questions of relevance, the court looks to RCFC 26(b)(1), which provides that, unless limited by court order, the parties may obtain discovery of any matter relevant to the claim or defense of a party that is not privileged. *Jade Trading, LLC v. United States*, 65 Fed. Cl. 487, 491 (2005). For the purposes of Rule 26, relevance is broadly construed. *Katz v. Batavia Marine & Sporting Supplies*, 984 F.2d 422, 424 (Fed. Cir. 1993). At this juncture, because the Court has not seen the documents at issue and cannot assess relevance with precision, the Court follows the approach sanctioned by the Supreme Court in *United States v. Reynolds*, 345 U.S. 1, 10-11 . . . (1953), and assesses whether the Plaintiffs have 'shown probable cause for discovery of the documents' without considering the applicability of privilege. *Jade Trading*, 65 Fed. Cl. at 491.

*Ford Motor Co. v. United States*, 84 Fed. Cl. 168, 170 (2008). The discovery at issue here meets that standard for three reasons.

*First*, the discovery is likely to lead to the production of evidence relevant to the merits of the independent contractor issue. As the Court is aware, one consequence of the Court's ruling that the "employer" for purposes of calculating FICA and FUTA wage bases is the common law

---

[6] Copies of Defendant's Second Set of Requests for the Production of Documents and Defendant's Third Set of Interrogatories are attached as Exhibits I and J, respectively.

employer (not the statutory employer), the parties and the Court must determine which entities (if any) were the common law employers of the various production workers with respect to work performed during the years at issue, in order to determine the extent to which defendant's assessment is overstated.[7]  The parties and the Court are devoting extensive time and effort to quantifying the amounts paid in respect of independent contractors—that is, workers who had *no* common law employer.  In pursuit of that effort, plaintiffs prepared an expert report of John F. Hadity (Ex. K) and an expert report of Charles H. Mullin (Ex. L).  Mr. Hadity's report employed a methodology similar to the methodology of the Market Segment Understanding.  Mr. Hadity considered 2279 different job titles given to the production workers at issue, categorized these into shorter list of occupations, and then assigned these occupations to one of three job categories.  *See* Ex. K, at 13.  These three categories are distinguished based on the manner in which the common law employer factors apply and the likely outcome of such an application.  *Id.* at 13-14.  In particular, Mr. Hadity classified into Group 1 occupations highly likely to be independent contractors; Group 3 occupations highly likely to be common law employees; and Group 2 occupations as to which more particularized facts would be needed to make a judgment.  *Id.*  Dr. Mullin's Expert Report relied on the Hadity Report to quantify the economic impact of these categorizations on plaintiffs' employment tax liability for the periods in issue.

In performing his categorization, Mr. Hadity considered the MSSP Entertainment and the Market Segment Understanding; indeed, his results were quite similar to (but more conservative than) the categorization published by the IRS in the Market Segment Understanding.  As a result, the basis for the IRS's categorization in the Commercial and Video Production Guidelines—

---

[7] Defendant has already conceded that the assessments incorrectly failed to credit plaintiffs for state unemployment insurance credits and further stipulated that the assessments' imposition of penalties will not be pursued.

including the documents relied on and the process followed in drafting and implementing the Market Segment Understanding—could provide an important source of evidence supporting the methodology used by plaintiffs' experts. In addition, if the IRS analyzed or quantified the prevalence of independent contractors in the entertainment industry, such information would certainly be relevant to the resolution of the case.

*Second*, some of the views of the IRS expressed in the Market Segment Understanding appear to qualify for deference under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944). The extent of so-called *Skidmore* deference to an agency document "in a particular case will depend on the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade . . . ." *Id.* at 140. The IRS's occupation classifications, or particular aspects of the methodology used in making such categorizations, may qualify for deference under this standard. *See U.S. v. Mead Corp.*, 533 U.S. 218, 235 (2001) (*Skidmore* deference depends on, *inter alia*, the writer's "thoroughness, logic and expertness"—classifications of items for tariff purposes); *Rubie's Costume Co. v. U.S.*, 337 F.3d 1350, 1355-58 (Fed. Cir. 2003) (giving *Skidmore* deference to agency tariff classifications). Therefore, documents and evidence concerning the Market Segment Understanding and the MSSP Entertainment are relevant to determining which aspects of the occupation classifications in the Market Segment Understanding are to be afforded deference.

*Third*, the document requests and interrogatories at issue are also likely to generate evidence that is highly relevant to defendant's "quasi-estoppel" defense. This defense is "a seldom-used doctrine that appears predominantly in tax cases." *In re Baker Hughes Inc.*, 215 F.3d 1297, 1301 (Fed. Cir. 2000). As the Court explained in *Baker Hughes*,

> The purpose of the doctrine of quasi estoppel is to prevent a taxpayer, after taking a position in one year to his advantage and after correction for that year is barred, from shifting to a contrary position touching on the same facts or transaction. J. Mertens, The Law of Federal Income Taxation [§] 60.04 (1976 rev.). A key element is the fact that the earlier position was then to the advantage of the taxpayer but that it is now to the taxpayer's advantage to shift his position.

*Id.*, 215 F.3d at 1301 (quoting *Union Carbide Corp. v. United States*, 222 Ct. Cl. 75, 612 F.2d 558, 566 (1979)).

Of particular importance here, the Federal Circuit has explained that reasonable reliance is an essential element of the defense:

> "Moreover, the misstatement ***must be one on which the government reasonably relied***, in the sense that it neither knew, nor ought to have known, the true nature of the transaction mischaracterized by the taxpayer." *Lewis*, 18 F.3d at 26; *see also Herrington*, 854 F.2d at 758; *Black's Law Dictionary* 572 (7th ed. 1999) . . . ("quasi-estoppel. An equitable doctrine preventing one from repudiating an act or assertion if it would harm another who reasonably relied on that act or assertion.").

*In re Baker Hughes*, 215 F.3d at 1302 (emphasis supplied); *accord Henry v. United States*, 870 F.2d 634, 637 (Fed. Cir. 1989) ("reasonable reliance, one of the essential traditional elements of estoppel, is lacking in this case").

When the government raises quasi-estoppel, whether the IRS knew or should have known of the relevant facts as a result of its examination of the taxpayer's returns is highly relevant to the issue of reasonable reliance. *See, e.g.*, *UNUM Corp. v. United States*, 886 F. Supp. 150, 162 (D. Me. 1995); *Estate of Posner v. Commissioner*, T.C. Memo. 2004-112, 2004 WL 1045461, at *9 n.16 (May 10, 2004) (quoting *Estate of Letts v. Commissioner*, 109 T.C. No. 15, 109 T.C. 290, 1997 WL 727721, at *6 (Nov. 24, 1997)).

In conducting the examination and issuing the TAM in this case, the IRS considered and rejected plaintiffs' contention that they were themselves the common law employers of the

production workers for purposes of FICA and FUTA. Moreover, during the process, plaintiffs specifically cited the Market Segment Understanding and specifically told the IRS that they would raise the independent contractor issue if the IRS rejected plaintiffs' reporting position. *See* Ex. G, at 8, n.3; Ex. H, at 22. Plaintiffs are entitled to discovery on what the else IRS knew about the prevalence of independent contractors in the entertainment industry. During the period of the examination and consideration of plaintiffs' returns, as evidenced by the MSSP Entertainment and the Market Segment Understanding, the IRS apparently had a team of agents studying the role, existence, and prevalence of independent contractors in the industry and publishing guidelines for field examiners to "make accurate and consistent determinations of employee/independent contractor status" in the industry. In evaluating the reasonableness of the IRS's alleged reliance on plaintiffs' reporting position that plaintiffs were themselves the common law employers of the production workers, it would be relevant to know just how widely these publications and the studies they reflect were circulated within the IRS. It would be relevant to know whether the team that conducted plaintiffs' audit knew about these publications or other related studies. And it would be relevant to know the process by which these guidelines were developed.

In sum, the discovery requests seek information about the production and use by the IRS of specific publications addressing the very same issues the parties and the Court now face in quantifying the extent to which independent contractors existed in the entertainment and film production industry during the years at issue in this case. Such information is plainly relevant to the amount of overstatement in the IRS's assessment and to the defendant's claim of reasonable reliance on plaintiffs' reporting position.

The Court has set October 15 as the deadline for discovery on the defendant's estoppel defense. Defendant has categorically refused to produce the evidence sought in this motion. Unless the parties and the Court expedite consideration of this motion, it will be difficult to complete discovery on the estoppel issue before October 15.

### III. CONCLUSION

Pursuant to RCFC 37(a), the Court should enter an order compelling defendant to answer Interrogatories Nos. 1-8, 16, and 17 of Plaintiffs' Third Set of Interrogatories and produce documents responsive to Requests Nos. 1, 2 and 6 of Plaintiffs' Second Request for the Production of Documents.

In view of the current October 15, 2009 cutoff for discovery relating to the quasi-estoppel issue, the Court should expedite the briefing on this motion.

Respectfully submitted,

Dated: August 31, 2009

By: /s/ Kent A. Yalowitz
Kent A. Yalowitz
*Counsel of Record*
Amalia W. Jorns
ARNOLD & PORTER LLP
399 Park Avenue
New York, NY 10022-4690
Telephone: (212) 715-1000
Facsimile: (212) 715-1399

James P. Joseph
ARNOLD & PORTER LLP
555 Twelfth Street N.W.
Washington, D.C. 20004-1206
Telephone: (202) 942-5000
Facsimile: (202) 942-5999

*Attorneys for Plaintiffs
Cencast Services, L.P., et al.*