IN THE UNITED STATES COURT OF FEDERAL CLAIMS

(Judge George W. Miller)

Nos. 02-1916 T, 02-1917 T, 02-1918 T, 02-1919 T, 02-1920 T,
02-1921 T, 02-1922 T, 02-1923 T, 02-1924 T, 02-1925 T

CENCAST SERVICES, L.P. ET AL,

                        Plaintiffs

v.

THE UNITED STATES,

                        Defendant

DEFENDANT'S STATUS REPORT

Pursuant to the October 6, 2009, Scheduling Order, defendant hereby submits its status report describing the areas of disagreement between the parties with respect to the use of a production worker survey in connection with plaintiffs' independent contractor theory. The parties are in disagreement in two fundamental respects: (1) the parties disagree as to whether a production worker survey is a reliable mechanism for obtaining production worker testimony relating to plaintiffs' independent contractor theory; and (2) the parties disagree as to the form of survey that should be fielded (regardless of its purpose).

"The classification of workers as either employees or independent contractors and the related tax administration issues have created some of the longest lasting and intensely controversial problems of tax law administration." H.R. Rep. 102-1060, 1992 WL 415130 at *19 (Leg. Hist.), *Improving the Administration and Enforcement of Employment Taxes*

(hereinafter H.R. Rep. 102-1060); *see also Alford v. United States*, 116 F.3d 334, 337 (8th Cir. 1997) (describing the analysis of common law employment status as "extraordinarily fact intensive"). Here, we respectfully submit that the issues presented by plaintiffs' independent contractor theory are far too complex to be reduced to a precise, manageable survey instrument.[1] Consequently, we propose that the parties instead field the IRS Form SS-8, not for the purpose of obtaining admissible production worker testimony, but rather for the purpose of obtaining preliminary information that will enable the parties to significantly narrow the pool of production workers who must be deposed.

**A.   The Issues Presented By Plaintiffs' Independent Contractor Theory Are Far Too Complex To Be Distilled Into A Precise, Manageable Survey Instrument Capable Of Generating Reliable Production Worker Testimony**

The Department of Justice (along with its expert consultant, Dr. Van Liere of NERA Economic Consulting) and the Internal Revenue Service expended considerable time and resources evaluating plaintiffs' proposal to field a production worker survey in lieu of production worker depositions. We have concluded that, because of its factually intensive nature, plaintiffs' independent contractor theory cannot be distilled to a manageable and precise survey instrument capable of both (a) being fielded as an efficient self-administered instrument and (b) providing sufficiently reliable information to serve as the mechanism for obtaining the production worker testimony that plaintiffs would need in order to reclassify that worker. A production worker survey cannot reliably capture the required information for the following five reasons:

---

[1] Defendant has neither agreed to nor otherwise waived its objections to plaintiffs' proposal to utilize a production worker survey. *See* Sept. 30, 2009, JSR at 2-3 ("defendant does not consent to, or otherwise waive its objections to, the use of a production worker questionnaire"); Aug. 21, 2009, Status Conf. Trans. at 27 (wherein defendant's counsel noted that plaintiffs' proposed survey "falls short in a number of areas"); Aug. 18, 2009, Def's Status Rpt. at 6 ("Defendant has not yet concluded that a survey is the appropriate mechanism by which to collect the relevant data."); Ex. B.

1.      **The Pool of Production Workers Is Too Diverse**

The production workers put at issue by plaintiffs' independent contractor theory cover a broad spectrum of occupations, each with its own range of job responsibilities and functions not readily susceptible to one universal survey instrument. In an effort to support their independent contractor theory, plaintiffs have selected an initial sample set of 379 production workers selected from 19 productions. Those 379 production workers exhibit 164 different job titles, ranging from "Directors-TV" to "Department Head" to "Best Boy Grip" to "Teamster Driver" to "Carpenters." This diverse spectrum of production workers distinguishes this action from the typical independent contractor action where only one type of worker is at issue. *See, e.g., Consolidated Flooring Servs. v. United States*, 38 Fed. Cl. 450 (Fed. Cl. 1997) (determining carpet installers were independent contractors).[2] Because there are so many types of workers at issue, any universal survey instrument, if it is to generate reliable responses, must include a multitude of questions and strings of questions capable of capturing the details of many types of work. But as more questions are asked, and as the instrument becomes more complicated, it becomes less likely that a production worker will respond and less likely that those who do respond will understand what is being asked and provide reliable answers.[3] *See* Federal Judicial Center, *Reference Manual on Scientific Evidence*, at 264 (2d ed. 2000) (hereinafter "*Reference*

---

[2] Even among suits involving only one type of worker, we are unaware of any instance in which a survey was utilized as the primary means for collecting worker testimony.

[3] The pool of production workers will become even more diverse should plaintiffs be required to survey more than the 379 production workers selected as the *initial* sample set. Plaintiffs' full sampling plan calls for the survey of up to 20,000 workers. (*See* Plts Aug. 18, 2009, Status Rpt.) As the number of production workers surveyed increases, so does the number of occupations any survey must cover. Indeed, plaintiffs' payroll database contains upwards of 1,461 distinct job titles. (*See* Van Liere Decl., Ex. A, ¶ 17, n.17.) It is not clear to us how any one survey instrument could be nimble enough to cover that many distinct job titles, particularly given the likelihood that a production worker's occupation may color his/her interpretation of any one survey question.

*Manual*") ("if eligibility to answer some questions depends on the respondent's answers to previous questions, such skip sequences may be difficult for some respondents to follow").

### 2. There Are Too Many Relationships To Consider

Each of the sampled production workers was a part of multiple, overlapping relationships with a variety of entities including, but not limited to, studios, production companies, the productions, the plaintiffs, and unions/guilds.[4,5] Each of these various relationships (*e.g.*, production worker/studio, production worker/production, production worker/union, etc.) will color the response provided by a survey recipient in ways that are difficult to anticipate. Indeed, it is likely that a production worker's response to any one question may vary significantly depending upon the relationship that production worker considers in providing his/her response. Thus, either the instructions or the questions must be specific as to the relationships the worker should consider, adding further complexity and length to the survey instrument.

### 3. There Are A Multitude of "Factors" To Consider

"In determining whether a hired party is an employee under the general common law of agency, [courts] consider the hiring party's right to control the manner and means by which the product is accomplished." *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323-24 (1992) (quoting *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 751-52 (1989)). In *Community for Creative Non-Violence*, the Supreme Court identified a number of factors relevant to that analysis:

---

[4] Certain of the production workers were non-union workers, and thus are not likely to have a relationship with a union/guild.

[5] For example, production worker 68606 performed work on the production "I Love Trouble" as a "steward." The entities associated with worker 68606 and "I Love Trouble" include Walt Disney, Annhall, Inc., and at least one of the plaintiffs. To the extent production worker 68606 was also a union/guild member, he would be associated with at least one union/guild.

>Among the other factors relevant to this inquiry are the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

*Community for Creative Non-Violence*, 490 U.S. at 751-52. Likewise, the IRS, in Revenue Ruling 87-41, has identified twenty "factors" relevant to the common law analysis. *See also Darden*, 503 U.S. at 324 (citing with approval Rev. Ruling 87-41). But these factors are not the be-all-and-end-all of the common law analysis; "[s]ince the common-law test contains 'no shorthand formula or magic phrase that can be applied to find the answer, ... all of the incidents of the relationship must be assessed and weighed with no one factor being decisive.'" *Id.* (quoting *NLRB v. United Ins. Co. of Am.*, 390 U.S. 254, 258 (1968)). Even assuming this action could be limited to the twenty factors identified in Revenue Ruling 87-41,[6] none of those factors may reliably be reduced to a single question, and most require the development of sufficient contextual facts to make a highly nuanced distinction between an employee and an independent contractor.[7]

---

[6] Plaintiffs have indicated that upwards of 24 factors should be considered in classifying the production workers at issue. *See* Hadity Rpt. Appx. E (ECF Doc. 186-5 at 74-108) (plaintiffs' memorandum instructing Mr. Hadity as to those factors he should consider in purporting to classify production workers).

[7] One of the twenty factors identified in Revenue Ruling 87-41 is the furnishing of tools and materials:

>The fact that the person or persons for whom the services are performed furnish significant tools, materials, and other equipment tends to show the existence of an employer-employee relationship. See Rev. Rul. 71-524, 1971-2 C.B. 346.

Here, that factor would require any survey instrument to inquire into the tools and materials used, who provided those tools and materials, whether the production worker was paid an equipment rental fee for use of the tools, whether the production worker was reimbursed for the purchase and/or use of materials, and whether pre-approval was required before additional tools or materials were obtained. But in the absence of deposition testimony, it is not even clear that

**4.      Production Worker Recall Is Of Significant Concern**

As we understand plaintiffs' proposed sampling methodology, it assumes that a production worker is sampled based on, and will be able to recall his/her work on, one specific production during the period 1993 through 1996.  Thus, to the extent a production worker is sampled and sent a survey, his/her responses to that survey must be limited to the production for which he/she was sampled.  But many of the production workers at issue worked on numerous productions during the period 1993-1996; and thus, any survey instrument would require a production worker to recall and segregate memories of work performed on multiple productions, even though that work was performed thirteen to sixteen years ago.  Consequently, any survey adopted in connection with plaintiffs' sampling methodology is likely to be subject to a wide range of types of recall errors due to the passage of time and the nature of information that must be recalled.  *See* Van Liere Decl., Ex. A, ¶¶ 25-32; *see also* Pittsburgh Press Club v. United States, 579 F.2d 751, 769 (3d Cir. 1978) (holding that a survey asking respondents for their best recollections of banquets that had taken place many years before lacked indicia of trustworthiness).

Furthermore, these errors may be systematically related to factors that influence whether wages are ultimately classified as independent contractor payments or employee wages.  (*See* Van Liere Decl., Ex. A. ¶ 32.)  Examples of types of errors that are of potential concern include, but are not limited to:

> i.  telescoping—production worker responses that include details from a period of time not meant to be included in the survey;

---

the foregoing information would provide an accurate and complete assessment of whether and how tools and materials were provided.

ii. projection—production worker responses that assume details of current life apply to the past; and

iii. production worker responses that include details of work experience for a similar production or company not sampled.

### 5. There Is Likely To Be A Significant Non-Response Bias

All surveys experience "non-response," where the survey recipient simply does not respond to the survey. Any survey fielded in connection with plaintiffs' independent contractor theory is likely to experience a significantly above average non-response rate for at least three reasons. *First*, the parties do not have access to an up-to-date listing of addresses for the sampled pool of production workers.[8] *See Reference Manual* at 264 ("A mail survey will not produce a high rate of return unless it begins with an accurate and up-to-date list of names and addresses for the target population.") *Second*, given the passage of time (13 to 16 years), it is more likely that production workers will not recall or will not attempt to recall the details of work performed long ago, and thus will not complete the survey. *Third*, to the extent any survey is fielded, the sheer length and complexity of that survey will likely discourage production workers from responding.[9] Moreover, it is not clear as to whether and how production worker non-response will introduce systemic biases into the survey results.[10] (*See* Van Liere Decl., Ex. A, ¶ 25-32.)

---

[8] To the extent the IRS is in possession of up-to-date addresses disclosed on current production worker income tax returns, that information would be protected and inaccessible to the parties under 26 U.S.C. § 6103.

[9] In this respect, even the perfunctory survey submitted by plaintiffs is 7 pages long with approximately 50 questions, some calling for undefined scaled responses. (*See* Plts Aug. 18, 2009, Status Rpt., Ex. B thereto; *see also* Van Liere Decl., Ex. A., ¶¶ 34-36.)

[10] Similarly, to the extent "don't know/don't recall" is an accepted survey answer, such responses may also be systematically related to production worker experiences and likely to introduce various potential biases. (*See* Van Liere Decl., Ex. A, ¶ 32.)

**B.     Plaintiffs' Proposed Survey Would Generate Unreliable Hearsay Results That Would Be Inadmissible At Trial**

Plaintiffs have submitted a form of survey which they propose to field as the primary or sole mechanism for generating production worker testimony.[11] For the reasons stated above in Part A, we generally object to the use of a survey as the primary or sole mechanism for generating production worker testimony. We further specifically object to plaintiffs' approach for three additional reasons: *First*, the results of any such survey would constitute inadmissible hearsay, and thus be of no assistance to the Court at trial. *Second*, plaintiffs' survey would fail to generate a sufficiently detailed understanding of the nature of the work completed by the sampled production workers and would not be a reliable mechanism to generate admissible evidence. *Thrid*, plaintiffs have not provided any concrete plan for interpreting survey responses and using those responses to make worker classification determinations. Consequently, we cannot agree to the approach recommended by plaintiffs.

**1.   Plaintiffs' Survey Results Would Constitute Inadmissible Hearsay**

As we understand plaintiffs' proposal, they would mail their questionnaire and collect production worker responses thereto and then seek to make a judgment, based on those responses, as to whether respondents were employees or independent contractors. This is a non-standard use of survey evidence. Survey evidence has generally been accepted by courts to ascertain the frequency of an event or to capture attitudes or reactions to questions posed at the time of the survey and to identify patterns across data. *See Reference Manual* at 231 ("Surveys are used to describe or enumerate objects or the beliefs, attitudes, or behavior of persons or other social units.") That is not what plaintiffs propose to do here. Rather, plaintiffs propose to draw

---

[11] Plaintiffs submitted their proposed survey instrument to the Court on August 18, 2009. To the extent plaintiffs have today submitted a revised form of survey, that revised survey was not previously made available to us.

conclusions about each individual production worker polled, accepting as true the respondents' recollection of historical facts and characterizations of work completed many years ago. Plaintiffs' proposal would thus seek to admit into evidence the out-of-court statements of sampled production workers and offer those statements for the truth of the matters asserted therein. This is the paradigm of hearsay evidence, for which no exceptions are applicable. FRE 801, 802, 803; *see also Pittsburgh Press*, 579 F.2d at 757 (finding survey results to be inadmissible hearsay where "[t]he survey was no more than a summary and distillation of 281 extrajudicial declarations offered to prove the truth of the matters asserted in those declarations . . .").[12]

### 2. Plaintiffs' Proposed Survey Is Not Likely To Provide Sufficient And Reliable Data To Make Production Worker Classification Decisions With Respect To The Sampled Production Workers

As part of our efforts to meet and confer with plaintiffs on their proposed survey form, we asked Dr. Kent Van Liere of NERA Economic Consulting to review the proposed survey form and provide his expert guidance on the utility of that form and whether it would generate sufficient reliable evidence. Dr. Van Liere's findings are attached hereto as Exhibit A. In his findings, Dr. Van Liere concludes that "a self-administered, primarily close-ended survey, such as the survey currently proposed by plaintiffs, is not likely to provide sufficient and reliable data to make worker classification determinations for the sampled workers." (*See* Van Liere

---

[12] Nor would plaintiffs be able to proffer the survey evidence through an expert witness. Because plaintiffs propose to use the survey responses to classify individual survey respondents, expert testimony regarding data patterns across the responses would be irrelevant. And to the extent plaintiffs propose to offer an expert to apply the common law employment test and classify individual workers based on their survey responses, that is the province of the Court, not an expert. *See, e.g.*, *Sparton Corp. v. United States*, 77 Fed. Cl. 1, 8 (2007) ("Whereas, in a jury trial, expert testimony on the law may be excluded in part to prevent jury confusion, the primary reason for exclusion of such testimony in a bench trial is that it invades the province of the court and is not helpful.").

Decl., Ex. A, ¶ 12.)  Dr. Van Liere identifies four overarching flaws in plaintiffs' form of questionnaire.  (*Id.* at ¶¶ 13-39.)

*First*, plaintiffs' form of questionnaire fails to adequately capture the details of the work performed by the sampled production workers, in that it asks a mainly generic set of questions that fail to account for the nuances that distinguish employees from independent contractors and fail to account for the wide range of types of production workers (*e.g.*, directors, wild animal handlers, truck drivers, etc.).  *See id.* at ¶¶ 13-19.

*Second*, plaintiffs' form of questionnaire assumes that each "production" sampled is an actual production of a specific film, television show, commercial, etcetera.  Yet many of the sampled "productions" are not typical productions, but rather companies or other entities through which production workers may have performed work on multiple productions.  Plaintiffs' form of questionnaire does not appear to account for how these "atypical" productions might impact production worker responses.  (*See id.* at ¶¶ 20-24.)

*Third*, plaintiffs' proposed form of questionnaire fails to include adequate checks on production worker recall (such as options to respond with "don't know/don't recall" and open-ended questions that request the respondent to explain their answer), and fails to account for potential recall errors and the potential that those recall errors may be systematically related to factors influencing how workers are classified.  (*See id.* ¶¶ 25-32.)

*Fourth*, plaintiffs' proposed questionnaire exhibits multiple design flaws that are likely to severely curtail its usefulness, including, but not limited to: "a) the problem of interpreting response categories that are multi-point scales for many questions, b) the vague nature of many of the questions themselves, c) the repetition of similar questions throughout the survey while

ignoring other areas, and d) the absence of any instructions to discourage guessing and the lack of 'don't know' response alternatives." (*See id.* at ¶¶ 33-39.)

In addition to the flaws identified by Dr. Van Liere, plaintiffs' survey is not "double-blind." In general, the intent of the survey and the identity of the survey sponsor(s) should be kept secret from the survey respondent. *See Reference Manual* at 266 ("the survey instrument should provide no explicit clues . . . and no implicit clues . . . about the sponsorship of the survey or the expected responses"). Plaintiffs' proposed survey packet violates this principle in several respects, including, but not limited to (1) providing a formal legal notice that the production workers' responses will be used in litigation; (2) providing the survey respondent with the case caption and thereby enabling the respondent to research the issues in dispute; and (3) threatening the respondent with a deposition if his/her responses are deemed to be incomplete. (*See* Plts. Aug. 18, 2009, Status Rpt. Ex. B.) [13]

### 3. Plaintiffs Have Not Provided A Written Plan Explaining How the Collected Data Would Be Utilized To Classify Production Workers

Finally, a glaring omission from plaintiffs' survey packet is any explanation of how the survey results will be utilized to classify production workers. In his Declaration, Dr. Van Liere identifies a number of issues that must be considered in interpreting results and classifying workers: (1) the weight to be given to particular responses; (2) how the conditional nature of many responses will be accounted for; and (3) how non-responses will be accounted for in interpreting the survey results. (*See id.* ¶¶ 40-46.) Plaintiffs have not adequately addressed these issues nor otherwise provided any concrete plan for interpreting survey results. Nor have plaintiffs provided any concrete plan for how those results would be used in this action. Without

---

[13] Additional flaws found in plaintiffs' questionnaire are identified in the letter attached hereto as Ex. B.

any such concrete plan, it is impossible to fully determine the reliability of any one question in light of how the answer it solicits is to be used.

**C.     The Parties Should Field The IRS Form SS-8 To Narrow, In A Manner Consistent With Plaintiffs' Burden Of Proof, The Amount Of Discovery Required**

In the context of plaintiffs' independent contractor theory, plaintiffs must carry the burden of proving that identifiable production workers are independent contractors and not employees.  While a survey may not reliably be utilized as the mechanism for obtaining production worker testimony that might fulfill plaintiffs' burden, we do believe that survey responses may substantially assist the parties in reducing the amount of discovery required and do so in a manner consistent with plaintiffs' burden of proof.   We propose that the parties field the IRS Form SS-8[14] and then use the responses to that Form to identify those workers that plaintiffs contend were or may have been independent contractors.  The parties could then depose that narrower subset of production workers.

In refund suits, there is a strong presumption that the finding of the Commissioner of Internal Revenue—the assessment of taxes—is correct.  *United States v. Fior D'Italia*, 536 U.S. 238, 243 (2002) ("An 'assessment' amounts to an IRS determination that a taxpayer owes the Federal Government a certain amount of unpaid taxes.  It is well established in the tax law that an assessment is entitled to a legal presumption of correctness—a presumption that can help the Government prove its case against a taxpayer in court."); *Conway v. United States*, 326 F.3d 1268 (Fed. Cir. 2003) ("The ruling of the Commissioner of the Internal Revenue enjoys a presumption of correctness and a taxpayer bears the burden of proving it to be wrong."); *Stobie Creek Invs., LLC v. United States*, 82 Fed. Cl. 636, 663 (2008).  With respect to plaintiffs'

---

[14] We suggest the parties use the Form SS-8 for number of reasons, including but not limited to the fact that it includes a number of open-ended questions that will likely solicit more detailed responses relative to plaintiffs' proposed survey.  *See* (Van Liere Decl., Ex. A., ¶ 48.)

independent contractor theory, the strong presumption of correctness translates into a presumption that the production workers were employees.

To overcome that strong presumption of correctness, the taxpayer carries the burden of proving, by a preponderance of the evidence, that the assessment is erroneous. *Brinskele v. United States*, 88 Fed. Cl. 334, 339 (2009); *Esposito v. United States*, 70 Fed. Cl. 558, 563 (2006); *Farkas v. United States*, 57 Fed. Cl. 134, 140 (2003). "In order to overcome the presumption of correctness, the taxpayer is 'required to show not only that the assessment was incorrect but also to prove the correct amount.'" *Brinskele*, 88 Fed. Cl. at 339.  **Moreover, "[t]he taxpayer carries the burden of proof both for this refund claim and against the defendant's counterclaim**." *Id.* (emphasis added); *see also Farkas*, 88 Fed. Cl. at 140 ("because the government's counterclaim relies on the same operative facts and legal conclusions as the plaintiff's claim, the taxpayer in effect carries the burden of proof both for his own claim and against the government's counterclaim").[15]

The burden imposed on plaintiffs is "the burden of going forward and the burden of persuasion." *Esposito*, 70 Fed. Cl. at 563. To carry the burden of going forward, plaintiffs "first must come forward with enough evidence to support a finding contrary to the Commissioner's determination." *See Esposito*, 70 Fed. Cl. at 563. When considered in light of plaintiffs' independent contractor sampling plan, this burden requires plaintiffs to come forward with

---

[15] Technically, the burden with respect to a government counterclaim shifts to the taxpayer once the government has established a *prima facie* case by tendering evidence that an assessment was made. "A certified copy of the taxpayer's "Certificate of Assessments and Payments" is "routinely used to prove that a tax assessment has in fact been made." *Teets v. United States*, 29 Fed. Cl. 697 (quoting *Rocovich v. United States,* 933 F.2d 991, 994 (Fed.Cir.1991) and citing *Dougherty v. United States,* 18 Cl.Ct. 335, 350 (1989), *aff'd without op.,* 914 F.2d 271 (Fed.Cir.1990); *Pototzky v. United States,* 8 Cl.Ct. 308, 315 (1985)). We are prepared to tender the certificates of assessment and payment at the appropriate time.

enough evidence to support a finding that identifiable production workers were independent contractors.

Taking plaintiffs' burden of proof into account, we recommend an approach whereby the parties field the IRS Form SS-8 (attached hereto as Ex. C), and then use the responses to that Form, the documents collected from joint subpoena recipients, and the payroll database files to identify that subset of the 379 sampled production workers that plaintiffs contend were independent contractors. The basic procedures we propose for fielding the Form SS-8 are as follows:

1. Determine the best current address for each sampled worker;

2. Send (via certified mail with a signature card) a cover letter jointly developed by the parties;

3. Include with the cover letter, a Form SS-8 and return (certified mail) envelope;

4. Send follow-up inquiries by mail as needed to increase the response rate;

5. Make a final follow-up call soliciting participation; and

6. Using the Form SS-8 responses and other available data, identify those respondents that plaintiffs contend are independent contractors and for whom depositions are required.

Utilizing the foregoing approach will enable the parties to more efficiently conduct discovery in at least three respects. *First*, because the Form SS-8 will not be used to solicit production worker testimony for use at trial (but instead will be used to identify those respondents for whom depositions are required), the process of sending the Forms and collecting the responses need not adhere to all of the requirements discussed above.[16] *Second*, use of the Forms SS-8 combined with other available data will allow the parties to sample the 379

---

[16] The same would be true of plaintiffs' proposed questionnaire were it not intended to solicit admissible production worker testimony. But we believe the Form SS-8's use of open-ended questions will elicit a greater amount of usable information than will plaintiffs' use of mostly close-ended questions.

production workers, but depose only a much narrower set of workers that plaintiffs, after reviewing those Forms and other available data, contend were independent contractors.  *Third*, to the extent any one of the 20 sampled productions does not yield any production workers that plaintiffs contend were independent contractors, further discovery into that production (including depositions of the joint subpoena recipients) would not be required.  Moreover, this approach has the added benefit of mimicking the standard process by which persons and entities seek worker classification decisions from the IRS.  *See, e.g.*, Ex. C at 4-5 (explaining how the Form SS-8 is used where a taxpayer seeks a worker classification decision).

**D.     In The Event Plaintiffs Field Their Own Survey, Independent Of Any Joint Effort, We Would Likely Require Discovery Into That Survey And Its Respondents**

To the extent plaintiffs decide to field their own survey, independent of any joint effort to field the IRS Form SS-8, we intend to seek discovery into the specific individual responses of the survey respondents, including depositions of those specific respondents plaintiffs contend were independent contractors.  As noted above, plaintiffs' proposed survey and sampling methodology call for the classification of individual workers based on the truth of the matters asserted in their survey responses.  Where survey evidence has been offered for the truth of the matters asserted in the response, courts have granted discovery into the identities of the survey respondents and their specific individual response.  *See, e.g., Comm-Tract Corp. v. Northern Telecom., Inc.*, 143 F.R.D. 20 (D. Mass. 1992) (without commenting on the admissibility of the survey evidence, holding that where a "survey is used as no more than a summary and distillation of ... extrajudicial declarations offered to prove the truth of the matters asserted in those declarations . . ." the only way the adverse party could counter the evidence "would be to test the specific individual responses of the survey participants") (internal quotations and citations omitted).

**CONCLUSION**

Based on the foregoing, we cannot agree to the use of plaintiffs' proposed survey and are not willing to invest further time and effort in developing a more responsible survey instrument. Instead, we propose that the parties field the IRS Form SS-8 and utilize the responses to that Form to narrow, in a manner consistent with plaintiffs' burden of proof, the number of sampled production workers that must be deposed.

                                                   Respectfully submitted,

November 24, 2009                             By: *s/Fredrick C. Crombie*

                                                   FREDRICK C. CROMBIE
Attorney of Record
U.S. Department of Justice
Tax Division
Court of Federal Claims Section
Post Office Box 26
Ben Franklin Post Office
Washington, D.C.  20044
(202) 305-2165
(202) 514-9440 (facsimile)

JOHN A. DiCICCO
Acting Assistant Attorney General
STEVEN I. FRAHM
Chief, Court of Federal Claims Section
MARY M. ABATE
Assistant Chief
CHRISTOPHER S. DOVE
Trial Attorney
ALLISON ICKOVIC
Trial Attorney

November 24, 2009                             *s/Mary M. Abate*
                                                   MARY M. ABATE

                                                   *Attorneys for Defendant*