No. 02-1916 T (and consolidated actions)

(Judge George W. Miller)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
_____

CENCAST SERVICES, L.P. ET AL,

Plaintiffs

v.

THE UNITED STATES,

Defendant.

_____

DEFENDANT'S REPLY BRIEF IN SUPPORT OF ITS PROPOSAL CONCERNING
DISCOVERY INTO INITIAL SAMPLE SET PRODUCTION WORKER EMPLOYEES AND
IN OPPOSITION TO PLAINTIFFS' PROPOSED FORM OF QUESTIONNAIRE
_____

JOHN A. DiCICCO
        Acting Assistant Attorney General

STEVEN I. FRAHM
MARY M. ABATE
FREDRICK C. CROMBIE
    Attorneys
    Justice Department (Tax)
    Court of Federal Claims Section
    P.O. Box 26
    Ben Franklin Post Office
    Washington, D.C.  20044
     (202) 305-2165
     (202) 514-9440 (facsimile)

# TABLE OF CONTENTS

Page:

INTRODUCTION ...................................................................................................................1

ARGUMENT .........................................................................................................................2

I.   THIS COURT SHOULD NOT ABANDON ITS WELL-ESTABLISHED
METHODOLOGY IN FAVOR OF AN UNPRECEDENTED AND UNTESTED
SURVEY PROCEDURE THAT UTILIZES A FAULTY INSTRUMENT ......................2

    A.   Plaintiffs' Proposal Is an Unprecedented Departure From the Federal
Judiciary's Long-Established Methodology and the Common-Law
Employment Test .........................................................................................3

        1.   Plaintiffs' Proposed Questionnaire Will Not Capture the "Total
Factual Context" .............................................................................3

        2.   Plaintiffs' Universal Point Scoring System Is Incompatible With
the Common-Law Test .....................................................................4

    B.   Plaintiffs' Proposed Survey Framework Is Untested and Lacks Any
Means By Which to Establish Its Criterion or Predictive Validity............................6

    C.   Plaintiffs' Proposed Survey Framework Would Generate Only
Inadmissible Hearsay ....................................................................................7

    D.   Plaintiffs' Proposed Survey Framework Is Riddled With Internal
Contradictions .............................................................................................10

        1.   Plaintiffs' Research Question .............................................................10

        2.   Individualized Determinations ............................................................10

        3.   Time-Specific Inquiries .....................................................................11

        4.   Depositions ....................................................................................11

        5.   Threat of Depositions .......................................................................12

5188977.2

# TABLE OF CONTENTS
## (Cont'd)

Page:

II.  DEFENDANT'S PROPOSAL IS TIME-TESTED AND STRAIGHTFORWARD AND WILL ALLOW THE PARTIES TO SUBSTANTIALLY NARROW THE REQUIRED DISCOVERY ................................ 12

    A.   Our Proposal Is Not a Survey ................................................................. 13

    B.   Our Proposal Is Not Unfairly Burdensome ............................................ 14

CONCLUSION ................................................................................................................ 16

5188977.2

# TABLE OF AUTHORITIES

**Page(s):**

**Cases:**

*Alford v. United States*,
  116 F.3d 334 (8th Cir. 1997) ........................................................................................ 2

*Bleavins v. United States*,
  807 F. Supp. 487 (C.D. Ill. 1992) ................................................................................ 7

*Bortelli v. Eli Lilly & Co.*,
  406 F. Supp. 2d 1 (D.D.C. 2005) ................................................................................. 8

*Brinskele v. Untied States*,
  88 Fed. Cl. 334 (2009) .............................................................................................. 13

*Broga v. NE Util.*,
  315 F. Supp. 2d 212 (D. Conn. 2004) ......................................................................... 8

*Burkhart v. Wash. Metro. Area Transit Auth.*,
  112 F.3d 1207 (D.C. Cir. 1997) .................................................................................. 7

*Central Mfg. Co. v. Casablanca Indus., Inc.*,
  87 Fed. Appx. 156 (Fed. Cir. 2003) ............................................................................ 8

*Community for Creative Non-Violence v. Reid*,
  490 U.S. 730 (1989) .................................................................................................... 3

*Comm-Tract Corp. v. Northern Telecom, Inc.*,
  143 F.R.D. 20 (D. Mass. 1992) ................................................................................... 9

*Consolidated Flooring Servs. v. United States*,
  38 Fed. Cl. 450 (1997) ................................................................................................ 2

*Esposito v. United States*,
  70 Fed. Cl. 558 (2006) .............................................................................................. 13

*JZ Buckingham Investments LLC v. United States*,
  78 Fed. Cl. 15 (2007) ................................................................................................ 14

*Nationwide Mut. Ins. Co. v. Darden*,
  503 U.S. 318 (1992) ............................................................................................ 2, 3, 5

*NLRB v. United Ins. Co. of Am.*,
  390 U.S. 254 (1968) ............................................................................................ 2, 3, 5

*Phillips v. Gates*,
  329 Fed. Appx. 577 (6th Cir. 2009) ............................................................................ 8

5188977.2

# TABLE OF AUTHORITIES
## (Cont'd)

Page(s):

**Cases (Cont'd):**

*Pittsburgh Press Club v. United States*,
   579 F.2d 751 (3d Cir. 1978) ........................................................................... 9

*Ralls, Inc. v. United States*,
   470 F.2d 579 (Ct. Cl. 1977) ........................................................................... 2

*Stobie Creek Investments, LLC v. United States*,
   81 Fed. Cl. 358 (2008) ................................................................................... 7

*Spivey v. United States*,
   912 F.2d 80 (4th Cir. 1990) ........................................................................... 8

*Tri-State Developers, Inc. v. United States*,
   549 F.2d 190 (Ct. Cl. 1977) ........................................................................... 2

*United States v. Dentsply*,
   Civ. A. 99-5, 2000 WL 654378 (D. Del. 2000) ............................................. 9

*United States v. Fior D'Italia*,
   536 U.S. 238 (2002) ..................................................................................... 13

*Waller v. United States*,
   461 F.2d 1273 (Ct. Cl. 1972) ......................................................................... 8

**Statutes:**

28 U.S.C. § 1746 ..................................................................................... 7, 8

**Rules:**

RCFC 56(e)(1) ............................................................................................ 8

**Treatises:**

11 James W. Moore, *Moore's Federal Practice* (3d ed. 2009) ....................... 8

5188977.2

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

———————————

(Judge George W. Miller)

———————————

Nos. 02-1916 T, 02-1917 T, 02-1918 T, 02-1919 T, 02-1920 T,
02-1921 T, 02-1922 T, 02-1923 T, 02-1924 T, 02-1925 T

———————————

CENCAST SERVICES, L.P. ET AL,

Plaintiffs

v.

THE UNITED STATES,

Defendant

———————————

DEFENDANT'S REPLY BRIEF IN SUPPORT OF ITS PROPOSAL CONCERNING
DISCOVERY INTO INITIAL SAMPLE SET PRODUCTION WORKER EMPLOYEES AND
IN OPPOSITION TO PLAINTIFFS' PROPOSED FORM OF QUESTIONNAIRE

———————————

*"**DISC does not pay independent contractors, and that has been its policy for
many years.**"* (Pls. Resp. to IDR 13 at PL057111 (attached as Ex. 3 to Def. Jan.
21 Br.) (emphasis added).)

Despite their admission to the contrary, plaintiffs now attempt to present, as a *fait

accompli*, their theory that there were independent contractors within that segment of their

payroll that they themselves classified as *employee* wages. That theory is based on industry-

wide assumptions not fairly relatable to the subset of plaintiffs' payroll at issue (*see* Def. Jan. 21

Br. at 7-9), and a purported expert report not supported by any factual analysis, but instead only

by that purported expert's *ipse dixit* assertion of expertise. *See* Hadity Depo. Trans., at 162:4-

163:14, 166:5-168:5 (attached hereto at Ex. 11); *General Elec. Co. v. Joiner,* 522 U.S. 136, 146

(1997).

–1–

As we explained in our January 21 brief, the common-law employment test utilizes "no shorthand formula or magic phrase," but instead is "extraordinarily fact intensive" and requires a careful weighing of "all the incidents of the employment relationship." *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323-24 (1992); *NLRB v. United Ins. Co. of Am.*, 390 U.S. 254, 258 (1968); *Alford v. United States*, 116 F.3d 334, 337 (8th Cir. 1997). This Court and others have time-and-again made such fact intensive, nuanced distinctions only after hearing the testimony of the employers, the workers or both. *See, e.g.*, *Consolidated Flooring Servs. v. United States*, 38 Fed. Cl. 450 (1997); *Ralls, Inc. v. United States*, 470 F.2d 579 (Ct. Cl. 1977); *Tri-State Developers, Inc. v. United States*, 549 F.2d 190 (Ct. Cl. 1977). Plaintiffs have never addressed this time-tested methodology, and indeed, have never cited any decision of any court that utilized survey evidence to classify workers as either employees or independent contractors. The Court should reject plaintiffs' proposal and adopt defendant's proposed iterative process which allows for follow-up with respondents.

## ARGUMENT

## I

### THIS COURT SHOULD NOT ABANDON ITS WELL-ESTABLISHED METHODOLOGY IN FAVOR OF AN UNPRECEDENTED AND UNTESTED SURVEY PROCEDURE THAT UTILIZES A FAULTY INSTRUMENT

Plaintiffs propose that this Court adopt a Rube-Goldberg combination of two different surveys, neither of which has legs sufficient to stand on its own. Plaintiffs, however, have *never* tested their proposed questionnaire and lack any plan for demonstrating its predictive validity. We believe that questionnaire is irredeemably flawed and unlikely to return sufficient and reliable data for all the reasons discussed in our prior briefings and for the additional reasons discussed herein and in the accompanying declaration of our expert, Dr. Kent Van Liere

–2–

(attached hereto as Ex. 12).  Indeed, even plaintiffs' own purported expert, Dr. Mullin, admits that plaintiffs' proposed process may ultimately yield unreliable data.  (Pl. Feb. 2 Br., Ex. 5 ¶ 16.)  Yet plaintiffs would nonetheless preclude any follow-up with questionnaire respondents.  (Pl. Feb. 2 Br. at 3; Pl. Feb. 2 Br., Ex. 2, at ECF pg. 4.)  Hence, plaintiffs' proposal is inherently risky.  To the extent unreliable data are returned (as we expect will happen), plaintiffs' proposal would provide no avenue for rehabilitating those data.

A.     **Plaintiffs' Proposal Is an Unprecedented Departure From the Federal Judiciary's Long-Established Methodology and the Common-Law Employment Test**

Plaintiffs' closed-ended survey framework would fail to adequately weigh and assess all the incidents of the employment relationships at issue, *NLRB*, 390 U.S. at 258, and thereby departs from the common-law employment test, in at least two respects.

1.     **Plaintiffs' Proposed Questionnaire Will Not Capture the "Total Factual Context"**

Because plaintiffs' proposed questionnaire relies primarily upon closed-ended questions, that questionnaire fails to capture the "total factual context" required to assess and weigh "all of the incidents of the relationship" and reliably classify workers.  *See NLRB*, 390 U.S. at 258; *see also Nationwide Mut.*, 503 U.S. at 323-24 (1992); *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 751-52 (1989).  For example, plaintiffs' questionnaire asks four questions relating to the provision of instructions:

- "Were you free to determine the sequence of daily events related to the services you provided on [sic] this company?"  [Yes/No];

- "I was generally provided with a set of instructions indicating how to accomplish the job."  [Scaled response; Strongly Disagree to Strongly Agree]

- "I was told what to accomplish but not how to accomplish it."  [Scaled response; Strongly Disagree to Strongly Agree]; and

- "Who determined how a task was to be accomplished?"  [Scaled response; "A supervisor from the company" to "It was left up to you"].

As Dr. Van Liere explains, "[w]hile these items can be grouped into a factor on instructions, the questions provide no information on what the instructions actually were, how these instructions relate to actual work that was being done, how the instructions relate to the order of the tasks being completed and whether the worker had to comply with the instructions or not; all key elements in weighing the importance of this factor in determining worker status. I find similar issues with other key areas of analysis, such as training and financial control."  (Feb. 12 Van Liere Decl. ¶ 12; *see also* Nov. 24 Van Liere Decl. ¶¶ 13-19.)  Absent such contextual information informing the nature of the factor considered, neither the parties nor this Court nor Professor Babin can accurately assess the particular weight to be given to that particular factor when assessing and weighing all the "incidents."

Plaintiffs assert that "Professor Babin has added several open-ended questions that will allow respondents to elaborate with regard to their work."  (Pl. Feb. 2 Br. at 10.)  While plaintiffs include 11 open-ended questions, only four would arguably solicit contextual facts related to the common-law factors, and those four questions appear at the end of their nine-page survey, combine multiple inquiries into one question, and provide little space for a meaningful response. (*See* Pl. Feb. 2 Br., Ex. 2 at ECF pgs. 16-17.)  Such a superficial use of open-ended questions will not solicit sufficient contextual facts to allow the Court to assess and weigh the "incidents."

### 2.     Plaintiffs' Universal Point Scoring System Is Incompatible With the Common-Law Test

To the extent that plaintiffs intend to submit purported expert testimony based upon an aggregate analysis employing a uniform point scoring system (Pl. Feb. 2 Br., Ex. 1 ¶¶ 7-8), that

5188977.2

system would also violate the common-law test.[1]  As plaintiffs' own legal memorandum

recognizes, the weight that should be given to any particular factor will almost certainly vary by

occupation or production.  (*See* Pl. Mot. to Compel Ex. J, ECF Doc. 188-12 at 75.)   An analysis

that employs a uniform point scoring system, however, does not permit careful weighing of the

"incidents" in accord with each PWE's contextual facts, and is thus nothing more than the type

of "shorthand formula" rejected by the Supreme Court.  *NLRB*, 390 U.S. at 258; *Nationwide*

*Mut.*, 503 U.S. at 324 (quoting *NLRB*).  Indeed, as we stated in our January 21 brief, "if one

scoring mechanism could be utilized to definitively classify the 164 different types of workers at

issue here—ranging from directors to writers to grips to carpenters to teamster truck drivers—it

is hard to discern what all the decades of employee/independent contractor fuss have been

about."  (D's Jan. 21 Br. at 13.)  Plaintiffs, of course, have made no effort to explain how their

"scoring" methodology comports with the common-law test, and we suspect no such explanation

will be forthcoming.

Moreover, plaintiffs' proposed factor and cluster analysis plan leads to a predetermined

result that at least some of the production workers would be reclassified no matter the contextual

facts.  (Pl. Feb. 2 Br., Ex. 1 ¶ 7-8.)  As Dr. Van Liere explains:

> [F]actor and cluster analyses do not ensure substantively meaningful results.
> Factor analysis is a statistical procedure used to group survey items based on
> correlations among the items. Generally, this process creates factors from the
> covariation that exists in the data.  Similarly, cluster analysis seeks to group
> individuals based on whatever variation and covariation exists in the data.  In this
> sense, Professor Babin's approach analyzes the relative variation in the data, but
> does not provide any insight as to whether respondents meet some absolute
> criteria (such as yes they received training or no they did not).  As a result, *it is*
> *predetermined in Professor Babin's approach that some fraction of workers will*
> *be coded as independent contractors* as there will be some group of individuals

---

[1] In this respect, plaintiffs propose to usurp the Court's role and have their purported expert make production worker classification determinations based not on a careful weighing of all the incidents, but instead on a scoring methodology and statistical analysis.

whose answers are more extreme than others on his scales. However, there is no mechanism in his plan to show that these workers meet some minimally accepted guideline for independent contractor status.

(Feb. 12 Van Liere Decl. ¶ 8 (emphasis added).)

**B.      Plaintiffs' Proposed Survey Framework Is Untested and Lacks Any Means By Which to Establish Its Criterion or Predictive Validity**

So far, plaintiffs have put forward a proposed questionnaire that has never been used and has never been tested, and have stated that they intend to employ a universal scoring system combined with factor and cluster analysis to identify respondents they contend are independent contractors. (*See* Pl. Feb. 2 Br., Ex. 1 ¶¶ 7-12.) Although plaintiffs' "plan" is incomplete, it is already clear that the plan is flawed in that there is no mechanism by which to establish the predictive validity of either their questionnaire or their scoring system (*i.e.*, a control group). As Dr. Van Liere explains:

> . . . Professor Babin offers no indication of how he will establish that his factor/cluster scoring system has criterion or predictive validity. *Validity generally indicates whether a scale measures what it is intended to measure and thus the meaning of the scale scores are valid.* Among key tests for validity is evidence that scales actually distinguish individuals on the variable or behavior of interest. For this case, Professor Babin seeks to use his factor/cluster analysis to construct groups of workers whose scores are consistent with either being an independent contractor or being an employee. Generally, in psychometrics, such scaling exercises require evidence that the scoring system correctly identifies the relevant groups. So, for example, the scales might be tested on groups of individuals who were known to be independent contractors or known to be employees to determine whether the scoring achieved the correct groupings. *Professor Babin's proposed work is exploratory and he does not offer any procedure to establish that the survey questions, factor scales, clustering analysis and scoring system he has designed would correctly identify independent contractors.*

(Feb. 12 Van Liere Decl. ¶ 9 (footnote omitted) (emphasis added).)

C.   **Plaintiffs' Proposed Survey Framework Would Generate Only Inadmissible Hearsay**

In both our November 24 and January 21 briefs, we explained that because plaintiffs propose to offer survey responses for the truth of the matters asserted therein, their survey proposal would not generate admissible evidence.  (*See* Def. Nov. 24 Br. at 8-9; Def. Jan. 21 Br. at 9-11.)

In response, plaintiffs contend that "whether or not the questionnaire responses themselves are hearsay is immaterial" because they expect Professor Babin to utilize those responses in providing expert testimony.  (Pl. Feb. 2 Br. at 13.)  But plaintiffs ignore the fact that they are attempting to impose their questionnaire on an initial sample set into which *both* parties are conducting discovery.  Given the tremendous resources (of parties and non-parties alike) being poured into that initial sample set, the parties should concentrate their efforts on discovering evidence this Court may consider directly and not on generating hearsay support for speculative and likely-inadmissible expert reports.[2]

Plaintiffs also contend that the hearsay responses would be admissible because they are signed under penalty of perjury pursuant to 28 U.S.C. § 1746.  Section 1746 does not solve plaintiffs' problem.  It permits only that an unsworn declaration signed under the penalty of perjury may be used in place of a sworn declaration or affidavit.  *Bleavins v. United States*, 807 F. Supp. 487, 489 (C.D. Ill. 1992).  The use of affidavits for summary judgment purposes,

---

[2] Plaintiffs apparently expect to offer the testimony of Professor Babin as to the legal conclusion that some group of PWEs are properly classified as independent contractors.  There is only one expert who may make that legal determination, and it is the Court.  *Stobie Creek Investments, LLC v. United States*, 81 Fed. Cl. 358, 360, 363 (2008) (stating "[e]ach courtroom comes equipped with a 'legal expert,' called a judge" and holding that "expert testimony that constitutes legal analysis or application of the law would not assist the court - the trier of fact - in understanding the evidence or determining a fact in issue") ) (quoting *Burkhart v. Wash. Metro. Area Transit Auth.*, 112 F.3d 1207, 1213 (D.C. Cir. 1997)).

however, is premised on the understanding that the affiant would be able to testify at trial to the matters asserted in the affidavit, and that the testimony would be admissible.[3]  *See* 11 James W. Moore, *Moore's Federal Practice*, § 56.14[a][d] at 56-192-196 (3d ed. 2009) ("at the summary judgment stage, the focus is not on the form of the evidence as it is presented in the affidavit, but rather, whether at trial the matter stated in the affidavit would constitute admissible evidence"). Here, because the survey responses will not be backed by the promise of admissible trial testimony and because the responses themselves would be inadmissible at trial, those responses could not properly be considered on summary judgment even were they to comply with 28 U.S.C. § 1746.  *See Central Mfg. Co. v. Casablanca Indus., Inc.*, 87 Fed. Appx. 156, 159 (Fed. Cir. 2003) (affidavits were properly excluded from evidence at trial on grounds that it constituted inadmissible hearsay); *Waller v. United States*, 461 F.2d 1273, 1277 (Ct. Cl. 1972) (same); *Phillips v. Gates*, 329 Fed. Appx. 577, 584 (6th Cir. 2009) (same); *Spivey v. United States*, 912 F.2d 80, 85 (4th Cir. 1990) (same); *Bortelli v. Eli Lilly & Co.*, 406 F. Supp. 2d 1, 9 (D.D.C. 2005) (same); *Broga v. NE Util.*, 315 F. Supp. 2d 212, 216-17 (D. Conn. 2004) (same).

Furthermore, to the extent plaintiffs intend to utilize survey responses as they have suggested, defendant would be entitled to depose those respondents.  As we have explained, plaintiffs propose to use their "survey" to collect out-of-court assertions of historical fact, and then use those assertions to definitively classify each PWE.  (Pl. Feb. 2 Br. at 3 (suggesting the use of "mini-trials" to make "individualized conclusions").)  As the court in *Comm-Tract v. Northern Telecom* noted, where "the survey is used as 'no more than a summary distillation of . . . extrajudicial declarations offered to prove the truth of the matters asserted in those

---

[3]  In this respect, the Court's Rules contemplate that the contents of an affidavit submitted on motion may be tested: "The court may permit an affidavit to be supplemented or opposed by depositions, answers to interrogatories, or additional affidavits."  RCFC 56(e)(1).

declarations . . .' . . .the only way [to] counter the evidence would be to test the specific

individual responses." *Comm-Tract Corp. v. Northern Telecom, Inc.*, 143 F.R.D. 20, 22 (D.

Mass. 1992) (citing *Pittsburgh Press Club v. United States*, 579 F.2d 751, 757 (3d Cir. 1978).  In

particular, that Court analyzed the survey in question and determined that it had a mixed

purpose; some questions sought classic "customer perception" while other questions amounted to

"specific factual inquiries."  *Id.* at 23.  As to those later "specific factual inquiries" it was clear

that the survey proponent intended to offer responses "for the truth of the matters asserted."

Thus, the Court determined that the opposing party "could effectively counter such evidence at

trial only by being able to test the specific individual responses of the survey participants," and

granted discovery into the survey and the identity of respondents, ostensibly so that the opposing

party could follow up with respondents and test their responses.  *Id.* at 24.  Conversely, in *United

States v. Dentsply*, the survey was limited to consumer perception and did not involve specific

factual inquiries and the plaintiff did not attempt to offer individual responses into evidence.  No.

Civ. A. 99-5, 2000 WL 654378, *9 (D. Del. 2000).[4]

---

[4] In this respect, the *Dentsply* Court noted "The United States has represented that it does not
intend to introduce individual survey responses into evidence other than as part of a survey
'package' underlying expert analysis of the data; that is, it does 'not intend to hold up any
individual survey response and say this one says that or that one says this.' . . . The Court will
hold the United States to this representation."  2000 WL 654378, *9 n.17 (citation omitted).

Furthermore, the survey in *Dentsply* (an antitrust case) was intended not to draw particularized
conclusions as to individual distributors, but instead was intended to draw generalized
conclusions regarding the market for prefabricated teeth.  2000 WL 654378 at *1.  In contrast,
here plaintiffs propose just the opposite; they seek to field a "survey" for the purposes of
classifying the sampled PWE/payment combinations.  Thus, unlike instances similar to *Dentsply*
where courts have permitted the use of surveys, here there is no generalized single conclusion
that the Court must make (such as market definition or how a behavior impacts the overall
functioning of a market).  Rather, the Court is here faced with the need to make many discrete
determinations.  (Pl. Feb. 2 Br. at 3.)

**D.      Plaintiffs' Proposed Survey Framework Is Riddled With Internal Contradictions**

In addition to the issues identified above, plaintiffs' proposed survey framework is riddled with internal contradictions and inconsistencies, certain of which are set forth below.

**1.      Plaintiffs' Research Question**

In his February 2 declaration, Professor Babin describes the "key research question" as "[w]hat ***proportion of individuals in the population*** most accurately exhibits the characteristics of independent contractors versus employees." (Pl. Feb. 2 Br., Ex. 1 ¶ 24 (emphasis added).) That statement is directly contradicted by Dr. Mullin, who states "***the fraction of taxable wages*** paid to independent contractors is the parameter of interest (***not the fraction of workers***) . . . ." (Pl. Feb. 2 Br., Ex. 5 ¶ 12 (emphasis added).) The inconsistency amongst plaintiffs' own purported experts indicates that at least one of them does not fully understand the purpose of the purported analysis. (*See* Feb. 12 Van Liere Decl. ¶ 5.)

**2.      Individualized Determinations**

In his February 2 declaration, Dr. Mullin takes the position that individualized determinations are not required and states "Defendant appears to be operating under the erroneous impression that a determination of the employment status of each sampled worker is necessary." (Pl. Feb. 2 Br., Ex. 5 ¶ 3.) Yet, in their February 2 brief, plaintiffs propose that this Court do just that:

> in cases where the parties do not so agree, either side would be free to present relevant evidence to the Court, either in support of partial summary judgment motions or (if necessary) at mini-trials. ***The individualized conclusions*** could then be tabulated and extrapolated to the population as a whole.

(Pl. Feb. 2 Br. at 3 (emphasis added).)

–10–

### 3.     Time-Specific Inquiries

In his February 2 declaration, Professor Babin attempts to minimize the potential impact of "telescoping" (a form of recall bias) by proclaiming that "[w]e do not intend to ask about the timing of events."  (Pl. Feb. 2 Br., Ex. 1 ¶ 36.)  Perhaps Professor Babin misunderstands the basic objective of plaintiffs' survey.  (Feb. 12 Van Liere Decl. ¶ 31.)  The timing of events is critical to the proper administration of plaintiffs' survey; and plaintiffs' proposed cover letter actually identifies a specific time period being inquired into.  (*See* Pl. Feb 2 Br., Ex. 2 at ECF pg. 7).  More importantly, as Dr. Van Liere explains:

> . . . Plaintiffs' survey and its utility as a means to extrapolate to the larger population of wages is dependent on workers' ability to accurately recall the work activities associated with the wages that they earned from a specific sampled production in a specific period of time.  I don't understand how Professor Babin's survey questions can ignore the timing of this work as it is critical to the extrapolation process.

(Feb. 12 Van Liere Decl. ¶ 31.)

### 4.     Depositions

At pages 19-20 of their February 2 brief, plaintiffs purport to agree to "depositions of survey respondents on a case-by-case basis if approved by the Court for good cause."  Yet their proposed questionnaire specifically waives any such depositions.  (Pl. Feb. 2 Br., Ex. 2 at ECF pg. 4 ("If you submit the questionnaire as directed in this notice by _____, 2010, you do not have to respond to the enclosed subpoena."); *see also* Pl. Feb. 2 Br. at 3 ("a subpoena for deposition to be issued by the Court that will be waived for individuals who complete the questionnaire.")

### 5. Threat of Deposition

In his February 2 declaration, Professor Babin criticizes our proposal on the ground that it "implies the threat of deposition based on the responses provided."[5]  (Pl. Feb. 2 Br., Ex. 1 ¶ 20.) According to Professor Babin, "[T]his endangers the validity of the information obtained at worst and complicates the data analysis at best because the missing data are not missing completely at random."  (*Id.*; *see also* (Pl. Feb. 2 Br. at 16 ("the prospect of depositions could affect the survey results")).)  Yet despite his professed concern, Professor Babin goes on to endorse his proposed questionnaire which (unlike defendant's instrument) (1) explicitly threatens the sampled PWEs with a deposition that will only be waived if and when the PWE responds to the questionnaire and (2) is accompanied by a deposition subpoena.  (Pl. Feb. 2 Br., Ex. 2, ECF pgs. 4, 19-23.)

## II

## DEFENDANT'S PROPOSAL IS TIME-TESTED AND STRAIGHTFORWARD AND WILL ALLOW THE PARTIES TO SUBSTANTIALLY NARROW THE REQUIRED DISCOVERY

In our January 21 brief, we recommended that the parties employ an iterative process whereby plaintiffs first field a modified Form SS-8, not as a scientific survey, but as an informal means to collect information sufficient to allow them to assert a more focused independent contractor theory.[6]  Once plaintiffs have asserted a more focused theory supported by informal

---

[5] Professor Babin contradicts himself even in this criticism, simultaneously complaining that our instrument violates ethical standards because it does *not* disclose the possibility of depositions. (Pl. Feb. 2 Br., Ex. 1 ¶ 22.)

[6] Because our proposed modified Form SS-8 employs both closed-ended and open-ended questions, it is better suited to collect contextual facts than is plaintiffs' proposed questionnaire, and it is therefore more likely to permit a more informed classification of PWEs than would plaintiffs' instrument.  (*See* Feb. 12 Van Liere Decl. ¶ 30.)  Moreover, the Form SS-8, upon which our proposed instrument is based, is battle-tested; it enjoys a rich, decades-long history as a tool used by the Service to assist it in making worker classification determinations.

responses to the Form SS-8, we expect that the parties will meet and confer in an effort to either

reach an informed settlement or to significantly narrow the PWEs remaining in dispute.  To the

extent plaintiffs do not contend that certain PWEs were independent contractors, those workers

are not in dispute and no further discovery (whether formal or informal) into those PWEs need

be had.[7]  *See United States v. Fior D'Italia*, 536 U.S. 238, 243 (2002).  Furthermore, to the

extent responses to the modified Form SS-8 provide sufficient compelling information, it is

possible the parties may also agree that other additional PWEs are not in dispute.  As to those

PWEs remaining in dispute, additional follow-up may be had in the form of depositions or other

informal means.  Because our proposal allows for follow-up with respondents, it is low-risk.  To

the extent insufficient information is returned, alternative avenues for rehabilitating those data

remain open.

**A.      Our Proposal Is Not A Survey**

> Plaintiffs and Professor Babin continue to inaccurately characterize our proposal as a

traditional survey.  We do not propose that the parties employ a survey, but instead propose an

informal and iterative information-gathering process.  As Dr. Van Liere explains:

> . . . I wish to state again that I am not proposing a survey be conducted in the
> traditional sense of surveys used in litigation.  Rather, as a result of my many
> concerns about whether a "traditional" survey would lead to reliable data and as a
> result of my concerns over Professor Babin's survey questions and procedures for
> this case, I offered an "alternative" data collection procedure that has the benefit
> of relying on a sample of workers, but also allows both Plaintiffs and Defendants
> to assess the quality of the information as it is collected to determine whether
> additional follow-up in some form is required.  This alternative process is what I

---

[7] As we have previously explained, the findings of the Commissioner of Internal Revenue are
entitled to a presumption of correctness.  *United States v. Fior D'Italia*, 536 U.S. 238, 243
(2002).  Thus, once defendant tenders valid certificates of assessments and payments, the burden
of proof as to defendant's counterclaim shifts to plaintiffs.  *See Brinskele v. Untied States*, 88
Fed. Cl. 334, 339 (2009); *see also Esposito v. United States*, 70 Fed. Cl. 558, 563 (2006).  We
attach hereto at Exhibits 1-10 valid certificates of assessments and payments with respect to each
of the plaintiffs and each of the tax periods in dispute.

> generally understood Plaintiffs had in mind when they proposed their original
> sampling methodology in the spring and summer of 2009.

(Feb. 12 Van Liere Dec. ¶ 20.)  Because what we propose is not a "survey," but rather an

alternative and informal iterative process, many of plaintiffs' and Professor Babin's criticisms

are irrelevant and off-point.  Moreover, for the reasons discussed in Dr. Van Liere's February 12

declaration at paragraphs 20-33, those straw-men criticisms, including those set forth in Section

V.A. of plaintiffs' February 2 brief, are also baseless.

**B.**     **Our Proposal Is Not Unfairly Burdensome**

In their February 2 brief, plaintiffs once again object to the concept of depositions, on the

ground that they are unduly burdensome.  Plaintiffs, however, have not made a "specific and

compelling" showing of "undue burden," *JZ Buckingham Investments LLC v. United States*, 78

Fed. Cl. 15, 25 (2007), and it is unlikely that depositions would be more costly than plaintiffs'

suggestion of employing a special master and expert witnesses and engaging in voluminous

expert discovery and attendant motions *in limine*.

Moreover, plaintiffs' assertion that our proposal would involve "hundreds" of depositions

is lacking in common sense.  To the extent plaintiffs' goal is to off-set the Service's assessment

of additional employment taxes, they are likely to focus their theory on those PWEs that (1) they

contend are most likely to be independent contractors and (2) that are sufficient to achieve that

off-set.[8]  In the event plaintiffs assert a less-focused theory that "hundreds" of PWEs were

independent contractors, several options would remain available to reduce the number of

depositions required.  For example, defendant could depose a statistically relevant sub-sample set

of those "hundreds" of PWEs for the purposes of testing plaintiffs' conclusions.  Alternatively,

---

[8] Indeed, imposing prior restraints on defendant's ability to conduct its own discovery would
only encourage plaintiffs to overreach and inflate the number of PWEs they contend are
independent contractors.

5188977.2

defendant could stage depositions, such that a limited number of depositions are taken for the

purposes of conducting mini-trials that would provide the parties with a better grasp of their

respective litigation hazards.  In short, a number of options will present themselves once

plaintiffs actually identify those initial sample set PWEs they contend were independent

contractors.

Plaintiffs assert that the sampled workers would also be unduly burdened, and offer the

generalized complaint, applicable to any action, that "[d]epositions are time-consuming, anxiety-

inducing, and costly to deponents, possibly requiring them to miss work or even hire legal

counsel."[9]  (Pl. Feb. 2 Br. at 19, 24.)   Plaintiffs' assertion of undue burden is entirely speculative

where, as here, it is not yet known who will be deposed and why.  While we are not insensitive

to the burdens plaintiffs' theory imposes on third-parties (and defendant), the individual PWEs at

issue here will be no more burdened than would workers deposed in connection with any other

employee/independent contractor dispute.  Indeed, under our proposal, which caps the length of

such depositions at four hours, the burden imposed on those PWEs would be significantly less

than that imposed on workers deposed in connection with other employee/independent contractor

disputes.  To the extent that even a limited four-hour deposition would prove unduly burdensome

to any particular PWE, we will explore alternative options.

---

[9] Plaintiffs attempt to analogize their position to depositions of absent class members.  (Pl. Feb. 2 Br. at 19-20.)  In class actions, however, the Court must appoint named representatives that are similarly situated as to the absent class members.  Those named representatives are subject to depositions which are generally controlling as to issues confronting the class.  That is substantially different than what plaintiffs propose; namely avoiding any and all depositions. Moreover, the PWEs at issue here are not "similarly situated"; they exhibit 164 different job titles and performed different services on 20 different productions.  In fact, plaintiffs' own theory also assumes that the PWEs are not similarly situated in that they opine that some were independent contractors and some were employees.

## CONCLUSION

For the foregoing reasons, and for the reasons discussed in our November 24 and January 21 briefs and Dr. Van Liere's accompanying declarations, we respectfully request that, in the event this Court does not grant our Motion *In Limine* (and it should), it reject plaintiffs' survey proposal and instead adopt the proposal set forth by defendant.

Respectfully Submitted,

Dated:  February 12, 2010                     By:   *s/Fredrick C. Crombie*
                                                       FREDRICK C. CROMBIE
                                                       Attorney of Record
                                                       U.S. Department of Justice
                                                       Tax Division
                                                       Court of Federal Claims Section
                                                       Post Office Box 26
                                                       Ben Franklin Post Office
                                                       Washington, D.C.  20044
                                                       (202) 307-6580
                                                       (202) 514-9440 (facsimile)

                                                       JOHN A. DiCICCO
                                                         Acting Assistant Attorney General
                                                       STEVEN I. FRAHM
                                                         Chief, Court of Federal Claims Section
                                                       MARY M. ABATE
                                                         Assistant Chief

Dated: February 12, 2010                     *s/Mary M. Abate*
                                                       Mary M. Abate
                                                       Of Counsel

                                                     *Attorneys for Defendant*