# In the United States Court of Federal Claims

Nos. 02-1916T, 02-1917T, 02-1918T, 02-1919T, 02-1920T,
02-1921T, 02-1922T, 02-1923T, 02-1924T, 02-1925T
(Filed September 3, 2010)
TO BE PUBLISHED

| | |
|---|---|
| CENCAST SERVICES, L.P., et al., <br><br> Plaintiffs, <br><br> v. <br><br> THE UNITED STATES, <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

Tax refund suit; divisible tax and requirement to pay as prerequisite to refund suit; doctrine of variance; setoffs and counter-setoffs in tax refund cases; waiver of regulatory specificity requirement; informal claim doctrine; spoliation; adverse inference sanction; supplemental allegations to cure jurisdictional defect; motion for leave to file a consolidated, amended and supplemental complaint; futility of permitting amendment of complaint to assert independent contractor theory; illegal exaction; presumption of correctness of tax assessment; "naked" tax assessment; burden of proof in tax refund cases

Kent A. Yalowitz, Arnold & Porter LLP, New York, N.Y., Attorney of Record for plaintiffs. Amalia W. Jorns, Hannah Fox, Arnold & Porter, LLP, New York, N.Y., and James P. Joseph, Arnold & Porter, LLP, Washington, D.C., of counsel.

Fredrick C. Crombie, Attorney of Record for defendant. Mary M. Abate, Assistant Chief, Steven I. Frahm, Chief, Court of Federal Claims Section, Tax Division, John A. DiCicco, Acting Assistant Attorney General, United States Department of Justice, Washington, D.C., of counsel.

## OPINION AND ORDER

GEORGE W. MILLER, Judge

Before the Court are several motions relating to plaintiffs' claims that certain of the workers whose employment taxes are at issue in these cases were actually independent contractors, not employees. Defendant has moved *in limine* to preclude plaintiffs from asserting

their independent contractor claims based principally on the doctrine of variance (docket entry 249, Jan. 15, 2010) ("Def.'s Mot."). Plaintiffs have opposed defendant's motion and cross-moved for partial summary judgment, seeking an order determining that the Court possesses jurisdiction to resolve the independent contractor issue (docket entries 311 & 312, May 6, 2010) ("Pls.' Summ. J. Mot."). Plaintiffs also seek an order that the IRS's tax assessments in these cases do not warrant the ordinary "presumption of correctness," which would mean that defendant would bear the burden of proof on its counterclaims to recover the remainder of the unpaid divisible tax assessments (docket entry 310, May 6, 2010) ("Pls.' Burden Shift Mot."). Plaintiffs' motion also requests that the Court draw, as a sanction for the IRS's loss or destruction of certain audit-related files, an adverse inference that the IRS considered and denied the independent contractor theory during its administrative review, thus precluding defendant's variance argument. *Id.* at 20-31. Finally, plaintiffs have moved for leave to file a consolidated, amended and supplemental complaint that would add allegations about events taking place after the filing of the original complaints as well as allegations based upon information obtained during discovery, including allegations regarding the independent contractor issue (docket entries 302 & 303, Apr. 21, 2010) ("Pls.' Supp. Compl. Mot."). The Court heard oral argument on these motions on August 4, 2010. *See* Transcript of Oral Argument (docket entry 348, filed Aug. 16, 2010) ("Tr."). For the reasons stated herein, defendant's motion *in limine* is **GRANTED** and plaintiffs' cross-motion for partial summary judgment is **DENIED**. Plaintiffs' motion to shift the burden of proof is **DENIED** and their motion for a spoliation sanction is **DENIED**. Plaintiffs' motion for leave to file a consolidated, amended and supplemental complaint is **GRANTED IN PART** and **DENIED IN PART**.

## I.      Background[1]

Plaintiffs are entities that provided payroll services to various movie production companies for the compensation of production workers. *See Cencast I*, 62 Fed. Cl. at 162. The underlying dispute in these cases involves determining which entities should be treated as the production workers' employers for Federal Income Contribution Act ("FICA") and Federal Unemployment Tax Act ("FUTA") purposes. *Id.* at 160. Because of the nature of the entertainment industry, such individuals "typically work[] on multiple productions within a calendar year, and the majority of workers in the industry move from project to project, rather than remaining with the same producer on a full-time basis." Plaintiffs' Proposed Findings of Uncontroverted Fact ¶ 1 (docket entry 313, May 6, 2010) ("Pls.' Proposed Findings"); Defendant's Response to Plaintiffs' Proposed Findings of Uncontroverted Facts ¶ 1 (docket entry 334, June 25, 2010) ("Def.'s Resp. to Proposed Findings") . During the relevant tax years, in order to facilitate the payment of the workers and the proper withholding of taxes, individual

---

[1]  The Court will describe only the background necessary to the resolution of the pending motions. For more detailed background information, see *Cencast Servs. L.P. v. United States*, 91 Fed. Cl. 496 (2010) ("*Cencast III*"); *Cencast Servs. L.P. v. United States*, No. 02-1916 et al., 2009 WL 3650921 (Fed. Cl. Nov. 2, 2009) ("*Cencast II*"); *Cencast Servs. L.P. v. United States*, 62 Fed. Cl. 159 (2004) ("*Cencast I*").

production companies generally outsourced their payroll functions to companies such as plaintiffs.  Pls.' Proposed Findings ¶¶ 2-3; Def.'s Resp. to Proposed Findings ¶¶ 2-3.

In determining the workers' wage bases, plaintiffs first identified those workers who provided services through "personal services corporations" ("PSCs").  Draney Information Services Corp.'s ("DISC's") Response to IRS Information Document Request at 11 & n.3 (Mar. 17, 1994) ("DISC's IDR Resp."), *attached as* Ex. 11 to Declaration of Fredrick C. Crombie (docket entry 249-1, Jan. 15, 2010, as supplemented by docket entry 327-1, June 23, 2010 and docket entry 336, June 25, 2010) ("Crombie Decl."); Pls.' Proposed Findings ¶ 24. These PSCs, also known as "loan-out corporations," are separate corporate entities "through which a [d]irector or major [s]tar receives his or her income."  ROBERT J. KOSTER, THE BUDGET BOOK FOR FILM AND TELEVISION 129 (2004), *excerpts attached as* Ex. 9 to Crombie Decl. Plaintiffs treated the individuals who accepted income through PSCs as independent contractors and therefore paid no FICA or FUTA taxes on these individuals' behalf.  *See* DISC's IDR Resp. at 11 & n.3; Moultry-Rand Dep. at 15.[2]  For purposes of determining the taxable FICA and FUTA wages for the remaining non-PSC workers, plaintiffs considered themselves to be the workers' "employers" and reported and paid employment taxes on that basis.  *Cencast I*, 62 Fed. Cl. at 163.

In collecting fees from the production companies, however, plaintiffs generally charged the production companies "as a component of the bill, the FICA and FUTA taxes that would be due from the [p]roduction [c]ompanies if the [p]roduction [c]ompanies were treated as the [production workers'] employers for federal employment tax purposes."  *Id.* at 163 (citing Joint Stipulation of Facts ¶ 20 (docket entry 38, Nov. 10, 2003), *attached as* Ex. 3 to Crombie Decl.). Plaintiffs' business model essentially depended on the profit—referred to as "breakage"—earned from the difference between (1) the employment taxes plaintiffs actually remitted based on the production workers being treated as plaintiffs' employees and (2) the amount the production companies were billed by plaintiffs, considering the production workers as the production companies' employees.  *See* Deloitte & Touche, Business Review at 2 (1991), *attached as* Ex. 8 to Crombie Decl.  Plaintiffs' business model therefore depended on the existence of production workers who earned their salaries as employees, not as independent contractors paid through a PSC.

---

[2] Plaintiffs have attached the complete transcripts from various depositions of IRS and Office of Chief Counsel ("OCC") employees.  For purposes of citation, these depositions are: Deposition of Gregory Peake (Mar. 2, 2010) ("Peake Dep."), *attached as* Ex. 57 to Pls.' Summ. J. Mot.; Deposition of Randy Perrin (Mar. 3, 2010) ("Perrin Dep."), *attached as* Ex. 58 to Pls.' Summ. J. Mot.; Deposition of Katrina Moultry-Rand (Mar. 4, 2010) ("Moultry-Rand Dep."), *attached as* Ex. 59 to Pls.' Summ. J. Mot.; Deposition of Debra L. Reale (Mar. 16, 2010) ("Reale Dep."), *attached as* Ex. 60 to Pls.' Summ. J. Mot; Deposition of Neil D. Shepherd (Mar. 25, 2010) ("Shepherd Dep."), *attached as* Ex. 61 to Pls.' Summ. J. Mot.; and Rule 30(b)(6) Deposition of Neil D. Shepherd (Apr. 8, 2010) ("30(b)(6) Dep."), *attached as* Ex. 62 to Pls.' Summ. J. Mot.

The IRS audit and this subsequent litigation relate to the computation of FICA and FUTA taxes due in respect of the non-PSC workers.  Plaintiffs "collect[ed] the full amount of employment taxes from each production company . . . based upon applying each worker's wage limitation separately to each production company . . . [but] when a worker [was] employed with multipl[e] production companies . . . during the calendar year . . . [plaintiffs] present[ed] [themselves] as 'employer of record.'"  Katrina Epps, *Proposed Employment Tax Issues and Adjustments (Draft)* at 19 (May 10, 1995), *attached as* Ex. 20 to Pls.' Summ. J. Mot.  Plaintiffs' business model is only profitable if plaintiffs are properly regarded as the employer for purposes of calculating the FICA and FUTA wage bases, and thus, the amount of employment taxes remitted (considering plaintiffs as the employer) is less than the amount billed (considering the production company as the employer); it was this business model that plaintiffs sought to defend during the audit.

A.      *Audit of Plaintiffs*

1.      Investigation and Technical Advice Memorandum ("TAM")

a.      Identification of Issues

In 1992, the IRS audited whether plaintiffs were the non-PSC production workers' employers for FICA and FUTA purposes.  *See* Letter from Revenue Agent Gregory Peake to DISC (May 6, 1992), *attached as* Ex. 1 to Pls.' Summ. J. Mot.; Peake Dep. at 10.  The audit team recognized from the outset that the main legal issue was the one eventually decided in *Cencast I*, namely, whether the statutory or common-law employer is properly regarded as the employer for purposes of calculating the FICA and FUTA wage bases.  DISC Inc. & Subsidiaries Employment Taxes Audit Plan at 1(Oct. 14, 1993) ("Audit Plan") , *attached as* Ex. 13 to Crombie Decl.; *see also Cencast I*, 62 Fed. Cl. at 163-64.  The audit team initially considered whether plaintiffs had misclassified PSC workers as independent contractors instead of employees, but eventually abandoned that inquiry.  Audit Plan at 2; Moultry-Rand Dep. at 25-29; Shepherd Dep. at 15-16.

After determining that the FICA and FUTA wage bases should be calculated relative to the common-law employer, the audit team concentrated on identifying which entities—plaintiffs or the production companies—were the common-law employers, *not* whether the workers were employees or independent contractors.  After the audit team declined to pursue the employee status of PSC workers, "the status of the production workers as employees as opposed to employees of whom was simply no longer in play."  Shepherd Dep. at 193.  Once a taxpayer files a return declaring that an individual is an employee (and thus subject to employment taxes), it would be unusual and administratively burdensome for the IRS to question that characterization.  Reale Dep. at 172; *see also* Shepherd Dep. at 202-03 ("[I]f every time the Service were to conduct an employment tax examination . . . it was to go in and try and make a *de novo* determination as to the worker's status as an employee or independent contractor when the parties to the relationship have represented that that's the relationship, . . . the system would

4

simply stop functioning.").

>    b.    TAM Request

Recognizing the complexity of the legal issues involved, the audit team decided to request a TAM from the OCC.[3]  Reale Dep. at 20-21; Shepherd Dep. at 35-36.  It took two years simply to draft the TAM request, during which time the audit team worked with plaintiffs to produce an agreed-upon statement of facts and issues to include in the submission.  Perrin Dep. at 162-65.  Ms. Reale, the attorney responsible for drafting the TAM request, also communicated with OCC attorneys regarding the legal issues.  Reale Dep. at 23.  One of these matters was the possibility that plaintiffs' business model and the collection of employment taxes would be adversely affected if plaintiffs were required to treat each production company as a separate employer, which could cause more workers to classify themselves as independent contractors.  *See* Handwritten Notes of Debra L. Reale at IRS-ADMIN-02661 (dated Apr. 14, 1995), *attached as* Ex. 18 to Pls.' Summ. J. Mot. ("*IC v. EE* is red herring[.]  Prod[uction] Co's [sic] would treat workers as [independent contractors]"); *see also* Reale Dep. at 30-31; Shepherd Dep. at 124.

The TAM request was ultimately submitted to the OCC on October 24, 1997, seeking advice on three issues:

>    Issue #1.  Who is the common law employer of the entertainment industry production worker employee ("PWE")?

>    Issue #2.  Whether [the Payroll] Company is a § 3401(d)(1) employer of PWEs?

>    Issue #3.  Whether [the Payroll] Company, as a § 3401(d)(1) employer, can aggregate FICA and FUTA wages among the various Production companies?

*See* TAM Request at 1 (Oct. 24, 1997), *attached as* Ex. 30 to Pls.' Summ. J. Mot. (footnote omitted).

Plaintiffs submitted a brief along with the TAM request "reserv[ing] the right to assert that some or all of the PWEs are independent contractors rather than employees and, to that

---

[3] A TAM involves

>    advice or guidance as to the interpretation and proper application of internal revenue laws, related statutes, and regulations, to a specific set of facts, furnished by the National Office upon request of a district office in connection with the examination of a taxpayer's return or consideration of a taxpayer's return claim for refund or credit.

Treas. Reg. § 601.105(b)(5)(i)(a) (as amended in 1987).

extent, [plaintiffs have] overpaid federal employment taxes." Taxpayers' Brief Regarding Request for Technical Advice at 8 n.3 (Oct. 24, 1997), *attached as* Ex. 29 to Pls.' Summ. J. Mot. Defendant believed this assertion was meant to emphasize the risks to the Government from concluding plaintiffs were not the common-law employers of the production workers, specifically, that there would be many more individuals claiming that they were independent contractors and thus not paying any employment taxes. *See* Shepherd Dep. at 124 (characterizing plaintiffs' statement as "saber rattling that if you . . . eliminate our business model and the way we conduct business then . . . you're going to have all these stray cats running around . . . in the entertainment industry"); *see also* Tr. at 103-04.

2. <u>Destruction and Loss of Documents</u>

As part of its investigation, the audit team sent a detailed survey to production workers consisting of IRS Form SS-8, which is typically used to distinguish an employee from an independent contractor using 20 "common-law factors." *See* Draft Survey (Feb. 18, 1994), *attached as* Ex. 11 to Pls.' Summ. J. Mot. This 20-factor test is also used, however, to determine which entity is the common law employer. *See e.g., Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 322-23 (1992); *Fathauer v. United States*, 566 F.3d 1352, 1356 (Fed. Cir. 2009). Unfortunately, many of the completed surveys are not currently available due to the loss or destruction of audit-related documents in two incidents involving Randy Perrin, the lead agent on the audit team.

Documents were first lost in 1997 when Mr. Perrin's car was stolen with his laptop in the trunk. Randy Perrin Decl. ¶ 2 (Apr. 9, 2010) ("Perrin Decl."), *attached as* Ex. 34 to Defendant's Opposition in Response to Plaintiffs' March 23, 2010 Motion to Compel (docket entry 295, Apr. 9, 2010). While Mr. Perrin did not recall exactly which documents were on his laptop, he stated that "it likely included correspondence with DISC entities and their representatives, information document requests, and case memoranda. There might also have been some email, but [he] did not use email very frequently in 1997, so these would have been limited." *Id.* ¶ 3.

The second loss of documents occurred in June of 1998, when an intern inadvertently shredded documents in file cabinet drawers at the IRS regional office in El Segundo, California. *See id.* ¶ 4. Mr. Perrin never figured out how the intern obtained access to the locked file cabinet. Perrin Dep. at 192. Apparently Mr. Perrin's supervisor instructed the intern to shred binders related to an entertainment seminar, but the intern shredded the wrong documents. *See* Memo from Randy W. Perrin to Ira Brown (May 20, 1999) ("May Shredding Memo"), *attached as* Ex. 7 to Pls.' Burden Shift Mot. The destroyed material included, *inter alia*, information regarding the TAM request, survey results, notes from meetings between regional and national counsel, and "case history worksheets" detailing the day-to-day activities of revenue agents working on the audit. *See* Memo from Randy W. Perrin to Horace Johnson (June 18, 1998) ("June Shredding Memo"), *attached as* Ex. 6 to Pls.' Burden Shift Mot. Because Mr. Perrin's computer had been stolen, the intern had, in some cases, shredded the only remaining copy. *See id.* At least partly as a result of the shredding incident, the intern lost his job, and the supervisor was demoted.

Perrin Dep. at 200-01.

>        3.        Adverse Finding and Assessments

In January 1998, Neil Shepherd, the OCC attorney drafting the TAM, concluded that the result would be adverse to plaintiffs. Pursuant to Revenue Procedure 97-2,[4] Mr. Shepherd scheduled an adverse finding conference with OCC personnel, the audit team, and plaintiffs' representatives. *See* Email from Neil D. Shepherd to Jerry E. Holmes (Jan. 7, 1998), *attached as* Ex. 31 to Pls.' Summ. J. Mot.; Memo from Horace Johnson to Gwen Williams (Jan. 16, 1998), *attached as* Ex. 32 to Pls.' Summ. J. Mot.

At the conference, plaintiffs again emphasized the increased administrative burden of an adverse finding and its effect upon their business model and the collection of employment taxes.[5] *See, e.g.,* Reale Conf. Notes at 6; Shepherd Dep. at 148.  Plaintiffs were unsuccessful, however, and both the audit and TAM culminated in unfavorable results.  The IRS issued the TAM on January 12, 1999, finding:

>   1. Taxpayer was not the common law employer of the workers performing services for the Operating Companies.[6]  Rather, the Operating Companies were the employers.

>   2. Taxpayer was the employer under § 3401(d)(1) with respect to compensation paid by Taxpayer to the workers.

---

[4] Revenue Procedure 97-2 permits the taxpayer to participate in a conference to advocate its views "[i]f, after the technical advice request is analyzed, it appears that technical advice adverse to the taxpayer will be given."  Rev. Proc. 97-2 § 12.01 (Jan. 6, 1997), *current version at* Rev. Proc. 2010-2 § 9 (Jan. 4, 2010).

[5] Plaintiffs also asked OCC to consider a Market Segment Understanding ("MSU") document published by the IRS entitled *Classification of Workers Within the Television Commercial Production and Professional Video Communication Industries.  See* Debra Reale, Notes from Adverse Finding Conference at 7 (dated Feb. 24, 1998) ("Reale Conf. Notes"), *attached as* Ex. 34 to Pls.' Summ. J. Mot.; MSU, *attached as* Ex. 14 to Pls.' Summ. J. Mot. Consistent with OCC's assumption that the workers were employees of *some* employer, Mr. Shepherd discounted the utility of the MSU, stating that the relevant inquiry was which entity was the employer, not the status of the worker (employee or independent contractor).  *See* Reale Conf. Notes at 7; Shepherd Dep. at 151.

[6] The IRS used the term "operating company" to refer to what the Court has been calling the "production company."  *See* Defendant's Objection to Plaintiffs' Motion to Shift Burden and for a Spoliation Sanction at 10 n.7 (docket entry 333, June 25, 2010) ("Def.'s Burden Shift Opp.").

> 3. Taxpayer was not the employer for purposes of determining a worker's wages under §§ 3121(a)(1) [FICA] and 3306(b)(1) [FUTA]. Rather, a separate wage base under §§ 3121(a)(1) [FICA] or 3306(b)(1) [FUTA] applied to the compensation paid to a worker for the services performed for each Operating Company.

TAM at 17, *attached as* Ex. 36 to Pls.' Summ. J. Mot.  Consistent with these findings, the IRS issued assessments to plaintiffs on February 14, 2001 for approximately $43.7 million in unpaid FUTA taxes and approximately $15.6 million in unpaid FICA taxes, plus interest and penalties. Pls.' Proposed Findings ¶ 56; *see* IRS Assessments (Feb. 14, 2001), *attached as* Ex. 39 to Pls.' Summ. J. Mot.

### B.     Administrative Claim for Refund

Plaintiffs paid a portion of these assessments[7] and then submitted administrative claims for refund.  *See* Ex. A to Compl. (docket entry 1, Dec. 20, 2002), *attached as* Ex. 4 to Crombie Decl.  In these refund claims, plaintiffs did not argue that certain of the production workers were independent contractors.  Presumably because plaintiffs believed the IRS would not change its position after the extensive audit, plaintiffs requested an immediate denial of their administrative refund claim pursuant to Internal Revenue Manual § 4.23.13.4(1)(g).[8]  *Id.*  The refund claims

---

[7]  Ordinarily, full payment of the assessed tax is a jurisdictional prerequisite to the filing of a refund suit in this court or the district court.  *Flora v. United States*, 362 U.S. 145, 171 (1960).  But because plaintiffs' FICA and FUTA taxes are divisible among various workers, plaintiffs were only required to pay one such divisible tax assessment before seeking a refund. *See Rocovich v. United States*, 933 F.2d 991, 995 (Fed. Cir. 1991) ("[D]ivisible taxes such as excise and employment taxes have been considered exceptions to *Flora*."); *cf. United States v. Fior d'Italia, Inc.*, 536 U.S. 238, 242 (2002) (hearing case after taxpayer paid "a portion of" the FICA taxes "brought this refund suit, while the IRS filed a counterclaim for the remainder"). Here, plaintiffs have paid and, therefore, seek a "refund" of only $637,065.68, representing one worker per plaintiff.  Pls.' Proposed Findings ¶ 57.  The Government has counterclaimed for the remainder of the unpaid assessments.  Def.'s Mot. at 5.

[8]  I.R.M. § 4.23.13.4(1)(g) provides:

(1) No consideration will be given to a claim for refund of employment tax which:

. . .

     (g) is based solely on an issue considered in previously examined returns of the claimant who requests in writing the immediate issuance of a statutory notice of claim disallowance.

were denied on May 21, 2002.  *See* Administrative Refund Claim Denial Letter (May 21, 2002), *attached as* Ex. 42 to Pls.' Summ. J. Mot.

C.      *Request for Reconsideration of the TAM*

Shortly thereafter, plaintiffs requested that the OCC reconsider the TAM.  *See* Letter from Stuart E. Siegel, Arnold & Porter LLP, to Hon. B. John Williams, Chief Counsel, IRS (May 23, 2002) ("Reconsideration Letter"), *attached as* Ex. 43 to Pls.' Summ. J. Mot; Shepherd Dep. at 254-76.  Plaintiffs again pointed out the practical implications of the IRS's position on plaintiffs' business model and consequently on the IRS's ability to collect payroll taxes with respect to individuals such as production workers.  Reconsideration Letter at 2; Shepherd Dep. at 256.  That is, if plaintiffs had to revise their business model, "the collection of federal income and employment taxes in the entertainment industry would be adversely impacted" because, *inter alia*, "[m]any of the individuals who provide services in the production of filmed entertainment material are, or would take the position that they are, independent contractors, not subject to federal income tax withholding and employment taxes."  Reconsideration Letter at 2.

The threat that without the business model under which plaintiffs operated, a significant number of workers would self-classify as independent contractors was taken into account by the IRS, but Mr. Shepherd, the principal author of the TAM, believed that "independent contractor argument would have been an act of self-destruction [by plaintiffs] given their business model, . . . [a]nd it just wasn't something that was considered viable, to the extent that it was considered at all."  Shepherd Dep. at 187-88; *see also* Tr. at 40.  Eventually, OCC decided to "maintain[] the position that was taken in the" TAM, and OCC took no action on plaintiffs' request for reconsideration.  Shepherd Dep. at 282, 338; *see also* 30(b)(6) Dep. at 167.

D.      *Litigation and Identification of Relevant Issues*

After the OCC declined to reconsider the TAM, plaintiffs filed suit in this court seeking a refund of the employment taxes paid, and the Government counterclaimed for the remaining unpaid assessments.  In a 2004 Opinion and Order, the Court determined that the appropriate employer for calculation of the FICA and FUTA wage bases is the common-law employer.  *Cencast I*, 62 Fed. Cl. at 183-84.  The Court then identified six remaining issues to be decided, only two of which remain extant:[9]

---

[9]  There were four other issues identified in *Cencast I*, namely (1) "[w]hether the plaintiffs or the production companies . . . were the common law employers of the workers," *Cencast I*, 62 Fed. Cl. at 184; (2) whether plaintiffs were entitled to certain State Unemployment Insurance ("SUI") credits against their FUTA liabilities, *id.*; (3) whether plaintiffs should be liable for penalties with respect to their FICA and FUTA liabilities, *id.*; and (4) whether the statute of limitations barred the assessments.  *Id.*  After several years of settlement negotiations, on May 14, 2008, the parties filed a Stipulation of Partial Compromise (docket entry 117), *attached as* Ex. 4 to Crombie Decl., in which the parties agreed that plaintiffs were not the

- Whether the computations of the FICA and FUTA taxes in issue erroneously included in the calculation of wages amounts that were paid under accountable plans, as defined by Treas. Reg § 1.62-2(c), or amounts otherwise not includable in wages for purposes of the FICA and FUTA taxes in issue.

- If the amount of wages, for purposes of determining FICA and FUTA liabilities, is determined with respect to the common law employers of the workers, and if plaintiffs were not the common law employers, did the IRS, in computing taxable wages, misidentify some of the employers so as to treat, in some instances, a single employer of a worker as being two or more employers.

*Cencast I*, 62 Fed. Cl. at 184.   The parties have referred to the former issue as the "accountable plan" issue; they have referred to the latter as the "aggregation issue."   The parties have been actively engaged in discovery relating to the aggregation issue.

On August 25, 2008, the parties participated in a status conference with the Court to discuss the resolution of the remaining issues in the case.   During this conference, counsel for plaintiffs stated that "there are certain classes of production workers who are independent contractors, and the Plaintiffs treated them, for purposes of withholding and reporting and remitting employment taxes, . . . as employees. . . .   [I]f, indeed, they were independent contractors, the Plaintiffs would be entitled to a credit" for those workers' FICA and FUTA taxes.   Aug. 25, 2008 Status Conf. Tr. at 6 (docket entry 122, filed Sept. 10, 2008), *attached as* Ex. 16 to Crombie Decl.   This was the first mention of plaintiffs' independent contractor theory in this litigation, which, at that time, had been pending for approximately six years.

   E.   *2008 Seizure of Assets in Nevada and Motion to Amend and Supplement Complaint*

In December of 2008, the IRS served notices of levy on Wells Fargo Bank in Las Vegas, Nevada, seeking to collect money allegedly transferred by nine of the ten plaintiffs—excluding Cenex—to two affiliates of plaintiffs, DISC and WRLJ Maple Corp. ("WLRJ").   Pls.' Supp. Compl. Mot. at 2.   Pursuant to these notices of levy, Wells Fargo froze $3,206,407.63 in the bank account of DISC and $1,080,518.09 in the bank account of WRLJ, for a total of $4,286,925.72. *Id.*; Defendant's Objections to Plaintiffs' Motion for Leave to File an Amended and Supplemental

---

common-law employers of the production workers and that the assessments were not barred by the statute of limitations.  *Id.* ¶¶ 1, 2.  In exchange for these concessions, the Government agreed that it would not seek penalties with respect to the tax assessments.  *Id.* ¶ 3.  On November 2, 2009, the Court determined that plaintiffs were entitled to certain SUI credits pursuant to I.R.C. § 3302(b) to offset their FUTA liabilities.  *See Cencast II*, 2009 WL 3650921, at *4.  This decision was not contested by the Government.  Thus, these four issues have been resolved.

Consolidated Complaint at 6 (docket entry 328, June 23, 2010) ("Def.'s Supp. Compl. Opp."). Defendant asserts that the IRS "concluded that the interests of the United States were not adequately protected in that the funds were under a significant threat of dissipation by those transferees." Def.'s Supp. Compl. Opp. at 7; *see also* Amended Answer ¶ 34, *Draney Info. Servs. Corp. v. United States* ("*DISC Nevada Action*"), 2:09-cv-0040-LDG (D. Nev. Mar. 27, 2009), *attached as* Ex. 69 to Crombie Decl.

After exhausting administrative remedies, DISC and WRLJ sued the IRS in the United States District Court for the District of Nevada pursuant to Internal Revenue Code § 7426(a), alleging, *inter alia*, that the IRS had wrongfully levied upon their property. Amended Complaint, *DISC Nevada Action*, 2:09-cv-0040-LDG (D. Nev. Feb. 13, 2009) ("Nevada Compl.").[10] Plaintiffs now seek leave to file one amended, supplemental and consolidated complaint.

1.     Proposed Supplementation of Plaintiffs' Complaints

While the Nevada litigation was pending, plaintiffs filed protective claims with the IRS in September 2009, seeking return of the Wells Fargo account money. Proposed Compl. ¶ 75 (docket entry 302-1, Apr. 21, 2010). The IRS has either denied these claims or has not acted upon them for six months. *Id.* ¶ 75. Plaintiffs ask to supplement their complaints here with facts and causes of action relating to the claim for refund of the $4.3 million seized in Nevada, including an illegal exaction claim. *Id.* ¶¶ 70-76, 84-93.

2.     Proposed Amendments to Plaintiffs' Complaints

Plaintiffs also wish to amend their complaints, based upon information obtained in discovery, to include factual allegations regarding the IRS's consideration of the independent contractor issue during the audit. For instance, plaintiffs allege that "during the examination, plaintiffs repeatedly stated orally and in writing that if the IRS maintained its position" that the production companies were the common-law employers, then "plaintiffs would seek refunds with respect to the independent contractors." *Id.* ¶ 37. Plaintiffs therefore seek at this point to amend their complaints to allege that "the assessments erroneously failed to give plaintiffs credit for FUTA and FICA taxes paid in respect of workers who were actually not common-law employees of anyone (*i.e.* independent contractors)."[11] *Id.* ¶ 82(d).

_____

[10] The Nevada action remains pending. As of the date of this writing, the parties are continuing to conduct discovery in that action.

[11] Plaintiffs also ask to add allegations regarding the request for reconsideration of the TAM, further alleging that defendant "failed to process plaintiffs' case on the basis of the conclusions expressed in the TAM" and the assessment of penalties was arbitrary and capricious. Proposed Compl. ¶¶ 65-68, 49, 82(a), 53-58, 82(f). The parties have already agreed that defendant will not seek penalties with respect to plaintiffs' assessments. *See supra* note 9; *see also* Pls.' Burden Shift Mot. at 15 ("Defendant has now stipulated that it will not seek

## II.    The Court Lacks Jurisdiction Over Plaintiffs' Independent Contractor Theory

Defendant contends that the Court does not possess jurisdiction to hear plaintiffs' independent contractor claims because plaintiffs never raised that theory in their administrative claims for refund.  Def.'s Mot. at 22.  Alternatively, defendant argues that the Court should not permit plaintiffs to raise the theory so late in the litigation.[12]  *Id.* at 29.

Plaintiffs proffer five arguments in opposition to defendant's motion: (1) their administrative refund claims implicitly included the independent contractor theory, Pls.' Summ. J. Mot. at 23; (2) they are entitled to a setoff against defendant's counterclaims, which they contend is not affected by the doctrine of variance, *id.* at 15; (3) either the informal claim exception or (4) the waiver exception to the variance doctrine permit the Court to consider the independent contractor theory, *id.* at 25; and (5) the Court should draw an adverse inference resulting from the destruction of documents.  Pls.' Burden Shift Mot. at 20.  Plaintiffs characterize defendant's argument that they waited too long to raise the independent contractor issue as "frivolous."  Pls.' Summ. J. Mot. at 40.

### A.    The Variance Doctrine

The doctrine of variance had its origin in the Revenue Act of 1921.  *United States v. Felt & Tarrant Mfg. Co.*, 283 U.S. 269, 270 (1931) (quoting Revenue Act of 1921, § 1318, 42 Stat. 227, 314-15 (1921)).  The current statutory basis for the doctrine is Internal Revenue Code § 7422(a), which provides, in pertinent part:

> No suit or proceeding shall be maintained in any court for the recovery of any internal revenue tax . . . *until a claim for refund or credit has been duly filed with the Secretary, according to the provisions of law in that regard, and the regulations of the Secretary established in pursuance thereof.*

*Id.* (emphasis added).  The implementing regulation provides that a viable claim for refund "must set forth in detail each ground upon which a credit or refund is claimed and facts sufficient to apprise the Commissioner of the exact basis thereof. . . .  A claim which does not comply with this

---

penalties.").  It is, therefore, unclear why plaintiffs wish to add these allegations, though defendant does not specifically oppose this alteration.  Plaintiffs also request to add allegations that the audit team's conduct exhibited "personal animus toward Taxpayers" and "gross negligence and willfulness in the destruction of documents."  Proposed Compl. ¶¶ 59-60.  These amendments will also be allowed, despite their uncertain benefit in view of the Court's finding as set forth in this Opinion.

[12]  Given the Court's conclusion in this section, the Court finds it unnecessary to address defendant's other alternative arguments, which rest upon a joint stipulation of facts and a union contribution statute.  Def.'s Mot. at 21, 33.

paragraph will not be considered for any purpose as a claim for refund or credit."  Treas. Reg. § 301.6402-2(b)(1) (as amended in 1982).

The taxpayer is barred "from presenting claims in a tax refund suit that 'substantially vary' the legal theories and factual bases set forth in the tax refund claim presented to the IRS." *Lockheed Martin Corp. v. United States*, 210 F.3d 1366, 1371 (Fed. Cir. 2000); *see also Ottawa Silica Co. v. United States*, 699 F.2d 1124, 1138 (Fed. Cir. 1983) ("[A] ground for a refund that is neither specifically raised by a timely claim for a refund, nor comprised within the general language of the claim, cannot be considered by a court in a subsequent suit for a refund."). Requiring notice of the grounds of the claim ensures that the IRS has an opportunity to administratively correct errors, thus limiting litigation.  *Computervision Corp. v. United States*, 445 F.3d 1355, 1363 (Fed. Cir. 2006)*; Union Pac. R.R. Co. v. United States*, 389 F.2d 437, 442 (Ct. Cl. 1968) (citing *United States v. Memphis Cotton Oil Co.,* 288 U.S. 62, 70 (1945) (Cardozo, J.)).

This court, therefore, lacks jurisdiction to consider complaints asserting arguments at variance with plaintiffs' administrative claims.  The parties joust over the appropriate form of motion to raise the variance issue. Pls.' Summ. J. Mot. at 13; Def.'s Resp. to Proposed Findings at 1.  Because the court lacks jurisdiction to hear the case if plaintiff's complaint varies from the administrative claim, Rule 12(b)(1) of the Rules of the Court of Federal Claims ("RCFC") appears to be the proper vehicle.[13]  *See, e.g., Mobil Corp. v. United States*, 67 Fed. Cl. 708, 710 (2008); *Crompton Corp. v. United States*, No. 01-182, 2003 WL 21979104, at *1 (Fed. Cl. July 8, 2003). The Court will assume that the factual allegations in plaintiffs' complaints are true and construe them in plaintiffs' favor.  *Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995).  Plaintiffs bear the burden of proving facts sufficient to invoke the court's jurisdiction by a preponderance of the evidence.  *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988).

---

[13]  Plaintiffs' complaints do not currently include a cause of action barred by variance. Thus defendant concluded that it could not move to dismiss a claim that was not contained in plaintiffs' complaints.  Def.'s Mot. at 1 n.1.  Instead, defendant filed a motion *in limine* pursuant to RCFC 16 to obtain "a pretrial order simplifying issues for trial, including the exclusion of irrelevant evidence on the ground that it is offered to prove a legally deficient claim."  *White Mountain Apache Tribe of Ariz. v. United States*, 10 Cl. Ct. 115, 116 (1986); *cf. Davis v. United States*, No. 92 C 3239, 1993 WL 410148, at *3 (N.D. Ill. Oct. 14, 1993) (ruling in the context of a non-tax case on motion *in limine* to exclude a claim for lack of jurisdiction because it was not included in administrative claim).  Because defendant asks the Court to find that it lacks jurisdiction, the Court treats defendant's motion *in limine* as one to dismiss pursuant to RCFC 12(b)(1) and analyzes the motion by those standards.  In any event, the parties have had ample opportunity to compile a record permitting the Court to decide the motions.

B.    *The Variance Doctrine Bars Plaintiffs from Raising the Independent Contractor Theory Before This Court*

    1.    Plaintiffs' Complaints Are at Variance with Their Administrative Claims for Refund

Plaintiffs confess that their administrative claims for refund did "not mention the existence of independent contractors *in haec verba*." Pls.' Summ. J. Mot. at 11. Plaintiffs nonetheless suggest that the independent contractor issue was "integral to" determining who was the common-law employer. *Id.* at 23. Plaintiffs argue that their claims raised the question "which entity is the common-law employer," and answering that inquiry entails the possibility that the answer is "no one." To succeed on this issue, their claim had to fairly present the IRS with the question "which entity, *if any*, is the common-law employer." *Id.*

The variance doctrine does not require exact precision; if the issue raised in court "is derived from or is integral to the ground timely raised in the refund claim," it "may be considered as part of the initial ground." *Ottawa Silica Co.*, 699 F.2d at 1139 n.6; *see also Union Pacific R.R.*, 389 F.2d at 443 (discussing cases in which the ground for refund was subsumed within the language used in the claim). If the Court were to conclude that the possibility that there is no common-law employer is implicit in determining which entity is the common-law employer, then the independent contractor theory was "comprised within the general language of the claim." *Ottawa Silica Co.*, 699 F.2d at 1138.

Unfortunately for plaintiffs, the evidence does not support their position. Our system of taxation relies heavily on self-reporting. *See, e.g., United States v. Rodgers*, 461 U.S. 677, 683 (1983). Though the IRS possesses a "formidable arsenal" to ensure that self-reporting complies with the law, *id.*, it cannot investigate every potential claim and, therefore, is justified in focusing on only those claims that the taxpayer actually raises as a ground for refund. *See* Tr. at 41 ("[The audit team] understood the Plaintiffs' business model. They understood that Plaintiffs intentionally reported these people as employees . . . [and] wanted them to be employees. . . . So what exactly would prompt the service to go and reinvent the wheel and investigate [the independent contractor issue]? It's just not there. It's not an issue.").

Plaintiffs rely heavily on the fact that the 20-factor test used to identify which entity is the common-law employer is the same one used to identify whether an individual is an employee or independent contractor. Pls.' Summ. J. Mot. at 32; Plaintiffs' Reply in Support of Cross-Motion for Partial Summary Judgment on Subject Matter Jurisdiction at 15 (docket entry 344, July 26, 2010) ("Pls.' Summ. J. Reply"); *see also Darden*, 503 U.S. at 322-23; *Fathauer*, 566 F.3d at 1356. Plaintiffs suggest that because the same test is used to make two different determinations, both determinations must necessarily be made every time the test is applied. *See, e.g.,* Pls.' Summ. J. Reply at 15. The Court does not agree. This proposition is incorrect both as a matter of logic and as a matter of fact.

The audit team was not asked to and did not investigate whether any production workers were actually independent contractors.[14]  *See, e.g.,* Perrin Dep. at 75 ("They were already employees.  They weren't independent contractors.  So I think this is—I believe this form [SS-8] is trying to determine are you an independent contractor or are you an employee.  In our case we went with what DISC had told us; that these were employees."); Moultry-Rand Dep. at 47 ("Again my position was: Who was the employer, the production companies or the payroll service company?").  The deponents stated that if a taxpayer reported him or herself as an employee, it would be unusual for the IRS to then go back and question whether in fact that classification was incorrect.  *See, e.g.,* Reale Dep. at 172, 268-69; Shepherd Dep. at 115.  The agency assumed plaintiffs' self-reporting was correct, and it was never asked to investigate any other possibility.[15]  Because plaintiffs did not assert the independent contractor status of certain workers as a basis of their claim for refund and the answer to that question was not implicitly included in the agency's audit investigation, it is beyond the scope of plaintiffs' administrative refund claims.

The independent contractor theory cannot, therefore, be said to be "fairly contained within the refund claim" and is barred by the variance doctrine.  *Blakely v. United States*, 593 F.3d 1337, 1342 (Fed. Cir. 2010) (quoting *Charter Co. v. United States*, 971 F.2d 1576, 1579 (11th Cir. 1992)); *see also True v. United States*, 190 F.3d 1165, 1172-73 (10th Cir. 1999).

> ### 2.    Plaintiffs Cannot Avoid the Bar of the Variance Doctrine by Labeling Their Independent Contractor Claims as a "Defensive Setoff"

As noted above, plaintiffs seek refunds of the divisible payments made, while defendant's counterclaim asserts entitlement to the remainder of the tax assessments.  Plaintiffs argue that they

---

[14]  Plaintiffs urge that "[t]o the extent the witnesses' self-contradictory testimony raises a genuine issue of material fact, the Court should schedule a hearing to weigh the witnesses' credibility."  Pls.' Summ. J. Reply at 24 n.18.  The Court does not find any material conflicts in the witnesses' deposition testimony.  All of the deponents admitted that they knew of the independent contractor issue and that plaintiffs had identified the issue as a *potential* ground for refund, but this ground was, in fact, never asserted in any claim for refund.

[15]  Plaintiffs are at pains to emphasize that individuals may be reclassified as independent contractors after they were classified as employees.  Pls.' Summ. J. Reply at 15.  This is undoubtedly true, but the issue is not whether the IRS may reclassify taxpayers as independent contractors but whether plaintiffs here raised that issue in their administrative refund claims.  Thus, for instance in *Ware v. United States*, 67 F.3d 574, 575 (6th Cir. 1995)*,* the Sixth Circuit held that the taxpayer should be re-classified as an independent contractor.  In that case, however, the taxpayer had filed an administrative claim for refund arguing that he was an independent contractor.  *Id.*  The remaining cases cited by plaintiffs were not refund suits but challenges to tax deficiencies before the Tax Court, and are thus unhelpful in deciding the variance issue.  *See Butts v. Comm'r*, 49 F.3d 713 (11th Cir. 1995), *aff'g* 66 T.C.M. (CCH) 1041 (1993); *Lozon v. Comm'r*, 73 T.C.M. (CCH) 2914 (1997).

are entitled to a "defensive setoff" that would reduce defendant's recovery on its counterclaim to zero. Although this purported setoff has not been pled, plaintiffs argue that success on their independent contractor theory would justify such a defensive setoff and plaintiffs contend that such a defensive setoff would not be subject to the variance doctrine. Pls.' Summ. J. Mot. at 15-16 ("This Court has declined to apply the variance doctrine to a taxpayer's assertion of a 'defensive setoff.'"). Because defendant's counterclaim merely re-asserts the position the IRS has maintained throughout the administrative process, plaintiffs' position is incorrect, and the assertion of any defensive setoff does not alter the application of the variance doctrine.

The ordinary use of the term "setoff" in tax refund cases refers to the Government's ability to reduce a taxpayer's recovery on its refund claim by other amounts owed to the Government for the same tax year. *See Dysart v. United States*, 340 F.2d 624, 628 (Ct. Cl. 1965). That is, despite the taxpayer's demonstrating his entitlement to a refund on one ground, if the Government shows the same taxpayer also owes the same type of tax for the taxable period encompassed by the refund suit on a separate ground, the Government may reduce the taxpayer's refund by the amount owed, even if the separate ground could not have been raised in a separate action because it would be barred by the statute of limitations. *Lewis v. Reynolds*, 284 U.S. 281, 283 (1932); *see also Fisher v. United States*, 80 F.3d 1576, 1580 (Fed. Cir. 1996); *Dysart*, 340 F.2d at 628; GERALD A. KAFKA & RITA A. CAVANAGH, LITIGATION OF FEDERAL CIVIL TAX CONTROVERSIES § 16.03 (2009). Implicit in this rule is the subsequent right of the taxpayer to raise a setoff to defendant's newly raised setoff, *i.e.,* a counter-setoff. KAFKA & CAVANAGH § 16.03; *see also Union Pac. R.R.,* 389 F.2d at 446-47; *Bessemer City Bd. of Educ. v. United States*, 576 F. Supp. 2d 1249, 1257 (N.D. Ala. 2008).[16] But the right to raise such a counter-setoff exists only when the Government raises a new issue that the plaintiff could not have anticipated and, therefore, could not have been asserted as grounds for its refund. *Union Pacific R.R.*, 389 F.2d at 447; *see also Shore v. United States*, 26 Cl. Ct. 826, 829 (1992), *rev'd on other grounds*, 9 F.3d 1524 (Fed. Cir. 1993).[17]

A plaintiff must be allowed to assert a counter-setoff after the Government inserts a new issue into the litigation because the Government *creates* the variance between the taxpayer's administrative refund claim and the claims before the court. *See Brown v. United States*, 427 F.2d

_____

[16] The authors of the *Litigation of Federal Tax Controversies* treatise coin the term "counter-setoff," which the Court adopts. KAFKA & CAVANAGH § 16.03. Previous courts have not distinguished between the Government's setoff and the taxpayer's subsequent setoff to the Government's setoff, referring to both as an attempted "setoff." *See, e.g., Bessemer City Bd. of Educ.*, 576 F. Supp. 2d at 1257.

[17] In *Shore*, the Government conceded in its motion for reconsideration that the plaintiff should be permitted to raise counter-setoffs that would otherwise be barred by variance because the Government itself created the variance by inserting a new issue into the litigation before the court. *Shore*, 26 Cl. Ct. at 829; *see also* Defendant's Motion for Reconsideration, *Shore*, 26 Cl. Ct. at 826 (Aug. 7, 1992) (No. 89-580), *attached as* Ex. 2 to Pls.' Summ. J. Mot.

57, 62 (9th Cir. 1970) ("It would be unfair to allow the Government to assert a new defense to a taxpayer's claim at pretrial and simultaneously to prevent the taxpayer from making appropriate responses to it, because the taxpayer had not previously anticipated the defense."). The plaintiff cannot be barred from defending itself when it was not aware of the Government's position at the time it made its administrative claim for refund. *See Shore*, 26 Cl. Ct. at 829.

But when the Government's counterclaim or offset does not raise a new issue, plaintiff cannot assert a "setoff" otherwise barred by the variance doctrine. KAFKA & CAVANAGH § 16.03; *see also* I.R.M. § 34.5.2.4.2.2 (2009) ("When the Government raises new issues by way of setoff, the taxpayer may raise its own setoffs to defeat the Government's setoffs. The taxpayer can only use its setoffs to defeat the Government's setoff, and it cannot use its setoffs to increase the amount of its original claim for refund. A taxpayer is otherwise limited to arguing in his refund suit only the grounds listed in the original refund claim.") (internal citation omitted); *Consol. Edison Co. of N.Y. v. United States*, No. 97-Civ-4366, 1999 WL 688456, at *1 n.1 (S.D.N.Y. Sept. 2, 1999) (Mukasey, J.) ("Here, it cannot be argued 'that the IRS created whatever "substantial variance" from the initial claims that it seeks to prevent.'") (quoting *Shore*, 26 Cl. Ct. at 829). Allowing such a setoff would exceed the Government's waiver of sovereign immunity for refund claims.[18]  *See Bear Valley Mut. Water Co. v. R.A. Riddell*, 493 F.2d 948, 952 & n.8 (9th Cir. 1974).

The Supreme Court's decision in *United States v. Dalm,* 494 U.S. 596 (1990), a case dealing with the doctrine of equitable recoupment, is instructive. In *Dalm*, the taxpayer reported certain money she received from serving as administrator of her deceased brother's estate as a gift and paid gift taxes on this money in 1977. *Id.* at 599. The IRS, believing that the money should have been treated as income, assessed income tax deficiencies. *Id.* After litigation in the Tax Court, in 1984, the taxpayer settled with the IRS and paid the income tax deficiency. *Id.* at 599-600. At the same time, the taxpayer filed an administrative refund claim for the previously paid gift taxes. *Id.* The refund claim was admittedly filed after the statute of limitations had run, but the taxpayer urged that the "doctrine of equitable recoupment permit[ted] [her] to maintain an action to recover the overpaid gift tax." *Id.* at 602. The Supreme Court held that the taxpayer was incorrect, reasoning that the doctrine of equitable recoupment permits "a party litigating a tax claim in a timely proceeding . . . [to], in that proceeding, seek recoupment of a related, and inconsistent, but now time-barred tax claim relating to the same transaction." *Id.* at 608. The doctrine of equitable recoupment, however, cannot substitute for jurisdiction over the refund

---

[18]  Plaintiffs point to the grant of jurisdiction in 28 U.S.C. § 2508 as supporting the argument that they should be permitted to raise the independent contractor issue as a setoff. Pls.' Summ. J. Mot. at 17 & n.12. But that provision grants the court jurisdiction to hear the *Government's* setoffs against a plaintiff making an affirmative claim in this Court and does not waive sovereign immunity for claims *against* the United States. *Haustechnik v. United States*, 34 Fed. Cl. 740, 744 (1996); *see Mulholland v. United States*, 361 F.2d 237, 245 (Ct. Cl. 1966) (holding that the Government's counterclaim pursuant to § 2508 must be dismissed if plaintiff's initial action is dismissed for lack of jurisdiction).

claim when no jurisdiction exists in the first place. *Id.* at 606. Because the taxpayer in *Dalm* was seeking "to invoke equitable recoupment only in a separate action for refund of gift tax, *an action for which there is no statutory authorization by reason of the bar of the limitations statute*" the Supreme Court held that the taxpayer was precluded from recovering the refund she sought. *Id.* (emphasis added).

As in *Dalm*, administrative assertion of a claim is a jurisdictional prerequisite to the filing of a refund suit. *Lockheed Martin*, 210 F.3d at 1371. Plaintiffs, like the taxpayer in *Dalm*, cannot use the concept of "equitable recoupment"—or in this case, "setoff"—to give the court jurisdiction where it does not otherwise exist. *Dalm*, 494 U.S. at 606. That is, because the independent contractor theory was not raised in plaintiffs' administrative claim for refund, the Court does not possess jurisdiction based solely on plaintiffs' attempt to offset the Government's counterclaims.

Plaintiffs may not take advantage of the divisible nature of employment taxes to insert an otherwise barred issue into this litigation. Plaintiffs observe that the Government may elect between counterclaiming for the remainder of the divisible assessment or pursuing a separate collection action in a district court, arguing that if the Government had not counterclaimed, plaintiffs would only be litigating regarding the few employees whose assessments were paid.[19] *See* Pls.' Summ. J. Reply at 10-11. But defendant did in fact counterclaim based on the same theory the IRS asserted throughout the administrative process, thereby placing the entire amount of plaintiffs' assessment at issue before this court. These counterclaims do not, therefore, raise "new issues" permitting plaintiffs to assert claims not raised in their administrative refund claims as a "counter-setoff." *See Bessemer*, 576 F. Supp. 2d at 1257.

Plaintiffs were fully apprised of the IRS's position and could have raised the independent contractor issue in their administrative claims for refund. Thus "it cannot be argued 'that the IRS created any "substantial variance" from the initial [administrative] claims.'" *Consol. Edison Co. of N.Y.,*1999 WL 688456, at *1 n.1 (quoting *Shore*, 26 Cl. Ct. at 829). Accordingly, plaintiffs cannot avoid the bar of the variance doctrine by labeling their independent contractor claims as a

---

[19] It is unclear whether plaintiffs' argument could ever be viable in light of *Fior d'Italia,* 536 U.S. at 245, in which the Supreme Court held that the employer's portion of FICA taxes are calculated by reference to the "*totality* of the 'wages' that the employer pays" to its employees. Because the employer's portion of FICA and FUTA taxes is based on the total wages paid, plaintiffs' burden to show "the correct amount, if any, of tax," *Cook v. United States*, 46 Fed. Cl. 110, 116 (2000), necessarily extends beyond the divisible payment plaintiffs made with respect to the FICA and FUTA taxes relating to one employee. *Fior d'Italia,* 536 U.S. at 244; *see also Lewis,* 284 U.S. at 283 (refund suit involves a "redetermination of the entire tax liability"). Unlike in *Allen* and *Klein*, the Government's counterclaims put at issue all of plaintiffs' FICA and FUTA taxes, which, per *Fior d'Italia*, are calculated based upon all of the wages paid by plaintiffs to the production workers. *Compare Allen v. United States*, 225 Ct. Cl. 555, 557 (1980) and *Klein v. United States*, 31 Fed. Cl. 614, 616 (1994).

"defensive setoff."

>    3.    Neither the Waiver Doctrine nor the Informal Claim Doctrine Permits the
>           Court to Consider Plaintiffs' Independent Contractor Claims

Plaintiffs next argue that two recognized exceptions to the variance doctrine permit them to raise the independent contractor theory in this action:  the waiver doctrine and the informal claim doctrine.  *See Computervision*, 445 F.3d at 1364-66.  These arguments are likewise unavailing.

>    a.    Defendant Has Not Waived the Requirements of Treasury
>          Regulation § 301.6402-2(b)(1)

The waiver doctrine is an exception to the requirement in Treasury Regulation § 301.6402-2(b)(1) that each claim be "set forth in detail."  *See Angelus Milling, Co. v. Comm'r,* 325 U.S. 293, 296 (1945); *Memphis Cotton Oil Co.,* 288 U.S. at 70; *Computervision*, 445 F.3d at 1365.  If the taxpayer "files a timely formal claim but fails to include the specific claim for relief, the claim may nonetheless be considered timely if the IRS consider[ed] that specific claim within the limitations period." *Computervision*, 445 F.3d at 1365.  Plaintiffs must present specific evidence that they "adequately alerted the service to the fact that the item is a ground for refund" and the IRS made a determination on the merits as to that claim.  *Davis v. United States*, 21 Cl. Ct. 84, 86 (1990) (quoting *Union Pac. R.R.*, 398 F.2d at 442); *see also Kikalos v. United States*, 479 F.3d 522, 525 (7th Cir. 2007).

>    i.    Plaintiffs are Not Entitled to an Adverse Inference of Waiver
>          due to Alleged Spoliation

Plaintiffs ask that the Court draw an adverse inference that the documents destroyed by the IRS would have shown that the IRS considered and made a determination on the independent contractor issue.  Pls.' Burden Shift Mot. at 21-22; Reply in Support of Plaintiffs' Motion to Shift Burden and for a Spoliation Sanction at 9 (docket entry 342, July 23, 2010) ("Pls.' Burden Shift Reply").  Based solely upon this inference, the plaintiffs would have the Court find that they fall within the waiver exception to the specificity requirement.  Pls.' Burden Shift Reply at 9.

An adverse inference based upon the destruction of evidence is only appropriate when:

>    (1) the party having control over the evidence had an obligation to preserve it at the
>    time it was destroyed; (2) the records were destroyed with a culpable state of mind;
>    and (3) the destroyed evidence was relevant to the party's claim or defense such
>    that a reasonable trier of fact could find that it would support the claim or defense.

*Jandreau v. Nicholson*, 492 F.3d 1372, 1375 (Fed. Cir. 2007) (quoting *Residential Funding Corp.*

*v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002) (alterations in original)).  The Federal Circuit, however, has not yet decided what level of culpability the alleged spoliator must have exhibited in order to warrant the imposition of a spoliation sanction.  *See United Med. Supply Co. v. United States*, 77 Fed. Cl. 257, 266 (2007); Def's Burden Shift Opp. at 27 n.25.[20]

Under any applicable test, the level of culpability is relevant to the propriety of a sanction.  *See, e.g., Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764 (1980).  As Judge Allegra stated in his thoughtful analysis of spoliation sanctions in *United Medical Supply*, 77 Fed. Cl. at 270, the court "must construct a sanction that is just and proportionate in light of the circumstances underlying the failure to preserve relevant evidence, as well as the punitive, prophylactic, remedial and institutional purposes to be served by such sanctions."  *See also Anderson v. Beatrice Foods Co.*, 900 F.2d 388, 395 (1st Cir. 1990) (noting that a judge "should take pains neither to use an elephant gun to slay a mouse nor to wield a cardboard sword if a dragon looms").

The Court assumes, without deciding, that defendant was obliged to preserve evidence when Mr. Perrin's laptop was stolen.[21]  *See Jandreau*, 492 F.3d at 1475.  But the facts underlying the destruction of documents here do not warrant the severe sanction plaintiffs advocate.  To begin with, plaintiffs' assertion that the destruction was deliberate is not supported by the evidence.  Pls.' Burden Shift Mot. at 17.  Mr. Perrin indicates that he had locked his laptop in the trunk of his car on his way to the office.  Perrin Decl. ¶ 2.  Both Mr. Perrin's declaration and documents generated contemporaneously with the shredding incident indicate that Mr. Perrin had locked his file cabinet and believed he was the only person who had the key.  *Id.* ¶ 4; May Shredding Memo.  At most, the evidence indicates negligence.  The adverse inference sanction requested by plaintiffs would be disproportionate to the offense.[22]  *See Keithley v. Homestore.com,*

---

[20] The Federal Circuit has only discussed spoliation sanctions in patent cases where it has applied the rule of the applicable regional circuit.  *United Med. Supply,* 77 Fed. Cl. at 266.  Judges of this court have disagreed over whether a showing of bad faith is necessary for a spoliation sanction.  *See Pitney Bowes Gov't Solutions, Inc. v. United States*, --- Fed. Cl. ----, 2010 WL 3278402, at *4 (Aug. 11, 2010).

[21] An IRS audit does not necessarily mean that defendant could have anticipated litigation and thus does not automatically give rise to a duty to preserve evidence.  *Compare Consol. Edison Co. of N.Y., Inc. v. United States*, 90 Fed. Cl. 228, 257 (2009) (defendant could not have anticipated litigation even during audit) *with Deseret Mgmt. Corp. v. United States*, 76 Fed. Cl. 88, 94 (2007) (in the context of the work product doctrine, "defendant knew or should have known that the auditing process could lead to litigation").

[22] The same is true for the alleged destruction of e-mails.  Routine document management processes within the IRS and OCC require employees "to delete all data from their computers when their official duties no longer require access to sensitive personally identifiable information or tax return information.  Prior to deleting any such data, the Internal Revenue Manual (I.R.M. 1.15.1 et. seq.) requires the employee to print out all federal records and place

*Inc.*, No. C-03-04447, 2008 WL 4830752, at *10 (N.D. Cal. Nov. 6, 2008) (holding that when "[a]t most . . . [p]laintiffs were negligent" "an adverse inference instruction is a harsh remedy that is disproportionate to [p]laintiffs' conduct in this case"); *see also O'Brien v. Ed Donnelly Enters. Inc.*, No. 2:04-cv-85, 2010 WL 1741352, at *5 (S.D. Ohio Apr. 29, 2010); *In re A & M Fla. Props. II, LLC*, Bankruptcy No. 09-15173, 2010 WL 1418861, at *6 (Bankr. S.D.N.Y. Apr. 7, 2010).

Additional evidence further counsels against the imposition of a sanction. Plaintiffs made an extensive request pursuant to the Freedom of Information Act at the end of 1995, and received a significant number of documents from the agency's files. Def.'s Opposition in Response to Plaintiffs' March 23, 2010 Motion to Compel at 10 & Exs. 8, 11. This production likely contained copies of some of the documents that were destroyed. In addition, copies of some of the files that were destroyed remained in the files of the district office. *See* June Shredding Memo. The documents that do exist indicate that the audit team was not asked to examine the independent contractor theory as a ground for refund and therefore conducted no such investigation. Any adverse inference "completely vanishes upon the introduction of evidence sufficient to support a finding of the nonexistence of the presumed fact." *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1037 (Fed. Cir. 1992); *see also* FED. R. EVID. 301. Thus, even if the Court were to consider an "adverse inference" appropriate under these circumstances, the inference would likely be rebutted. In any event, plaintiffs have not demonstrated significant prejudice due to the loss or destruction of documents. For these reasons, the Court **DENIES** plaintiffs' motion for a spoliation sanction consisting of an adverse inference regarding waiver of the specificity requirement.

ii.     Defendant Has Not in Fact Waived the Specificity
        Requirement

To prevail on the waiver argument, plaintiffs must present "unmistakable" evidence that they notified the IRS they were seeking a refund on the independent contractor theory and that the IRS actually considered and denied that claim. *See* Pls.' Summ. J. Mot. at 25; *Angelus Milling, Co.*, 325 U.S. at 297. Although plaintiffs contend that they did so, the Court disagrees with plaintiffs' characterization of five scattered references from the record upon which they rely.

First, plaintiffs observe that the handwritten notes of Ms. Moultry-Rand, an employment tax specialist for the audit team, diagramed the "potential enforcement issues" involved in the audit and wrote under the "employment taxes" category, "determine if worker qualifies as an employee." Notes of Katrina Moultry-Rand at 1 (Sept. 16, 1993), *attached as* Ex. 7 to Pls.' Summ. J. Mot. Second, in a submission to the IRS plaintiffs noted that "DISC [p]aid [t]axes

---

them in the official file which is retained pursuant to the records retention schedule in the I.RM." E. Faith Bell Decl. ¶ 7 (Apr. 8, 2010), *attached as* Ex. C to Def.'s Burden Shift Opp. Again, even assuming some duty on the part of defendant in 1997 to preserve the e-mails, plaintiffs have pointed to, at most, negligence on the part of certain IRS employees.

[w]ith [r]espect [t]o [r]emuneration of [w]orkers [w]ho [a]re [a]ctually [i]ndependent [c]ontractors." Presentation by DISC to Internal Revenue Service at 2 (June 23, 1994), *attached as* Ex. 17 to Pls.' Summ. J. Mot. Revenue agent Gregory Peake wrote on this document: "Who are these actual independent contractors?" *Id.* Third, various handwritten notes by individuals involved in the audit referred to the possibility that people who had previously classified themselves as employees would classify themselves as independent contractors if the audit concluded that the production companies were the common-law employers. Pls.' Summ. J. Mot. at 27; *see, e.g.,* Notes of Randy Perrin at IRS-ADMIN-29710 (Feb. 24, 1998), *attached as* Ex. 33 to Pls.' Summ. J. Mot. Fourth, plaintiffs state that in 1998, in a memorandum to the IRS, counsel for plaintiffs stated that "it is quite clear that many of the individuals in the filmed entertainment industry are independent contractors. . . . As we point out in our Brief [submitted with the TAM request], in the event of an adverse determination [plaintiffs] intend[] to file claims for the refund of taxes attributable to classes of PWEs who are, or who are likely to be held to be, independent contractors and not employees." Letter from Stuart Seigel to Neil Shepherd at 22 (Apr. 9, 1998), *attached as* Ex. 35 to Pls.' Summ. J. Mot. Finally, after the administrative refund claim was disallowed, counsel for plaintiffs contacted the OCC to obtain reconsideration of the TAM and again referred to the presence of independent contractors in the entertainment industry. Reconsideration Letter at 2.

Ultimately, the evidence demonstrates only that, as an argument supporting a substantive finding in their favor, plaintiffs pointed out one consequence of an adverse finding that would adversely impact the IRS—namely, that individuals would begin to report themselves as independent contractors, resulting in less employment taxes collected.[23] *See* Shepherd Dep. at 124-25; *see also* Tr. at 103-04. The IRS viewed this as "saber rattling" by plaintiffs in the face of a potentially enormous tax liability if the IRS found they were not the common-law employers. In these portions of the record, plaintiffs sought to show the IRS that it would lose significant tax revenue if it persisted in the view the production companies were the relevant employers for purposes of calculating the FICA and FUTA wage bases.

---

[23] The parties debate whether IRS consideration of an issue during the audit phase can waive the specificity requirement, a matter upon which the authorities seem to conflict. In *Disabled American Veterans v. United States*, 650 F.2d 1178, 1179-80 & n.2 (Ct. Cl. 1981), the Court of Claims did not "view the agents' statement at the audit level as negating any further purpose for filing a refund claim." In *Computervision*, however, the Federal Circuit concluded in *dicta* that the waiver doctrine covered grounds "that the IRS had discovered, within the limitations period, *during investigation of the original claim*." *Computervision*, 445 F.3d at 1377 (emphasis added). At least one judge of this court has considered evidence from the audit stage as sufficient to demonstrate a waiver of the specificity requirement. *See Dillon, Read & Co., Inc. v. United States*, 15 Cl. Ct. 246, 251-52 (1988), *rev'd on other grounds*, 875 F.2d 293 (Fed. Cir. 1989). In this case, the evidence does not support a finding that plaintiffs sought a refund on the independent contractor theory at any stage of the audit or investigation. Thus, the Court need not address the effect of the IRS's consideration of the independent contractor theory during the audit phase on plaintiffs' claims that defendant waived the regulatory specificity requirement.

Fairly read, the evidence supports a conclusion that at most plaintiffs only suggested that they *might* seek a refund on the ground that individuals identified as employees were actually independent contractors in the context of reserving their right to later assert such a claim. *See* Taxpayers' Brief Regarding Request for Technical Advice at 8 n.3 (Oct. 24, 1997), *attached as* Ex. 29 to Pls.' Summ. J. Mot.; Letter from Stuart Seigel to Neil Shepherd at 22 (Apr. 9, 1998), *attached as* Ex. 35 to Pls. Summ. J. Mot.; *see also* Tr. at 66 ("[T]he statements were . . . essentially . . . if you maintain your position . . . which they did . . . you can count on us raising this issue."). These statements of a *future* intent to file such a refund claim are insufficient to alert the IRS that plaintiffs were actually making claims for refund based on that theory. *Mobil Corp. v. United States*, 67 Fed. Cl. 708, 717 (2005) ("In our view, it must be clear that the taxpayer is making a *present* demand for refund."); *see also Martin v. United States*, 833 F.2d 655, 660 (7th Cir. 1987).

Furthermore, the context of plaintiffs' reservation of their right to assert the independent contractor theory as a ground for refund undercuts their claim that this reservation was a present claim for refund. Plaintiffs' formal statement reserving their right to assert the independent contractor theory was contained in a footnote to the following statement in their brief regarding the TAM request: "Moreover, the issue in the case at hand is not whether the workers are employees *or* independent contractors. [Plaintiffs] ha[ve] always treated the [production workers] as employees." Taxpayers' Brief Regarding Request for Technical Advice at 8. Given the context, the IRS acted reasonably in not investigating whether certain of the production workers were independent contractors; therefore, the IRS cannot be said to have waived the specificity requirement.

Plaintiffs were not "lulled" into excluding the independent contractor issue from their administrative claims for refund. Their reservation of the right to assert such a claim shows plaintiffs' awareness of and ability to in fact assert such a claim. At most, plaintiffs notified the IRS only of a possible future claim, not the existing "nature of the claim and the specific facts upon which it is predicated." And the claim was never actually made. *Computervision*, 445 F.3d at 1363 (quoting *Alexander Poundfoot Co. v. United States*, 454 F.2d 1379, 1383 (Ct. Cl. 1972)).

Because plaintiffs chose to file an administrative refund claim setting forth certain grounds and omitting others, the IRS rationally concluded that the claims asserted by plaintiffs, and only those claims, were the issues plaintiffs had chosen to litigate. Finding waiver of the specificity requirement in these circumstances would undermine the principal goal of the variance doctrine, which is to provide clear notice to the IRS of the specific grounds that the taxpayer will litigate. A reservation of rights to later assert a theory of refund does not excuse plaintiffs from actually making the claim. *Disabled Am. Veterans*, 650 F.2d at 1179.

Plaintiffs neither gave the IRS notice that a claim for refund had been or was being asserted based on the independent contractor theory, nor did they provide evidence that the IRS actually considered and decided this claim they did not assert. Thus, plaintiffs have not shown

that the IRS waived the specificity requirement, and the variance doctrine continues to bar their independent contractor claim.

        b.        Plaintiffs Do Not Meet the Requirements of the Informal Claim Doctrine

     The second arguably applicable exception to the variance doctrine, the "informal claim doctrine," allows a "timely claim with purely formal defects . . . if it fairly apprises the IRS of the basis for the claim within the limitations period." *Computervision*, 445 F.3d at 1364; *see also BCS Fin. Corp. v. United States*, 118 F.3d 522, 524 (7th Cir. 1997) (Posner, C.J.). There must, however, be some written component to the informal claim. *Boddie-Noell Enters., Inc. v. United States*, 36 Fed. Cl. 722, 730 (1996); *cf. Wrightsman Petroleum Co. v. United States*, 35 F. Supp. 86, 96 (Ct. Cl. 1940). And the court is only permitted to consider documents submitted to the IRS within the period of the statute of limitations. *Computervision*, 445 F.3d at 1367.

     The informal claim doctrine "is of no assistance to the taxpayer here" because plaintiffs' "original complaint was formal, and contained no specific suggestion that" plaintiffs would raise other grounds for relief. *Id.* at 1365. In this case, plaintiffs stated that they might seek a refund on an independent contractor theory later but in no way did they alert the IRS that they were actually making such a claim. *Mobil Corp.*, 67 Fed. Cl. at 717; *see also Zeier v. Internal Revenue Comm'n*, 80 F.3d 1360, 1363 (9th Cir. 1996).

     There were no formal defects to be cured in plaintiffs' claims; plaintiffs properly alerted the IRS to a very specific list of alleged grounds for refund. *Davis*, 21 Cl. Ct. at 87; *see also United States v. Andrews*, 302 U.S. 517, 525 (1937) (informal claims doctrine inapplicable when refund claim was "as specific as it could be made and pointed unerringly to the items the Commissioner must consider"). Because the IRS was only notified of the claims identified in the administrative claims for refund, those are the only ones over which this Court possesses jurisdiction. The informal claim doctrine, therefore, does not aid plaintiffs in their effort to avoid the variance doctrine.

     In light of the foregoing, plaintiffs' assertion of the independent contractor theory is, therefore, barred by the doctrine of variance. The Court accordingly **GRANTS** defendant's motion *in limine* and **DENIES** plaintiffs' cross-motion for summary judgment, treating both as motions under Rule 12(b)(1).[24]

---

    [24] The parties previously proposed competing discovery plans with respect to identifying whether certain production workers were independent contractors or employees and requested that the Court determine which plan should be followed. *See, e.g.*, Defendant's Reply Brief in Support of Its Proposal (docket entry 264, Feb. 12, 2010); Plaintiffs' Memorandum Concerning Proposed Form of Questionnaire (docket entry 258, Feb. 2, 2010). The present determination renders these requests moot. Also outstanding is plaintiffs' Motion to Compel Defendant's

**III.    The Court Also Holds That Plaintiffs Are Barred from Pursuing Their Independent Contractor Claims Because Plaintiffs Waited Too Long to Assert Those Claims**

Defendant further argues that the Court should refuse to consider the independent contractor theory "because plaintiffs have inexcusably and unduly delayed in asserting it."  Def.'s Mot. at 29.  Plaintiffs' first mention of the independent contractor theory was approximately six years into the litigation on August 25, 2008.  This was despite a February 23, 2007 deadline by which the parties were required to seek leave to amend their pleadings.  Def.'s Supp. Compl. Opp. at 12; Tr. at 33; *see also* Scheduling Order at 1 (docket entry 84, Jan. 23, 2007).  Plaintiffs provide no reason justifying their failure to assert this claim before the 2007 deadline.  Defendant's Reply Brief in Support of its Motion *In Limine* at 41-42 (docket entry 327, June 23, 2010) ("Def.'s Reply").

If a party in a tax dispute unreasonably delays the assertion of a ground for setoff, the court may preclude that party from raising the ground if its assertion would prejudice the other side.  *Bank of Am. v. United States*, 217 Ct. Cl. 731, 732 (1978); *see also St. Louis-San Francisco Ry. Co. v. United States*, 417 F.2d 1359, 1360 (Ct. Cl. 1969); *Mahoney v. United* States, No. 497-71, 1981 WL 11210, at *12 (Ct. Cl. Trial Div. Nov. 6, 1981); *Principal Life Ins. Co. v. United States*, 76 Fed. Cl. 326, 328 (2007).  Plaintiffs significantly delayed asserting the independent contractor theory without adequate justification.  *Mahoney*, 1981 WL 11210, at *12.  Plaintiffs' attempted justification for the delay relies principally upon events occurring after 2008, Pls.' Summ. J. Mot. at 45, and points to their subsequent discovery requests regarding the independent contractor issue.[25]  But in arguing against the variance doctrine, plaintiffs admit—and indeed stress—that they were aware of the potential for refund based upon the independent contractor theory in the early 1990s.  *See, e.g.,* Pls.' Summ. J. Mot. at 9.

Despite waiting six years to assert their theory in court, plaintiffs accuse defendant of unduly waiting a year to "unveil its 'variance' defense in writing."  *Id.* at 48.  Even if the Court were to fault defendant for this delay, variance implicates the court's jurisdiction and, therefore, it cannot be waived.  *See, e.g., Ottawa Silica Co.*, 699 F.2d at 1139 (observing that the court's jurisdiction does not extend to those claims that "were not first raised in the claim for a refund"); *Dillon, Read & Co.*, 15 Cl. Ct. at 251 (considering the variance issue *sua sponte* because of its jurisdictional implications).  Moreover, defendant's failure to more promptly assert the variance

---

Production of Documents (docket entry 321, May 14, 2010), which seeks an order compelling the production of documents pertinent to identifying whether certain production workers were independent contractors or employees.  That motion is **DENIED** as moot.

[25] Plaintiffs also observe that the Joint Preliminary Status Report (docket entry 34, July 22, 2003), only stated the issues that the parties had "*so far*" identified.  Pls.' Summ. J. Mot. at 45.  This may be so, but it does not relieve plaintiffs of the obligation to raise their other claims in a timely fashion.

defense does not excuse plaintiffs' prior failure to raise the independent contractor theory in a timely fashion.

Allowing plaintiffs to introduce the independent contractor theory at this point would prejudice defendant, which has already devoted significant resources to litigating the issues long recognized as raised by this case. The parties have engaged in extensive discovery regarding the aggregation issue; each side has sought judicial intervention in the discovery process.[26] Yet despite this substantial investment of time and resources, discovery is still not complete on the aggregation issue, and other issues remain to be dealt with. The Court finds that, "in a case of this vintage [and] complexity," the addition of the independent contractor theory would cause "further factual disputes, substantial factual inquiry by [the parties], or other delay" and would, therefore, prejudice defendant. *Bank of Am.*, 217 Ct. Cl. at 732. Even if the Court were persuaded that the independent contractor theory was otherwise permissible, the Court would nonetheless preclude plaintiffs from injecting it into the litigation at this point because it simply comes too late. *Id.*; *Mahoney*, 1981 WL 11210, at *12.

## IV.    Plaintiffs May File a Consolidated, Amended and Supplemental Complaint But May Not Assert the Independent Contractor Theory

Because the Court has already concluded that it lacks jurisdiction to hear claims regarding plaintiffs' independent contractor theory, any amendment adding such a cause of action would be futile. Therefore, plaintiffs' motion is **DENIED** to the extent that it seeks to amend the complaints to add a claim for refund based upon the independent contractor theory.

### A.    *Plaintiffs May Supplement Their Complaints But May Not Assert a Claim for Refund Based Upon Their Independent Contractor Theory with Regard to the $4.3 Million Seized in Nevada*

The events giving rise to plaintiffs' new allegations regarding the seizure of assets in Nevada occurred after the Court's February 2007 deadline for the parties to seek leave to amend

---

[26] In addition to the motions described in note 24, *supra*, seeking discovery regarding the identify of workers as employees or independent contractors, the parties have also sought judicial intervention into the discovery process on numerous other occasions. *See* Plaintiffs' Motion to Compel Production of Documents Concerning Destructionn of Documents and ESI (docket entry 283, Mar. 23, 2010); Plaintiffs' Motion to Compel Production of Documents (docket entry 277, Mar. 9, 2010); Defendant's Motion to Compel RCFC 30(b)(6) Deposition Testimony and and to Compel the Production of Documents (docket entry 234, Nov. 16, 2009); Defendant's Motion for Expedited Status Conference regarding Administration of Joint Subpoenas (docket entry 226, Nov. 4, 2009); Plaintiffs' Motion for Determination of Privilege Claim Pursuant to Rule 26(b)(5)(B) (docket entry 199, Sept. 22, 2009); Plaintiffs' Motion to Compel Defendant to Answer Interrogatories and Produce Documents (docket entry 188, Aug. 31, 2009).

their pleadings.  Thus, no matter how diligent plaintiffs were, they could not have met the Court's February 2007 deadline.  Pls.' Supp. Compl. Reply at 2 n.2; *see, e.g., Ulibarri v. City & County of Denver, Colo.*, No. 07-cv-1814, 2008 WL 544922, at *1 (D. Colo. Feb. 25, 2008) (holding that events occurring after pretrial deadline to amend pleadings constituted changed circumstances satisfying the good cause standard).

Supplementation of pleadings "should be allowed where post-commencement events are material to the action, consideration of those events could be accommodated within the orderly progression of the case to trial or other disposition, and supplementation would not prejudice any party."  *Sys. Fuels, Inc. v. United States*, 73 Fed. Cl. 206, 211 (2006).

1.   <u>Plaintiffs May Not Assert a Claim for Refund Based Upon Their Independent Contractor Theory with Respect to the $4.3 Million Seized in Nevada</u>

Plaintiffs first contend that whether or not their independent contractor theory is barred by variance as to the principal allegations of their complaint, the variance doctrine does not preclude raising the independent contractor issue with respect to the $4.3 million seized in Nevada because plaintiffs raised that issue in their administrative claim for refund in September of 2009.  Pls.' Summ. J. Mot. at 22; Pls.' Supp. Compl. Reply at 3; *see also* Proposed Compl. ¶¶ 65-76, 88(d). That is, plaintiffs argue that they have cured the failure of their 2001 administrative claim to raise the independent contractor theory because after the seizure of the $4.3 million in Nevada, DISC and WRLJ raised the independent contractor issue in their *2009* administrative refund claims. Pls.' Summ. J. Mot. at 22.

"The existence of federal jurisdiction ordinarily depends on the facts as they exist when the complaint is filed."  *Walton v. United States*, 80 Fed. Cl. 251, 262 (2008) (quoting *Newman Green, Inc. v. Alfonzo-Lorrain*, 490 U.S. 826, 830 (1989)); *see also GAF Bldg. Materials Corp. v. Elk Corp. of Dallas*, 90 F.3d 479, 483 (Fed. Cir. 1996).  Thus, as the Federal Circuit has cautioned, "[d]etermining whether a supplemental pleading can be used to rescue an insufficient petition or complaint in a particular case depends on a careful reading of the substantive provision at issue."  *Black v. Sec'y of Health & Human Servs.,* 93 F.3d 781, 790 (Fed. Cir. 1996).  When a statute sets forth a specific process or order of events that a plaintiff must accomplish in order to vest jurisdiction in a court, a supplemental pleading does not cure the plaintiff's failure to follow the process.  *See id.*; *see also McNeil v. United States,* 508 U.S. 106, 108 (1993); *Hallstrom v. Tillamook County,* 493 U.S. 20, 31 (1989); *Weddel v. Sec'y of the Dep't of Health & Human Servs.*, 23 F.3d 388, 393 (Fed. Cir. 1994).

The administrative refund claim submitted in 2009 does not cure the jurisdictional defect created by plaintiffs' failure to raise the independent contractor issue in their 2001 administrative refund claims.  This court is only vested with jurisdiction over a refund claim when specific processes laid out in the Internal Revenue Code and its implementing regulations are followed. Permitting plaintiffs to cure a jurisdictional defect by filing a second and overlapping refund claim

27

would contravene these jurisdictional requirements by allowing taxpayers to alter the grounds for their refund claim after a suit has been filed in court, even outside the limitations period. *See Computervision*, 445 F.3d at 1372.

Plaintiffs argue that parties have previously amended their pleadings to incorporate later-filed administrative refund claims. Pls.' Suppl. Compl. Reply at 7. But in none of the cited cases did plaintiff add a theory different from those set forth in the pre-litigation administrative claim for refund. *See, e.g., Houston Indus. Inc. & Subsidiaries v. United States*, 32 Fed. Cl. 202 (1994), *appeal dismissed*, 78 F.3d 564, 565-66 (Fed. Cir. 1996), *and aff'd*, 125 F.3d 1442, 1443-44 (Fed. Cir. 1997); *Sharp v. United States*, 27 Fed. Cl. 52, 53 n.2 (1992), *aff'd*, 14 F.3d 583 (Fed. Cir. 1993). Allowing an amendment at this point would permit plaintiffs to raise a claim not appearing in their initial administrative refund claims, which would contravene the variance statute. *Computervision Corp. v. United States,* 62 Fed. Cl. 299, 326 (2004), *aff'd*, 445 F.3d at 1355; *see also* I.R.C. § 7422(a).

Allowing plaintiffs in this case to raise new and different administrative claims after the case has been brought to court to "cure" the jurisdictional defect created by the variance doctrine would contravene the fundamental goal of that doctrine "and thus effectively would read [I.R.C. § 7422(a)] out of the statute."[27] *Weddel*, 23 F.3d at 393*; see also Black*, 93 F.3d at 791; *Harris v. United States*, No. 99-228, 2000 WL 141272, at *2 (Fed. Cl. Jan. 6, 2000). Therefore, plaintiffs remain barred by the variance doctrine from asserting a claim for refund relating to the $4.3 million that was seized in Nevada. Accordingly, the Court **DENIES** plaintiffs' motion to the extent that it seeks to add a claim for refund of the money seized in Nevada based on the independent contractor theory.

---

[27] Defendant also asserts that I.R.C. § 7122(a) and Executive Order No. 6166, § 5 (June 10, 1933), *reprinted in* 5 U.S.C. § 901, transfer all authority to "compromise" a dispute from the IRS to the Department of Justice once a lawsuit regarding the dispute is filed in court. The Court agrees that this rationale provides an additional basis for preventing plaintiffs from "curing" the jurisdictional defect raised by the variance doctrine. If the IRS had granted plaintiffs' 2009 refund claim, the agency would have conceded that plaintiffs were entitled to a refund on a portion of their claim in this court, an action that would constitute a partial "compromise." *See Computervision*, 445 F.3d at 1372; *Int'l Paper Co. v. United States*, 36 Fed. Cl. 313, 321-22 (1997). If the IRS had denied the 2009 refund claims, such action would waive defendant's variance defense and would, therefore, also "compromise" defendant's case because it would decide "whether and in what manner to . . . defend" part of the case. Exec. Order No. 6166, § 5. Thus, the IRS was without authority to allow or disallow any claims for refund regarding the original tax assessments because all authority transferred to the DOJ when plaintiffs' complaints were filed in this court in 2002. The IRS may not take either action after a lawsuit has been filed. *See Computervision,* 445 F.3d at 1371-72.

2.      Plaintiffs May Amend to Add Their "Illegal Exaction" Claim and
        Supplement Their Complaint to Include Allegations About the Events in
        Nevada

Next, defendant argues that the motion to amend the complaint to include an illegal
exaction claim should be denied as futile because the court lacks jurisdiction to hear that claim.
Def.'s Supp. Compl. Opp. at 33.  Alternatively, defendant argues that this cause of action must be
dismissed under Rule 12(b)(6) because plaintiffs have failed to adequately plead an ownership
interest in the property exacted, a prerequisite to maintaining an illegal exaction suit.  *Id.* at 36.

An "illegal exaction" occurs when money was "improperly paid, exacted, or taken from
the claimant in contravention of" federal law.  *Norman v. United States*, 429 F.3d 1081, 1095
(Fed. Cir. 2005) (quoting *Eastport S.S. Corp. v. United States*, 372 F.2d 1002, 1007 (Ct. Cl.
1967)).  This court hears illegal exaction claims pursuant to the Tucker Act, 28 U.S.C.
§ 1491(a)(1), because a viable illegal exaction claim is predicated on a "statute or provision [that]
provides, either expressly or by 'necessary implication,' that 'the remedy for its violation entails a
return of money unlawfully exacted."  *Id.* (quoting *Cyprus Amax Coal Co. v. United States*, 205
F.3d 1369, 1373 (Fed. Cir. 2000)).  Thus, to maintain an illegal exaction claim in this court,
plaintiffs must demonstrate that a "statute or [regulatory] provision caused an exaction," and that
the statute implies that the remedy is the return of the money.  *Strategic Hous. Fin. Corp. of
Travis County v. United States*, 86 Fed. Cl. 518, 549 (2009), *aff'd in relevant part*, 608 F.3d 1317
(Fed. Cir. 2010); *see also Norman*, 77 F.3d at 1095.

A tax refund suit is the classic example of an illegal exaction claim.  *Clintwood Elkhorn
Mining Co. v. United States* ("*Clintwood*"), 553 U.S. 1, 8-9 (2008); *Norman*, 429 F.3d at 1095;
*City of Alexandria v. United States*, 737 F.2d 1022, 1028 (Fed. Cir. 1984).  In a tax refund suit,
the taxpayer alleges that the Government, via the IRS, "has the citizen's money in its pocket," that
is, money that belongs to the taxpayer has been exacted by the Government.  *Aerolineas
Argentinas v. United States*, 77 F.3d 1564, 1573 (Fed. Cir. 1996) (quoting *Clapp v. United States*,
117 F. Supp. 576, 580 (Ct. Cl. 1954)).  The appropriate remedy for such a wrong is the return of
the money.  28 U.S.C. § 1346(a)(1); *see also Demes v. United States*, 52 Fed. Cl. 365, 370 (2002).

Defendant has conceded that if plaintiffs prevail in these actions, it would be required to
"refund . . . [the] money collected" in Nevada.  Def.'s Supp. Compl. Opp. at 36.  Plaintiffs merely
ask that the Court consider the money "exacted" in Nevada as part of the final resolution of these
actions.  Pls.' Supp. Compl. Reply at 12.  Defendant is, therefore, incorrect that plaintiffs have
not alleged the violation of a statute that implies as a remedy the return of money to plaintiffs.

Defendant further argues that because plaintiffs' "illegal exaction" cause of action is
subject to the procedural strictures of the Internal Revenue Code, *Clintwood,* 553 U.S. at 8-9,
plaintiffs must demonstrate that they filed an administrative refund claim and the cause of action
may not vary from this administrative claim.  Def.'s Supp. Compl. Opp. at 34.  This proposition is

undoubtedly true.  *See Clintwood*, 553 U.S. at 8-9.  But because defendant argues that the taxes at issue in Nevada are a part of those at issue in these cases, the original 2001 administrative refund claim allows plaintiffs to seek a refund of this money on the grounds asserted in their 2001 refund claim.  Def.'s Supp. Compl. Opp. at 36.  Because these lawsuits put all of the amounts assessed in controversy, plaintiffs may seek a refund of the money allegedly illegally exacted on the same grounds plaintiffs raised in their 2001 administrative claims for refund.

Defendant also seeks to dismiss the illegal exaction claims because plaintiffs have allegedly not adequately pleaded an ownership interest in the funds seized in Nevada.  But plaintiffs' argument in the Nevada action is that the levies against DISC and WRLJ were "wrongful . . . because [plaintiffs] have no property or rights to property in DISC[] and WRLJ's bank accounts at Wells Fargo."  Nevada Compl. ¶¶ 51, 54.  Plaintiffs could, however, lose in the Nevada action and prevail here.  In that event, the only means of protecting their claim for the refund of the Nevada funds is to present a claim to this court "that the $4.3 million is either property of the taxpayers or represented rights to property."  Proposed Compl. ¶ 72.  Rule 8(d)(3) expressly provides that plaintiff "may state as many separate claims or defenses as it has, regardless of consistency."  *See Stockton E. Water Dist. v. United States*, 583 F.3d 1344, 1368 (Fed. Cir. 2009). Plaintiffs have, therefore, sufficiently pleaded an ownership interest in the Nevada money to assert a right to its return.[28]

Finally, the Court finds that defendant will not suffer prejudice as a result of the addition of this cause of action, which adds no new issues to the proceedings.  Defendant's arguments regarding prejudice focus only on whether plaintiffs should be able to "inject their independent contractor theory" into the proceedings, which the Court has already precluded.  Def.'s Supp. Compl. Opp. at 21.  Thus, defendant's concerns regarding prejudice are moot.[29]

---

[28] For similar reasons, defendant's argument about whether plaintiffs have adequately pre-paid the $4.3 million in Nevada in order to seek a refund is unavailing.  Def.'s Supp. Compl. Opp. at 29-30.  This argument fails to account for the realities of plaintiffs' situation.  Certainly if DISC and WRLJ prevail in the Nevada action, plaintiffs' "illegal exaction" cause of action will necessarily fail here—none of plaintiffs' property will have been exacted.  But the "conditional" nature of the seizure is accounted for in the alternate nature of the pleading, which merely protects plaintiffs in the event that they lose in Nevada but prevail here.  That is, the cause of action here assumes as a factual predicate that plaintiffs are found to have a property interest in the $4.3 million and this money is not returned to DISC or WRLJ.

[29] The Court considers plaintiffs' 2001 administrative refund claim to put at issue plaintiffs' entire tax liability, including any subsequent credits against their liability.  The Court will permit plaintiff to assert this cause of action but is mindful of its potential overlap with the original claim for refund.  *Cf. Anchor Sav. Bank, FSB v. United States*, 81 Fed. Cl. 1, 133 (2008) (controlling against double recovery based on partially overlapping causes of action).

B.      *Plaintiffs May File a Consolidated, Amended and Supplemental Complaint*

Plaintiffs further seek leave to file their complaints as a single consolidated, amended and supplemental complaint. Pls.' Supp. Compl. Mot. at 8. The new consolidated complaint would include factual allegations that plaintiffs assert were developed in discovery. Defendant opposes, contending that because the seizure of funds in Nevada did not affect all of the plaintiffs here, this tactic is an attempt to raise the independent contractor theory with respect to plaintiffs that were not affected by the seizure in Nevada. Def.'s Supp. Compl. Opp. at 10 n.8. However, the danger of such "bootstrapping" is non-existent, given that the Court has precluded plaintiffs from raising their independent contractor theory.

In the absence of this concern, a single consolidated complaint would serve the interests of administrative convenience and would ameliorate a significant logistical burden on the parties and the Court. Plaintiffs attached exhibits to the proposed consolidated complaint dealing with each individual plaintiff, providing a roadmap to the allocation of the total amount of any refund among the plaintiffs. Proposed Compl. Exs. A-J.

The Court also finds that good cause exists to modify the January 2007 scheduling order to permit the amendment of the complaint to include allegations of facts learned through discovery. *See* RCFC 16(b)(4); *see also Burns ex rel. Office of Pub. Guardian v. Hale & Dorr, LLP*, 242 F.R.D. 170, 174 (D. Mass. 2007) (holding that good cause exists when facts came to light as a result of discovery). The addition of these facts will not require any changes in the course of future proceedings and will not prejudice defendant. That is, "such an amendment [will not] result in any other change to the scheduling order or further delay the proceedings."[30] *Id.*

Accordingly, plaintiffs' motion for leave to file a consolidated, amended and supplemental complaint is **GRANTED IN PART** and **DENIED IN PART**. Plaintiffs may not assert claims based on their independent contractor theory. Plaintiffs are permitted, however, to file a consolidated, amended and supplemental complaint setting forth factual allegations based upon information developed during discovery. Plaintiffs may also add factual allegations relating to the events in Nevada and assert an illegal exaction claim seeking return of the $4.3 million seized from the Wells Fargo accounts in Nevada, although the independent contractor theory remains barred as to those funds.

---

[30] Defendant's argument that many of the allegations are of "dubious veracity" is beside the point. Def.'s Supp. Compl. Opp. at 9 n.6. Defendant has already controverted those allegations, thereby identifying factual matters that may be in dispute. Such factual disputes can, if necessary, be resolved in the course of further proceedings.

V.     **Defendant's Assessments Are Entitled to a Presumption of Correctness and the Burden of Proof with Respect to the Amounts Owed by Plaintiffs is Properly on Plaintiffs**

Finally, plaintiffs allege that the IRS's assessments in these cases do not warrant the ordinary "presumption of correctness" and seek to shift the burden of proof to defendant.[31]  Pls.' Burden Shift Mot. at 1; Pls.' Burden Shift Reply at 2.

In general, a tax refund suit is a *de novo* proceeding and any subsidiary factual findings of the IRS are given no weight by the court.  *Cook*, 46 Fed. Cl. at 113; *Sara Lee Corp. & Subsidiaries v. United States*, 29 Fed. Cl. 330, 334 (1993).  But the procedures followed by the IRS in assessing taxes ordinarily create two significant advantages for the Government.  First, the IRS assessment is presumed to be correct, and the taxpayer bears the burden of coming forward with evidence to overcome this presumption.[32]  *Helvering v. Taylor*, 293 U.S. 507, 515 (1935); *Barenholtz v. United States*, 784 F.2d 375, 379 n.7 (Fed. Cir. 1986); *see also Cook*, 46 Fed. Cl. at 114; *Sara Lee*, 29 Fed. Cl. at 334.  Second, "[e]ven after satisfying this burden [of overcoming the presumption of correctness], the taxpayer must still carry the ultimate burden of proof."  *Danville Plywood Corp. v. United States*, 899 F.2d 3, 8 (Fed. Cir. 1990); *see also Cook*, 46 Fed. Cl. at 115-16.

The presumption of correctness ordinarily "prohibits a court from looking behind the Commissioner's determination, even though it may be based on hearsay or evidence inadmissible at trial."  *Cook*, 46 Fed. Cl. at 114.  But if the Court finds that the assessment is "naked," *i.e.,* "without [a]ny foundation whatsoever," then the presumption does not apply.  *United States v. Janis*, 428 U.S. 433, 441 (1975); *see also Carson*, 560 F.2d at 696; *Cook*, 46 Fed. Cl. at 144.  A "naked" assessment

must be more than incorrect, for the correctness of the amount assessed is quite irrelevant.  It must be arbitrary in the sense that the calculation has no support and the true amount of tax owed is incapable of being ascertained.  Thus, where records

---

[31] Although courts generally refer to two parts of the burden of proof—the burden of production and the risk of non-persuasion—"in this court, which conducts trials without juries and does not employ a directed verdict procedure, the burden of production is largely meaningless."  *Cook v. United States*, 46 Fed. Cl. 110, 116 n.13 (2000).  From this point forward, the Court will use the term "burden of proof" to refer to the ultimate risk of non-persuasion.  *Id.*

[32] The presumption of correctness is ordinarily justified because of the "strong need of the government to accomplish swift collection of revenues and in order to encourage recordkeeping by taxpayers."  *Cook*, 46 Fed. Cl. at 114 (quoting *Carson v. United States*, 560 F.2d 693, 696 (5th Cir. 1977)).

> supporting an assessment were excluded from evidence, or are nonexistent, so that
> the basis upon which an assessment is calculated is beyond the knowledge of the
> court, the assessment is "arbitrary and erroneous."   It is beyond saving.

*United States v. Schroeder*, 900 F.2d 1144, 1149 (7th Cir. 1990) (internal citations omitted).

An assessment is not "naked" "as long as the method the IRS used" to estimate the amount of liability "is a 'reasonable' one."  *Fior d'Italia*, 536 U.S. at 243.  Courts "have stressed that 'scantily clothed' is not 'naked.'"  Boris I. Bittker & Lawrence Lokken, FEDERAL TAXATION OF INCOME, ESTATES AND GIFTS ¶ 115.4.2 (rev. ed. 2010); *see also, e.g., Day v. Comm'r*, 975 F.2d 534, 537-38 (8th Cir. 1992); *Pollard v. Comm'r*, 786 F.2d 1063, 1065 (11th Cir. 1986).

Plaintiffs argue that the notices of disallowance issued pursuant to Internal Revenue Manual § 4.23.12.4 were so "perfunctory" and "ministerial in nature" that they should not be afforded a presumption of correctness.[33]  Pls.' Burden Shift Mot. at 3 (quoting 30(b)(6) Dep. at 100-01).  But it is the underlying tax assessments—not the act of disallowing plaintiffs' administrative refund claims—that receive the presumption of correctness.  Moreover, it was plaintiffs who requested the "perfunctory" disallowance in order to pursue immediate court action. Plaintiffs could have pursued other administrative remedies, such as an administrative appeal, but elected not to do so.[34]

Next, plaintiffs assert that the TAM "provided clear marching orders for the examination team: determine the FUTA and FICA wage bases for each production company with which each production worker has a common-law employment relationship," but the errors they allege simply restate their substantive disagreements with the assessments.  Pls.' Burden Shift Mot. at 5.  For example, plaintiffs maintain that the assessments were "grossly overstated" because of the IRS's "double-counting" of "millions of dollars of wages," but in the next sentence recognize that this alleged error is one of the bases of their claim for refund, namely, the "aggregation issue."  Pls.' Burden Shift Mot. at 8.  They likewise restate their independent contractor theory as contravening an allegedly clear instruction in the TAM not to include "hundreds of millions of dollars paid to individuals who had *no common-law employer at all*," *i.e.,* independent contractors.[35]  *Id.* at 9.

---

[33] I.R.M. § 4.23.12.4 requires the IRS to disallow an administrative claim for refund without further analysis if the issue has already been fully examined and the plaintiffs request an automatic disallowance.  *See supra* note 8 and accompanying text.

[34] Plaintiffs' reliance on *Sara Lee Corp.,* 29 Fed. Cl. at 331, is also misplaced.  *Sara Lee* did not involve a final action by the Commissioner.  *Id.* at 336.

[35] The other allegations relate to substantive disputes that are already resolved: the matter of the SUI credits, Pls.' Burden Shift Mot. at 15, which was resolved by court decision; and assessment of penalties, which the parties have settled.  *Id.*

Mere allegations of error on the part of the agency are not sufficient to show that an assessment is naked.  *Schroeder*, 900 F.2d at 149.  If plaintiff were correct, any challenged assessment would be considered naked, eviscerating the presumption of correctness.

The IRS assessments rested upon extensive analysis and evidence, including a statement of facts that plaintiffs agreed to, a "16-page, factor-by-factor analysis" in the TAM request, and the legal analysis in the TAM as promulgated, in which the OCC agreed with the position taken by the IRS.[36]  Def.'s Burden Shift Opp. at 9-11.  Whether the IRS's rationale is correct is ultimately a question to be decided by the Court *de novo*.  But the assessments certainly have some rational foundation.  Thus, the presumption of correctness remains applicable.

Plaintiffs lastly contend that the the destruction of documents described above—in addition to supporting an adverse inference regarding a waiver of the specificity requirement, *see supra* Part II.B.1—also warrants depriving the assessments of the presumption of correctness.  But the IRS may rely on any evidence to demonstrate that its assessments have a rational foundation; "it is irrelevant whether it is the same evidence that the Service relied upon in originally making its assessment."  *Cook*, 46 Fed. Cl. at 114; *see also Tucker v. United States*, 8 Cl. Ct. 180, 187-88 (1988), *modified on other grounds*, 8 Cl. Ct. 575 (1988).  Defendant has amply demonstrated a rational basis for its assessments.  The loss or destruction of certain files does not warrant the Court's abrogation of the presumption.

Plaintiffs' argument that defendant should bear the ultimate burden of proof on its counterclaims also fails.  In a refund suit, even after rebutting the presumption of correctness, the taxpayer bears the burden of proving the "exact dollar amount of the alleged overpayment to which it claims a refund."  *Sara Lee*, 29 Fed. Cl. at 334; *see also Cook*, 46 Fed. Cl. at 116.  When the taxpayer seeks a refund of a divisible tax, such as in these cases, it bears the burden on its affirmative claims.  The Government technically bears the burden of proof on its counterclaims.  But when the presumption of correctness attaches—*i.e.,* the assessment is not shown to be "naked"—defendant establishes a *prima facie* case by offering a certified copy of the assessment into evidence, and the burden then shifts to plaintiffs to establish the amount of the alleged overpayment and the resultant refund due to plaintiffs.  *Brinskele v. United States*, 88 Fed. Cl. 334, 339 (2009); *Cook*, 46 Fed. Cl. at 118-19; *see also Adams v. United States*, 358 F.2d 986, 994 (Ct. Cl. 1966).  Here, defendant's proffer of plaintiffs' tax assessments and the rational basis therefor shifts the burden of proof to plaintiffs on defendant's counterclaims.

---

[36] Plaintiffs appear to argue that defendant cannot rely upon this analysis because none of these actions were taken after 1999, the "point in time the IRS actually prepared the assessments."  Pls.' Burden Shift Reply at 3.  Plaintiffs cite no law creating such a temporal limitation on the evidence the IRS may rely upon in arguing that the assessments have a rational foundation.  Moreover, this argument is belied by plaintiffs' own description of the facts in these cases, which places heavy emphasis on the TAM process as the focus of the parties' efforts.  *See, e.g.,* Pls.' Summ. J. Mot. at 10.

Therefore, plaintiffs' motion, based in part on their request for a spoliation sanction, that seeks to abrogate the presumption that the assessments are correct and to shift the burden of proof to defendant with respect to its counterclaims is **DENIED**.

## CONCLUSION

For the above reasons, defendant's Motion *in Limine*, treated as a motion to dismiss for lack of subject matter jurisdiction, is **GRANTED**.  Plaintiffs are precluded from raising the claim that they are entitled to a refund because certain of the production workers were independent contractors.  Plaintiffs' cross-motion for partial summary judgment that the Court has jurisdiction over plaintiffs' independent contractor theory is **DENIED**.  Plaintiffs' motion for an order shifting the burden of proof on the accuracy of defendant's assessments is **DENIED**; their motion for a spoliation sanction is also **DENIED**.  Plaintiffs' motion for leave to file a consolidated, amended and supplemental complaint is **GRANTED IN PART** and **DENIED IN PART**.

In view of the foregoing, the Court **FURTHER ORDERS** as follows:

(1) Plaintiffs shall file their Consolidated Amended and Supplemental Complaint on or before **Friday, September 10, 2010**, in the form filed with their Motion for Leave to File Amended and Supplemental Consolidated Complaint, except that plaintiffs' Consolidated, Amended and Supplemental Complaint **shall not include paragraphs 82(d) and 88(d)**, which set forth claims for relief predicated on the theory that certain of the production workers were independent contractors.

(2) Defendant shall answer or otherwise respond to plaintiffs' Consolidated, Amended and Supplemental Complaint by **Friday, September 24, 2010**.

(3) Plaintiffs shall file their reply, if any, to defendant's response by **Friday, October 15, 2010**.

(4) The parties shall file a joint status report by **Friday, October 22, 2010**, describing the issues that remain to be resolved, the current status of discovery, and the nature and timing of further proceedings looking toward a final decision on the merits with respect to the remaining issues.

(5) The parties shall participate with the Court in a status conference on **Friday, October 29, 2010 at 10.00 a.m. Eastern Time at the National Courts Building, 717 Madison Place N.W., Washington, D.C.,** to discuss the contents of the parties' October 22, 2010 joint status report.

**IT IS SO ORDERED.**

  s/ George W. Miller
GEORGE W. MILLER
Judge